## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| TIEQIAO ("TIM") ZHANG, Individually, and as the Independent Administrator of the Estate of ALBERT LIANG (a/k/a ALBERT ZHANG and f/k/a LIANGSHENG ZHANG), deceased; and JING ("LINDA") LIANG, | ) ) ) ) | CIVIL ACTION NO.: |
| Plaintiffs, | ) | |
| v. | ) ) | |
| EMORY UNIVERSITY; | ) | |
| Defendant. | | |

_____

## COMPLAINT FOR PERSONAL INJURIES AND WRONGFUL DEATH AND DEMAND FOR TRIAL BY JURY

COME NOW Plaintiffs, TIEQIAO ("TIM") ZHANG, individually and as

the Independent Administrator of the Estate of ALBERT LIANG (a/k/a ALBERT

ZHANG and f/k/a LIANGSHENG ZHANG), deceased, and JING ("LINDA")

LIANG, and sue Defendant, EMORY UNIVERSITY, and allege as follows:

## PARTIES

1.

Plaintiff TIEQIAO ("TIM") ZHANG (hereinafter referred to as "TIM ZHANG") is the natural parent of ALBERT LIANG (a/k/a ALBERT ZHANG and f/k/a LIANGSHENG ZHANG), deceased (hereinafter referred to as "ALBERT").

2.

Plaintiff JING ("LINDA") LIANG (hereinafter referred to as "LINDA LIANG") is the natural parent of ALBERT.

3.

ALBERT, the deceased, was born on October 21, 2001; he was the natural child of TIM ZHANG and LINDA LIANG.

4.

At the time of ALBERT's death by suicide on August 30, 2019, he was a minor child, seventeen (17) years of age.

5.

TIM ZHANG is the duly appointed Independent Administrator of the Estate of ALBERT; a copy of his March 3, 2020 Letters of Independent

Administration, issued in the Probate Court of Dallas County, Texas, is attached hereto as Exhibit "A".

6.

TIM ZHANG, as the Independent Administrator of the Estate of ALBERT, is the proper party to maintain this action, and to recover damages, for ALBERT's survival action.

7.

TIM ZHANG and LINDA LIANG (hereinafter sometimes referred to as "parent" or "parents"), in their individual capacities, are the proper parties to maintain this action, and to recover damages for, the claim for ALBERT's wrongful death.

8.

Defendant EMORY UNIVERSITY (hereinafter referred to as "EMORY") is an educational institution and, at all times pertinent hereto, is and was a Domestic Nonprofit Corporation with its principal location in Atlanta, DeKalb County, Georgia.

9.

EMORY can be served with process through its duly-appointed registered agent, Amy Adelman, at 201 Dowman Drive, 101 Administration Bldg., Atlanta, Georgia 30322-1018.

## VENUE AND JURISDICTION

10.

TIM ZHANG and LINDA LIANG are, and at all times pertinent hereto were, residents and citizens of the state of Texas.

11.

ALBERT was, at all times pertinent hereto, a resident and citizen of the state of Texas.

12.

EMORY is, and at all times pertinent hereto was, a resident and citizen of the state of Georgia.

13.

Subject matter jurisdiction is proper under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Plaintiffs and Defendant, and Plaintiffs' claims for damages, including for wrongful death and the survival action, exceed $75,000.00.

14.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and Northern District of Georgia Local Rule 3.1.

## FACTS

## ALBERT in the United States

15.

On September 13, 2000, TIM ZHANG and LINDA LIANG were married in their native China.

16.

At the time he married LINDA LIANG in 2000, TIM ZHANG had a Ph.D. in Physics from Peking University (awarded in 1999).

17.

At the time she married TIM ZHANG in 2000, LINDA LIANG had a Bachelor's Degree in Computer Engineering from Taiyuan University of Science and Technology (awarded in 1997).

18.

After they were married in 2000, TIM ZHANG and LINDA LIANG emigrated from China to Japan.

19.

On October 21, 2001, ALBERT was born to TIM ZHANG and LINDA LIANG while they were living in Japan.

20.

In 2002, TIM ZHANG and LINDA LIANG immigrated to the United States.

21.

From 2002 through 2005, ALBERT lived in China with his maternal grandmother; at age three (3), ALBERT immigrated to the United States.

22.

From the date ALBERT immigrated to the United States, through the date of ALBERT's death by his own hand on August 30, 2019 at the tender age of seventeen (17), TIM ZHANG, LINDA LIANG and ALBERT lived together as a family.

23.

After immigrating to the United States, TIM ZHANG and LINDA LIANG had two (2) more children: ALBERT's little brother, Bradley

Liang (born June 5, 2008), and ALBERT's little sister, Claire Liang (born December 30, 2012).

24.

In 2014, TIM ZHANG, LINDA LIANG and ALBERT (then 13 years of age), along with Bradley Liang and Claire Liang, moved to Dallas, Texas, and continued to live there together, as a family, until ALBERT's death.

25.

When ALBERT reached his teenage years, consistent with the adolescent behavior of most teenage boys, he developed difficulties in his relationship with his parents, which continued until ALBERT's death at age seventeen (17) in 2019.

26.

Since 2014, TIM ZHANG has been employed at the University of Texas Southwestern Medical Center in Dallas, Texas; his current position is Senior Research Scientist.

27.

During this time of TIM ZHANG's employment in Dallas, Texas, while ALBERT was attending school, LINDA LIANG was primarily a stay-at-home mother.

28.

On May 9, 2017, in a ceremony conducted in Irving, Texas, TIM ZHANG, LINDA LIANG and ALBERT became naturalized citizens of the United States.

## ALBERT in High School

29.

ALBERT was educated in the public school system of Texas; he attended Highland Park High School ("Highland Park") in Dallas, Texas in its Talented and Gifted Program, where he was designated as a Non-Hispanic Asian student.

30.

While attending Highland Park from 2014 through 2018, ALBERT was already engaged in pre-professional activities.

31.

In December, 2015, at age fourteen (14), ALBERT obtained an appointment as a Research Intern at Southern Methodist University, where he served through August, 2017.

32.

In June, 2017, at age fifteen (15), ALBERT obtained an appointment as a Research Assistant at the University of Texas at Arlington, where he served through January, 2018.

33.

While attending Highland Park, ALBERT served as President of the school's Asian Student Association, and was more widely engaged as a community activist: he tutored recent immigrants and asylees in math, English and science; and he was awarded the Ben Wiseman Scholarship, which recognized ALBERT's good citizenship, his involvement in school and extracurricular activities, and his commitment to community service.

34.

While attending Highland Park, ALBERT was also recognized as an outstanding scholar: he was a Voula Steinberg Scholar for Excellence in Mathematics; he was a National Merit Semifinalist; he was Captain of the University Interscholastic League Science Team; he was a Semifinalist in the Siemens Competition in Math, Science and Technology; and he won First Place in the Texas Math and Science Coaches Association Competitions in 2015 and 2016.

35.

On June 1, 2018, at the age of sixteen (16), ALBERT graduated from Highland Park with a Distinguished Level of Achievement and a Performance Acknowledgement for Bilingualism/Biliteracy; and Endorsements in the Arts

and Humanities, Multidisciplinary Studies and STEM (Science, Technology, Engineering and Mathematics).

36.

ALBERT graduated from Highland Park with a 4.596 Grade Point Average (GPA), and was ranked number eight (8) in his class of 548 graduates.

37.

ALBERT's expressed academic interest at the time of his graduation from Highland Park was to study Computer Science and Economics as a pre-med student, with the goal of helping society meld the fields of artificial intelligence and medicine.

38.

After graduation from Highland Park, ALBERT served as a Summer Research Assistant at the University of Texas Southwestern Medical Center from June, 2018 through September, 2018.

39.

During the Summer after graduation from Highland Park, ALBERT was enrolled at Southern Methodist University.

40.

Presented with opportunities from a number of the country's most prestigious universities as a Freshman beginning in the 2018/2019 academic year, many of which opportunities included various levels of merit scholarships, ALBERT and his parents decided that it was in their best interests that ALBERT, who was leaving home to live on his own for the first time in his life, accept EMORY's offer of admission and a full merit scholarship, the details of which are more fully described below.

**By the beginning of the 2018/2019 academic year,
EMORY and its staff, faculty and administrators were uniquely aware of the
risk factors, warning signs and behaviors of college student suicide,
and methods of suicide prevention**

41.

In 2004, the United States experienced a wave of college campus suicides; EMORY was already experimenting with different approaches to identifying troubled students who needed help, and to prevent them from considering, committing and dying by suicide.

42.

By 2011, it was already well established in the medical literature, and known to EMORY, that, among Asian Americans, a "recent academic problem"

was among the top three (3) most frequent significant events occurring before the development of suicidal ideation.

43.

In 2017, the year ALBERT turned sixteen (16), the Journal of the American Medical Association published a report (the 2017 JAMA report) that suicide rates among those aged fifteen (15) to twenty-four (24) had reached a seventeen (17) year high, all of which was known to EMORY prior to the 2018/2019 academic year.

44.

The 2017 JAMA report further revealed that, during that seventeen (17) year period (which encompasses the span of ALBERT's life), suicide rates among teens aged fifteen (15) to nineteen (19) had spiked, from eight (8) per 100,000 people, to nearly twelve (11.8) per 100,000 people, all of which was known to EMORY prior to the 2018/2019 academic year.

45.

The 2017 JAMA report noted that, nationally, during the year in 2017, there were 6,241 suicides involving fifteen (15) to twenty-four (24) year-olds, and that overwhelming majority (5,016) of these suicides were committed by males, all of which was known to EMORY prior to the 2018/2019 academic year.

46.

As of September 2017, according to its own statistics, during the previous twelve (12) months, nearly one (1) of every one hundred (100) students attending EMORY had attempted suicide.[1]

47.

At all times pertinent hereto, EMORY employed an individual named Nadine Kaslow, Ph.D. ("Professor Kaslow"), the 2014 President of the American Psychological Association, as Professor of Psychiatry and Behavioral Sciences, and Vice Chair for Faculty Development, at its School of Medicine.

48.

Prior to the 2018/2019 academic year, Professor Kaslow's primary areas of research focus included child and adolescent psychopathology, with particular attention to the assessment and treatment of suicidal youth.

49.

Prior to the 2018/2019 academic year, Professor Kaslow authored the article, *"What to Do if You're Worried About Suicide"*, on the *Child Mind Institute*

---

[1]   In 2017, EMORY had 14,263 enrolled students. https://datausa.io/profile/university/emory-university

website, which article emphasized the importance of a parent's role with an at-risk child, including parents showing the child love and empathy.

50.

At all times pertinent hereto, Professor Kaslow's knowledge regarding the risk factors, warning signs and behaviors, and methods of prevention, of college student suicide was imputed to EMORY.

51.

At all times pertinent hereto, Professor Kaslow was available as an internal resource to EMORY and its staff, faculty and administrators in implementing and employing its methods of protecting its students from considering, committing and dying by suicide.

52.

At all times pertinent hereto, Professor Kaslow was the "Organization Contact" for EMORY's Suicide Prevention Research Center.

53.

At all times pertinent hereto, and prior to the 2018/2019 academic year, EMORY's Suicide Prevention Research Center recognized, as an at-risk group for selective efforts, those students who are male.

54.

At all times pertinent hereto, and prior to the 2018/2019 academic year, EMORY's Suicide Prevention Research Center recognized, as an at-risk group for selective efforts, those students who are of Asian descent.

55.

At all times pertinent hereto, and prior to the 2018/2019 academic year, EMORY's Suicide Prevention Research Center recognized, as an at-risk group for selective efforts, those students who are Lesbian/Gay/Bisexual/Transgender/ Questioning (LGBTQ).

56.

In 2009, Professor Kaslow, in her capacity as Professor of Psychiatry and Behavioral Sciences at EMORY School of Medicine, received a three (3) year Garrett Lee Smith Memorial Campus Suicide Prevention grant ("Smith grant") to help Professor Kaslow develop and build a campus-wide Suicide Prevention Program.

57.

At all times pertinent hereto, and prior to the 2018/2019 academic year, the specific goals of EMORY's Suicide Prevention Program included efforts to ensure

that EMORY's staff, faculty and administrators had a suicide response and prevention plan in place to address the issue of at-risk students.

58.

One component of EMORY's Suicide Prevention Program was "gatekeeper" training, which teaches people how to recognize and react to suicide warning signs.

59.

In 2009, as a result of its Smith grant, and as part of its "gatekeeper" training, EMORY adopted an evidence-based suicide prevention program called Question, Persuade and Refer ("QPR"), which program trains participants to ask if someone is suicidal, and then persuade that person to get help.

60.

During the 2018/2019 academic year, and particularly on March 26, 2019, EMORY provided on-campus QPR suicide prevention training.

61.

In 2013, a team led by Professor Kaslow, in her capacity as an employee of EMORY, developed a user-friendly mobile app designed to provide continuity and follow-up linkages for persons at risk for suicide (EMORY's Suicide Prevention App), which received the $50,000.00 First Prize by the Federal

Substance Abuse & Mental Health Services Administration at its Suicide Prevention: Continuity of Care and Follow-up App Challenge.

62.

By 2015, EMORY's Suicide Prevention App was readily available to EMORY's community.

63.

In comments published in Capitol Hill Publishing Corp.'s *The Hill* regarding the results of the 2017 JAMA report, Professor Kaslow, in her capacity as an employee of EMORY, noted the particular increase in suicide among young males in the younger age group of fifteen (15) to nineteen (19).

64.

In 2017, the year prior to the 2018/2019 academic year, EMORY recognized, in its own publications, that suicide was the third highest cause of death among people between the ages of fifteen (15) and twenty-four (24), that males were more likely to complete the act of suicide, and that attempts among LGBTQ youth were four (4) times greater than attempts by others.

65.

On June 9, 2018, mere months before the beginning of the 2018/2019 academic year, in the wake of two (2) then-recent, high-profile celebrity

suicides (Kate Spade (June 6, 2018) and Anthony Bourdain (June 8, 2018)), Professor Kaslow, in her capacity as an employee of EMORY, was interviewed on the *National Public Radio* program, *All Things Considered*, during which she observed that, after a relationship ends, the risk of suicide is increased because of feelings of isolation, loneliness, and hopelessness.

66.

By the beginning of the 2018/2019 academic year, with regard to the risk of its students considering, committing and dying by suicide, EMORY knew that male, Asian students under twenty-one (21) years of age, with relationship problems, and who had difficulties with their parents, were among those identified as having the greatest risk of suicide ideation and attempts.

67.

By the beginning of the 2018/2019 academic year, EMORY knew that the risk factors for suicide included feelings of hopelessness and helplessness, impulsive tendencies, trauma or abuse, loss of a relationship, and limited support from family.

68.

By the beginning of the 2018/2019 academic year, with regard to the warning signs indicating that one of its students may be considering suicide,

EMORY knew that these warning signs included indications that the student was in an abusive relationship.

69.

By the beginning of the 2018/2019 academic year, with regard to the warning signs indicating that one of its students may be considering suicide, EMORY knew that these warning signs included difficulty adjusting to gender identity.

70.

By the beginning of the 2018/2019 academic year, with regard to behaviors indicating a serious risk of suicide, EMORY knew that such behaviors included talking about feeling trapped, especially if the behavior was new and/or seemed related to a painful event, loss, or change.

71.

By the beginning of the 2018/2019 academic year, with regard to the prevention of its students considering, committing and dying by suicide, EMORY's established approach to preventing suicide included a focus on certain student populations, including its LGBTQ students.

72.

By the beginning of the 2018/2019 academic year, EMORY's strategies for preventing suicide in its higher education community included reaching out to students when their risk factors, warning signs and behaviors were just developing, so that fewer students would consider, attempt and die by suicide.

73.

By the beginning of the 2018/2019 academic year, EMORY knew that the top two (2) protective factors to prevent suicide were family support, and community support from teachers, bosses and individuals of authority.

74.

By the beginning of the 2018/2019 academic year, EMORY's staff, faculty and administrators, for a significant period of time, had been directed to attend, and had attended, training to recognize and focus upon those students at risk of considering, committing and dying from suicide, and helping them obtain necessary services.

### EMORY admits sixteen (16) year old ALBERT as a Woodruff scholar for the 2018/2019 academic year[2]

75.

On or about February 16, 2018, ALBERT and his parents accepted an invitation from EMORY for ALBERT to attend EMORY's Scholar Finalists' Week program, on EMORY's campus, from March 26, 2018 through March 29, 2018.

76.

The paperwork that EMORY required for ALBERT's attendance at its Scholar Finalists' Week program included: LINDA LIANG's email address and her daytime, mobile, work and emergency contact telephone numbers; TIM ZHANG's mobile telephone number; and Bradley Liang's mobile telephone number, which information, at all times pertinent hereto, remained readily available in the files of EMORY, in its Scholar Program files, and to its Scholar Program staff.

---

[2] EMORY's 2018/2019 academic year consisted of the Fall 2018 Semester (August through December, 2018), and the Spring 2019 Semester (January through May, 2019).

77.

The paperwork that EMORY required for ALBERT's attendance at its Scholar Finalists' Week program, at all times pertinent hereto, remained readily available in the files of EMORY, in its Scholar Program files, and to its staff, faculty and administrators.

78.

When ALBERT attended EMORY's Scholar Finalists' Week program, EMORY advised that, as an incoming Freshman in its Scholar Program, ALBERT would be required to live on-campus, providing ALBERT's parents with the assurance that ALBERT would be provided with safe shelter, and that he would be living under EMORY's watchful eye.

79.

When ALBERT attended EMORY's Scholar Finalists' Week program, EMORY further advised that, as an incoming Freshman in its Scholar Program, ALBERT would also be under EMORY's watchful eye academically, in that ALBERT would be assigned an individually selected advisor, providing ALBERT's parents with the further assurance that ALBERT would matriculate under EMORY's close supervision, care and protection.

80.

As a result of, and in reliance upon, the representations made by EMORY to ALBERT during its Scholar Finalists' Week program, and through other communications sent to ALBERT and his parents prior to the beginning of the 2018/2019 academic year, ALBERT and his parents accepted EMORY's selection of ALBERT to membership in its self-proclaimed "esteemed" Scholar Program.

81.

As a further result of, and in reliance upon, the representations made by EMORY to ALBERT during its Scholar Finalists' Week program, and through other communications sent to ALBERT and his parents prior to the beginning of the 2018/2019 academic year, ALBERT and his parents accepted EMORY's offer to ALBERT of a Robert W. Woodruff merit scholarship ("Woodruff scholarship"), a scholarship that provided ALBERT with full tuition, fees, and room and board, for four (4) years.

82.

The paperwork that EMORY required for ALBERT's Woodruff scholarship, and for his membership in EMORY's Scholar Program, included TIM ZHANG's email address and LINDA LIANG's mobile telephone number, which information, at all times pertinent hereto, remained readily available in

the files of EMORY, in its Scholar Program files, and to its staff, faculty, and administrators.

83.

On or about May 2, 2018, ALBERT submitted his official application for admission to EMORY; however, because ALBERT was a minor, his application was not considered by EMORY to be complete until it was signed by a parent or guardian.

84.

A signature of ALBERT's parent was submitted to EMORY on or about May 24, 2018.

85.

After the signature of ALBERT's parent was submitted to EMORY, ALBERT was accepted as a Freshman for EMORY's 2018/2019 academic year.

86.

At all times pertinent hetero, EMORY was aware of Highland Park's designation of ALBERT as a Non-Hispanic Asian student.

87.

In accepting ALBERT as a Freshman in its 2018/2019 academic year, EMORY designated ALBERT as an Asian American student.

88.

As ALBERT entered EMORY as a Freshman in its 2018/2019 academic year, his declared major was Public Policy and Analysis.

89.

Pursuant to his Woodruff scholarship, and his membership in EMORY's Scholar Program, ALBERT was required to live in on-campus housing for the 2018/2019 academic year, and EMORY assigned ALBERT to Thomas Hall 349 as his on-campus residence.

90.

In anticipation of ALBERT's four (4) years of study in Atlanta, Georgia while attending EMORY, and in anticipation of many family visits to Atlanta, Georgia to see ALBERT during that time, LINDA LIANG purchased a house, near EMORY's campus, at 3709 N. Druid Hills Road NE in Decatur, Georgia ("the house on Druid Hills Road").

91.

At all times pertinent hereto, the house on Druid Hills Road was vacant, unfurnished, had no active utility service, and was uninhabitable.

92.

The paperwork that EMORY required for ALBERT's Woodruff scholarship, and membership in its Scholar Program, also gave EMORY permission to use ALBERT's name, image, and information about him and his accomplishments in its public communications about its Scholar Program.

93.

In accepting ALBERT as a Freshman at its educational institution for the 2018/2019 academic year, and into its Scholar Program with a Woodruff scholarship, EMORY knew that, in ALBERT, it was adding to its ranks, and to its prestige as an institution of higher learning, a results oriented individual, marked by his unique personality, his great intellect, and his passion; an individual who brought to EMORY, from his family, a keen interest in medicine, law, science, public policy, and many other personal interests including the Asian American culture and community, student government, journalism, media, service, and the outdoors.

## **ALBERT, as a member of EMORY's Scholar Program, is assigned an individually selected advisor**

94.

For the 2018/2019 academic year, Ed Goode, Ph.D. ("Goode"), a longtime member of EMORY's staff, served as the Assistant Director of EMORY's Scholar Program.

95.

At all times pertinent hereto, Goode was employed by EMORY, was acting in the course and scope of his employment with EMORY, and was considered a member of its staff, faculty and administration.

96.

At all times pertinent hereto, Goode reported directly to, and was supervised by, the Director of EMORY's Scholar Program.

97.

During most of the 2018/2019 academic year, the position of Director of EMORY's Scholar Program was vacant.

98.

Prior to the beginning of the 2018/2019 academic year, ALBERT and his parents were informed that the Scholar Program required ALBERT to participate

in an "advising program" that was focused on the needs and challenges of high-ability students, that an individually selected advisor appointed by EMORY would guide ALBERT to reflect candidly on his interests, passions and pursuits, and that, among the purposes of EMORY's "advising program", was to elicit thoughtful reflections from ALBERT, and to allow ALBERT's individually selected advisor to discern patterns in Albert's thinking, learning, and experience over time.

99.

In further reliance upon the representations made by EMORY to ALBERT and his parents that ALBERT would be provided with an individually selected advisor, and the guidance that this individually selected advisor would provide, ALBERT and his parents accepted EMORY's selection of ALBERT to membership in its Scholar Program.

100.

EMORY charged Goode with the responsibility of serving as ALBERT's individually selected advisor.

101.

Goode served as ALBERT's individually selected advisor during the 2018/2019 academic year.

102.

As more fully described below, Goode continued to serve as ALBERT's individually selected advisor during the Summer that followed the 2018/2019 academic year, and was ALBERT's advisor at the time of his death.

103.

At all times pertinent hereto, EMORY's staff, faculty, and administration, including Goode and the Scholar Program staff, had, readily available in its files, the email addresses and the daytime, mobile, work, and emergency contact telephone numbers for ALBERT's parents, and the mobile telephone number for his brother.

104.

Prior to the 2018/2019 academic year, EMORY had directed Goode, and the rest of its staff, faculty, and administration, to attend, and they had all attended, EMORY's Suicide Prevention Program, which programming clearly communicated to Goode that extensive body of knowledge that EMORY had developed prior to the beginning of the 2018/2019 academic year regarding the risk of its students considering, committing and dying by suicide, the warning signs indicating that one of its students may be considering suicide, behaviors indicating a serious risk of suicide, the prevention of its students considering,

committing and dying by suicide, the protective factors to prevent suicide, and recognizing at-risk students and helping them obtain necessary services.

## ALBERT in the EMORY Scholar Program

### 105.

Prior to the beginning of the 2018/2019 academic year, ALBERT and his parents were provided with the benefits, expectations and attendance policies for ALBERT's participation in EMORY's Scholar Program.

### 106.

Prior to the beginning of the 2018/2019 academic year, ALBERT and his parents were also provided with descriptions of the program-led events, and the scholar-led events, that ALBERT would be required to attend and participate in.

### 107.

Prior to the beginning of the 2018/2019 academic year, ALBERT and his parents were also provided with a calendar of approximately a dozen specific, scheduled activities during the 2018/2019 academic year that ALBERT would be required to attend.

### 108.

Among the scheduled activities during the 2018/2019 academic year that ALBERT would be required to attend was a Scholar Retreat after the Winter

Break of the 2018/2019 academic year, just prior to the beginning of the Spring 2019 Semester.

109.

During the 2018/2019 academic year, ALBERT completely fulfilled his attendance obligations as a member of EMORY's Scholar Program.

110.

During the 2018/2019 academic year, ALBERT's individually selected advisor, Goode, was present at all of the Scholar Program events that required ALBERT's attendance.

111.

As a sixteen (16) and seventeen (17) year old Freshman during EMORY's 2018/2019 academic year, ALBERT met EMORY's every expectation of him as a member of its Scholar Program with a Woodruff scholarship.

112.

While maintaining a cumulative GPA of 3.943 as a Freshman during the 2018/2019 academic year at EMORY, ALBERT quickly climbed the ranks of several student organizations: he served as Vice President of Communications for the College Council; he served as a senior reviewer for the Emory Journal of Asian Studies; he served as Co-Editor-in-Chief of the Emory Undergraduate

31

Medical Review; he served on the Executive Board of the Media Council; he served as a member of the Federal Defender Program, Inc.; and he served as an assistant news editor for The Emory Wheel campus newspaper.

113.

During the 2018/2019 academic year, Goode and ALBERT had attended, together, dozens of in-person on-campus and off-campus meetings and programs; additionally, they met in person scores of times, spoke on the telephone frequently, and exchanged hundreds of emails (which email exchanges used their emory.edu email addresses); the topics of these communications included: academic advice; time management advice; the availability of, and application for, various internships (and introductions to individuals who could assist therewith); EMORY's Scholarship and Service ("SAS") Summer Program; The Emory Wheel; assisting Goode with speechwriting; the planning of in-person on-campus and off-campus meetings and programs for the Scholar Program and SAS Summer Program; and personal, private meals and meetings that only ALBERT and Goode attended together.

114.

During the 2018/2019 academic year, Goode developed with ALBERT a close and personal friendship and relationship that went well beyond the

requirements and expectations of academic advising; Goode became ALBERT's confidant in all matters – Goode was teacher to ALBERT as student, Goode was mentor to ALBERT as mentee, and Goode was surrogate parent to ALBERT as minor child.

115.

In charging Goode with the responsibility of serving as ALBERT's individually selected advisor, the teacher/student, mentor/mentee, surrogate parent/minor child relationship that Goode forged with ALBERT during the 2018/2019 academic year was precisely the relationship that EMORY intended and expected so as to allow Goode to fully and properly advise ALBERT regarding all aspects of his life at EMORY.

116.

During the 2018/2019 academic year, as a result of his relationship with ALBERT, Goode became keenly aware of ALBERT's impulsive tendencies.

117.

For the November, 2018 Thanksgiving holiday, ALBERT traveled from Atlanta, Georgia to Dallas, Texas to be with his family, all of which was known to Goode.

33

118.

For the December, 2018 through January, 2019 Winter Break during EMORY's 2018/2019 academic year, ALBERT traveled from Atlanta, Georgia to Dallas, Texas to be with his family, all of which was known to Goode.

**ALBERT, as an EMORY Scholar,
is selected for EMORY's 2019 SAS Summer Program**

119.

Prior to the beginning of the 2018/2019 academic year, ALBERT and his parents had also been made aware of opportunities for ALBERT, as a member of EMORY's Scholar Program, to remain in Atlanta, Georgia during the Summer following the 2018/2019 academic year.

120.

One of the opportunities for ALBERT to remain in Atlanta, Georgia during the Summer following the 2018/2019 academic year was participation in EMORY's 2019 SAS Summer Program.

121.

EMORY's SAS Summer Program is an annual living and learning program, exclusively for participants in EMORY's Scholar Program.

122.

EMORY's SAS Summer Program occurs in June and July, during which time the participants are required to reside in a house together (the SAS house) while working part-time and participating in other activities, including daily meetings.

123.

Goode, ALBERT's individually selected advisor, was also the 2019 SAS Summer Program Director.

124.

With Goode's encouragement and assistance, during the Fall 2018 Semester, ALBERT had applied for, and been accepted to, EMORY's SAS Summer Program for the Summer after the 2018/2019 academic year.

125.

Based upon the representations made by EMORY regarding its 2019 SAS Summer Program, including the representations that ALBERT would continue to be under EMORY's watchful eye while he was required to live at the SAS house, and that ALBERT would continue to have Goode as his individually selected advisor, ALBERT's parents acquiesced in ALBERT's choice to participate in

EMORY's 2019 SAS Summer Program, instead of returning to Dallas, Texas for Summer Break (which was his parent's preference).

126.

During EMORY's 2019 SAS Summer Program, Goode continued to act as ALBERT's individually selected advisor.

127.

As part of his participation in EMORY's 2019 SAS Summer Program, ALBERT had a part-time job at the Federal Defender Program, Inc. in Atlanta, Georgia.

128.

During his participation in the 2019 SAS Summer Program, ALBERT also had an internship at EMORY; his boss for this EMORY internship was Professor Benjamin Druss ("Professor Druss"), EMORY's Rosalynn Carter Chair in Mental Health in the Department of Health Policy and Management (jointly appointed to the Department of Behavioral, Social, and Health Education Sciences).

129.

By the Summer of 2019, EMORY had directed its faculty member Professor Druss, and his staff, to attend, and Professor Druss, and his staff, had attended, EMORY's   Suicide   Prevention   Program,   which   programming   clearly

communicated to them that body of knowledge that EMORY had developed prior to the Summer of 2019 regarding the risk of its students considering, committing and dying by suicide, the warning signs indicating that one of its students may be considering suicide, behaviors indicating a serious risk of suicide, the prevention of its students considering, committing and dying by suicide, the protective factors to prevent suicide, and recognizing at-risk students and helping them obtain necessary services.

130.

The information provided to Professor Druss as a result of his participation in EMORY's Suicide Prevention Program was separate and apart from, and in addition to, his own education and training, and his experience as the Chair in Mental Health in EMORY's Department of Health Policy and Management and the Department of Behavioral, Social, and Health Education Sciences.

## **ALBERT in Peril**

131.

After the conclusion of the Winter Break during EMORY's 2018/2019 academic year, and prior to the beginning of the Spring 2019 Semester, from January 8 through January 13, 2019, ALBERT and Goode both attended the

Scholar Program Retreat in Hilton Head, South Carolina, one of the Scholar Program's mandatory programs.

132.

By the beginning of EMORY's Spring 2019 Semester, Goode knew that ALBERT was engaged in an ongoing, intimate sexual relationship with a woman who was older than ALBERT; at all times pertinent hereto, this woman was over the age of eighteen (18) and was of the age of majority ("the adult woman").

133.

During EMORY's Spring 2019 Semester, Goode knew that the adult woman was also a student actively enrolled at EMORY.

134.

During EMORY's Spring 2019 Semester, Goode also knew that ALBERT's parents did not approve of his relationship with the adult woman.

135.

During EMORY's Spring 2019 Semester, Goode also knew that the adult woman was preventing ALBERT from freely communicating with his parents.

136.

During EMORY's Spring 2019 Semester, Goode also knew that the adult woman was exploiting ALBERT's academic excellence and achievement for her own personal gain.

137.

During EMORY's Spring 2019 Semester, Goode also knew that there were problems in ALBERT's relationship with the adult woman.

138.

During EMORY's Spring 2019 Semester, Goode also knew that ALBERT was receiving limited emotional support from his parents.

139.

During EMORY's Spring 2019 Semester, Goode also knew that, instead of travelling from Atlanta, Georgia to Dallas, Texas to spend Spring Break with his family, ALBERT travelled to New York to spend Spring Break with the adult woman.

140.

After the conclusion of EMORY's Spring 2019 Semester, on June 6, 2019, ALBERT sought assistance from EMORY's Counseling & Psychological Services

("CAPS"), seeking help to process how his relationship with his parents had impacted his relationship with himself and others.

141.

At the conclusion of ALBERT's June 6, 2019 encounter at CAPS, because he was a minor child, CAPS refused to provide ALBERT with any counseling without first obtaining his parents' permission, which ALBERT declined to authorize because of the very nature of the counseling he was seeking.

142.

During the Summer of 2019, Goode also knew that, even though ALBERT was assigned to live at the SAS house as part of EMORY's 2019 SAS Summer Program, ALBERT frequently stayed overnight in an off-campus apartment being subleased by the adult woman.

143.

As of the Summer of 2019, through his interactions with ALBERT as the SAS Program Director and as ALBERT's individually selected advisor, Goode further knew that: ALBERT had developed deep feelings for the adult woman; ALBERT's relationship with the adult woman was ALBERT's first sexual relationship; ALBERT was confused about his relationship with the adult woman; ALBERT's relationship with the adult woman had caused ALBERT to

become confused about his sexuality; and, at the insistence of the adult woman, ALBERT had, for the first time in his young and impressionable life, begun cross-dressing, using colored polish on his fingernails, and identifying as genderqueer.[3]

144.

During the Summer of 2019, Goode knew that ALBERT's relationship with the adult woman was not traditional from the perspective of gender norms, and that the relationship involved Bondage, Discipline, Dominance and Submission and Sadomasochism (BDSM), in which ALBERT was the submissive partner.

145.

Goode knew that, after the conclusion of EMORY's 2019 SAS Summer Program in July, 2019, and until the beginning of the 2019/2020 academic year, ALBERT would be living with the adult woman, in the off-campus apartment being subleased by the adult woman.

---

[3] Denoting or relating to a person who does not subscribe to conventional gender distinctions but identifies with neither, both, or a combination of male and female genders. www.lexico.com/en/genderqueer.

146.

For the 2019/2020 academic year, EMORY assigned ALBERT to Evans Hall 512 as his on-campus residence; the residence hall was not available for ALBERT to move in until August 24, 2019, all of which was known to Goode.

### **ALBERT's final encounters with his individually selected advisor**

*The August 15, 2019 encounter*

147.

On or about August 15, 2019, ALBERT presented himself at Goode's Scholar Program office for an impromptu, unscheduled in-person meeting with Goode as his individually selected advisor ("the August 15 encounter").

148.

An impromptu, unscheduled in-person meeting between Goode and ALBERT was an unusual occurrence.

149.

During the August 15 encounter, ALBERT told Goode that ALBERT's relationship with the adult woman had abruptly ended that morning, at her demand, and with no explanation.

150.

During the August 15 encounter, ALBERT told Goode that the adult woman threatened to call the police if ALBERT did not immediately vacate her apartment.

151.

During the August 15 encounter, ALBERT told Goode that he had been thrown out of the adult woman's apartment, where he had been living, and that as a result he was homeless and without safe shelter.

152.

During the August 15 encounter, ALBERT told Goode that he had been in an abusive relationship with the adult woman, and that the end of the relationship was precipitated by a physical altercation, during which ALBERT had been criminally assaulted by the adult woman.

153.

During the August 15 encounter, ALBERT told Goode that, as a result of the criminal assault by the adult woman, ALBERT's glasses were broken, his body was scratched, and his testicles had been punctured.

154.

At the time of the August 15 encounter, ALBERT had a large and discolored bruise on his chest, evidence of a traumatic physical injury.

155.

At the time of the August 15 encounter, Goode saw and acknowledged ALBERT's traumatic physical injury.

156.

The physical injury visible to Goode at the time of the August 15 encounter was evidence of a criminal assault by the adult woman.

157.

During the August 15 encounter, ALBERT expressed sadness to Goode over the end of his relationship with the adult woman.

158.

During the August 15 encounter, ALBERT told Goode that he was upset and worried over the fact that the adult woman was unfairly blaming ALBERT for the physical altercation, during which the adult woman claimed to also have been hurt.

159.

During the August 15 encounter, ALBERT further expressed his feelings of isolation, loneliness and hopelessness to Goode, telling Goode that, although he had many friends, he did not have any friends with whom he could share these unpleasant circumstances: the violent end of his relationship with the adult woman, the abuse he had suffered at the hands of the adult woman who had abruptly ended the relationship, and his feelings of loneliness.

160.

At the time of the August 15 encounter, Goode was a "Mandatory Reporter" under Title IX of the Educational Amendments of 1972 ("Title IX").

161.

During the August 15 encounter, Goode recognized, and advised ALBERT, that the interaction between ALBERT and the adult woman, who was also a student at EMORY, could have serious implications under Title IX.

162.

During the August 15 encounter, Goode knew that ALBERT had grounds to lodge a Title IX complaint against the adult woman.

163.

During the August 15 encounter, Goode's only advice to ALBERT was to avoid, at all costs, apologizing to the adult woman, or admitting any type of guilt, since the adult woman could use such statements against ALBERT.

164.

During the August 15 encounter, ALBERT asked Goode if he could stay with Goode until ALBERT's on-campus housing for the 2019/2020 academic year became available on August 24, 2019; Goode declined ALBERT's request, accentuating Albert's isolation.

165.

During the August 15 encounter, ALBERT asked Goode if he could store his belongings with Goode, until ALBERT's on-campus housing for the 2019/2020 academic year became available on August 24, 2019; Goode declined ALBERT's request, further accentuating Albert's isolation.

166.

From August 15, 2019, and until his on-campus housing became available on August 24, 2019, seventeen (17) year old ALBERT was alone and adrift in Atlanta, Georgia, a community of six (6) million residents located 800 miles from his home in Dallas, Texas.

167.

On August 20, 2019, ALBERT sent an email that was received by Professor Druss (ALBERT's boss at his Summer 2019 EMORY internship), Professor Druss's administrative aide, and one of EMORY's medical school Psychiatry residents, in which email ALBERT told these individuals that, due to a "recent series of unfortunate events", he had become homeless, and was without safe shelter.

168.

As a result, as of ALBERT's August 20, 2019 email, these three (3) members of EMORY's staff, faculty or administration (in addition to Goode) became aware that ALBERT was homeless, and without safe shelter.

### *The August 24, 2019 encounter*

169.

On August 24, 2019, Goode had a chance, in-person encounter with ALBERT while he was moving in to his on-campus residence for the 2019/2020 academic year at Evans Hall ("the August 24 encounter").

170.

As of the August 24 encounter, Goode knew that ALBERT's mandatory, on-campus housing assignment in Evans Hall was in the same on-campus residence as the adult woman who had manipulated, physically abused, and then abruptly ended her relationship with, ALBERT.

171.

As of the August 24 encounter, Goode knew that ALBERT's living arrangement for the 2019/2020 academic year would be such that ALBERT, going forward, would have unavoidable interactions with the adult woman on a regular, and likely daily, basis.

*The August 26, 2019 encounter*

172.

Sometime prior to August 26, 2019, ALBERT requested an in-person meeting with Goode, which meeting occurred on August 26, 2019 in Goode's Scholar Program office ("the August 26 encounter").

173.

During the August 26 encounter, ALBERT told Goode that the adult woman was planning to file a Title IX complaint against ALBERT.

174.

During the August 26 encounter, Goode knew that it was possible that a Title IX complaint could represent a serious academic problem for ALBERT, or at least knew that ALBERT would react to such an occurrence as if it were a serious academic problem.

175.

At the time of the August 26 encounter, Goode knew, from his experience as member of EMORY's staff, faculty, and administration, and from his experience as a Title IX Mandatory Reporter, that a Title IX complaint against ALBERT by the adult woman, under the circumstances as known to Goode at the time, would result in little, or no (and certainly not severe), consequences for ALBERT.

176.

During the August 26 encounter, Goode did not inform ALBERT that the adult woman's Title IX Complaint against ALBERT would likely result in little, or no (and certainly not severe), consequences for ALBERT.

177.

During the August 26 encounter, ALBERT told Goode, and Goode himself observed, that ALBERT had begun to feel trapped by the circumstances

surrounding the recent painful events, losses, and changes in his life that he was experiencing.

178.

During the August 26 encounter, despite his knowledge that the adult woman's Title IX Complaint against ALBERT would likely result in little, or no (and certainly not severe), consequences for ALBERT, Goode advised ALBERT, a minor child, to hire an attorney to defend himself against the adult woman's allegations, advice that further led ALBERT to believe that he was facing serious consequences.

179.

At the time of the August 26 encounter, Goode knew, or in the exercise of reasonable care could and should have known, that under Georgia law, ALBERT, a minor child, lacked the capacity to engage, and/or contract with, an attorney.

180.

At the time of the August 26 encounter, in light of the strong teacher/student, mentor/mentee, and surrogate parent/minor child relationship that Goode had cultivated and established with ALBERT, ALBERT was, and felt, forsaken by Goode's failure to assist him, or to otherwise intervene on his behalf.

**As a result of ALBERT's final encounters with his individually selected advisor, EMORY knew that he was exhibiting many of the risk factors, warning signs and behaviors of considering, committing and dying by suicide**

181.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode had already spent nearly one (1) year as ALBERT's individually selected advisor in EMORY's Scholar Program and 2019 SAS Summer Program, guiding ALBERT to reflect candidly on his interests, passions, and pursuits, eliciting ALBERT's thoughtful reflections, and discerning patterns in ALBERT's thinking, learning, and experiences over time.

182.

At the time of Goode's three (3) in-person encounters with ALBERT between August 15, 2019 and August 26, 2019 ("Goode's August, 2019 final encounters with ALBERT"), Goode had already developed his strong teacher/student, mentor/mentee, and surrogate parent/minor child relationship with ALBERT.

183.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that ALBERT, as a minor child aged seventeen (17), was within the

age group that had suffered an astonishing increase in suicide during ALBERT's lifetime.

184.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that the following factors placed ALBERT in an at-risk group for EMORY's selective efforts for suicide prevention: ALBERT was a male student of Asian descent who was LGBTQ (or, at least, experiencing difficulty adjusting to gender identity).

185.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that, after ALBERT's relationship with the adult woman ended, ALBERT's risk of suicide increased because of his feelings of isolation, loneliness, and hopelessness.

186.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that ALBERT had the following risk factors for suicide: feelings of hopelessness and helplessness, impulsive tendencies, trauma or abuse, loss of a relationship, and limited support from family.

187.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that ALBERT, as an Asian student under twenty-one (21) years of age, with obvious relationship problems, and who had difficulties with his parents, was among those identified as having the greatest risk of suicide ideation and attempts.

188.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that ALBERT was exhibiting at least two (2) warning signs of suicide: indications that he was in an abusive relationship, and having difficulty adjusting to gender identity.

189.

At the time of Goode's August, 2019 final encounters with ALBERT, ALBERT told Goode about feeling trapped, which was a new behavior related to a painful event, loss, or change, and was an indication of serious risk of suicide, all of which was known to Goode.

190.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that ALBERT's suicide related risk factors, warning signs and behaviors were just developing.

191.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode had been trained by EMORY that, when risk factors, warning signs and behaviors are just developing, it is a critical time for the prevention of suicide.

192.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode knew that it was a critical time to intervene so that ALBERT would not consider, attempt, or die by suicide.

193.

The knowledge and information conveyed to and acquired by Goode as a result of his August, 2019 final encounters with ALBERT was conveyed to and acquired by Goode while in the course and scope of his employment with EMORY, and that knowledge and information is thereby imputed to EMORY.

194.

At the time of Goode's August, 2019 final encounters with ALBERT, Goode had been trained and educated by EMORY that the most important thing to provide to a student at risk for suicide is family support, and community support from teachers and bosses.

195.

At the time of Goode's August, 2019 final encounters with ALBERT, the position of Director of EMORY's Scholar Program was vacant; as a result, Goode was deprived of any supervision of, and guidance from, the person to whom he would typically report, and the person who EMORY would have placed in a position to advise Goode as to how to advise ALBERT.

196.

As of August 24, 2019, because ALBERT was, at all times pertinent hereto, a minor child, EMORY had previously communicated with ALBERT's parents, in order to advise them, and/or obtain their permission, regarding ALBERT's attendance at Scholar Finalists' Week, regarding ALBERT's admission to EMORY, regarding ALBERT's acceptance of its Woodruff scholarship, regarding ALBERT's membership in its Scholar Program, regarding ALBERT's counseling at CAPS, and regarding ALBERT's attendance in its 2019 SAS Summer Program.

197.

At no time from the date of the August 15 encounter, through the date of ALBERT's death on August 30, 2019, did any professor, staff or administrative employee of EMORY, including Goode and/or the Scholar Program staff, and including Professor Druss (and his staff), make any effort to contact ALBERT's parents to advise them of the circumstances regarding ALBERT of which these individuals were aware during that time.

198.

At no time from the date of the August 15 encounter, through the date of ALBERT's death on August 30, 2019, did any professor, staff or administrative employee of EMORY, including Goode and the Scholar Program staff, and including Professor Druss (and his staff), make any effort to provide ALBERT with the family or community support which they had been trained was the most important thing to provide to him as a student at risk for suicide, including, but not limited to, contacting this minor child's parents.

199.

At no time after August 15, 2018, and through the time that they were notified of ALBERT's death on August 30, 2019, were ALBERT's parents ever advised by EMORY of its notice, and knowledge, of ALBERT's behavior, or of

the risk factors and warning signs of ALBERT considering, committing or dying from suicide.

**The adult woman's Title IX Complaint against ALBERT**

200.

On August 28, 2019, EMORY's Interim Title IX Coordinator advised ALBERT, via email, that on August 26, 2019, the adult woman had filed a Title IX Complaint against ALBERT ("the Title IX Complaint").

201.

The August 28, 2019 email to ALBERT from EMORY's Interim Title IX Coordinator acknowledged ALBERT's status as a minor child.

202.

The August 28, 2019 email to ALBERT from EMORY's Interim Title IX Coordinator was not provided to ALBERT's parents.

203.

At no time after August 26, 2018, and through the time that they were notified of ALBERT's death on August 30, 2019, were ALBERT's parents ever advised by EMORY of the existence of the August 26, 2019 Title IX Complaint against ALBERT.

204.

On August 28, 2019, the position of Title IX Coordinator at EMORY was vacant, and had been vacant for most of the 2018/2019 academic year.

205.

The position of Title IX Coordinator at EMORY is typically filled with a highly trained individual, possessing vast experience in reviewing and acting upon Title IX complaints.

206.

As a result of the vacancy in EMORY's Title IX Coordinator position, the adult woman's Title IX Complaint against ALBERT was not timely reviewed and acted upon by the type of highly trained and experienced individual who would have typically been in the position to decide how to respond to the adult woman's Title IX Complaint against ALBERT, how to inform ALBERT, and/or whether to advise ALBERT's parents.

207.

As a further result of the vacancy in EMORY's Title IX Coordinator position, the Interim Title IX Coordinator, who prepared and sent the notice of the adult woman's Title IX Complaint against ALBERT, was deprived of the supervision of, and guidance from, the person to whom she would typically

report, and the person who EMORY would have placed in a position to advise her.

208.

The August 26, 2019 Title IX Complaint filed by the adult woman against ALBERT was perceived by ALBERT as a serious academic problem, the first serious academic problem ALBERT had ever experienced in his young life.

209.

On August 28, 2019, the attorney with whom ALBERT consulted, as a result of the advice given to him on August 26, 2019 by Goode, his individually selected advisor, advised ALBERT that the allegations of the Title IX Complaint could result in ALBERT's loss of his membership in EMORY's Scholar Program, could result in ALBERT's loss of his Woodruff scholarship, could result in ALBERT's suspension from EMORY, and could result in felony criminal charges against ALBERT.

210.

On August 28, 2019, ALBERT was asked, by the attorney with whom he had consulted as a result of Goode's August 26, 2019 advice, to sign an agreement of representation, and to pay an initial retainer in the amount of $50,000.00.

211.

The request for $50,000.00 created a great deal of anxiety in ALBERT, as it was an amount of money that neither ALBERT, nor his parents, could afford to pay.

212.

Advising his parents of the legal advice that ALBERT had received, from the attorney that he had consulted solely because of Goode's advice, would have created a great hardship for his parents, and would have been a source of great shame and embarrassment for ALBERT.

213.

In following Goode's advice, ALBERT was given legal advice that caused him to mentally spiral further downward into an emotional abyss, stuck in what seemed, in the underdeveloped teenage aspect of ALBERT's rational mind, and without much needed parental guidance and love and experience-based advice, a futile situation from which escape did not seem possible.

**ALBERT's suicide**

214.

On August 28, 2019, ALBERT left his on campus residence at Evans Hall 512, and never returned.

215.

On August 28, 2019, at approximately 8:45 p.m., ALBERT went to the JOANN retail store located at 2655 N. Decatur Road in Decatur, Georgia, and purchased a yard of quarter inch braided knit elastic, and a two-pack of black round chord, and at approximately 8:59 p.m., he went to the Walmart retail store located at 2525 N. Decatur Road in Decatur, Georgia, and purchased packing tape, cloth tape, plastic turkey bags and scissors.   On August 29, 2019, at approximately 8:43 a.m., ALBERT went to an Airgas facility located at 600 Northside Drive NW in Dallas, Georgia, and purchased an industrial size tank of nitrogen gas, and a regulator flowmeter with a ten (10) inch hose.

216.

On August 30, 2019, at approximately 8:00 a.m., Goode received an automated email from ALBERT's personal Gmail account, advising Goode that ALBERT could be found at the vacant, unfurnished, and uninhabitable house on Druid Hills Road owned by LINDA LIANG.

217.

On the morning of August 30, 2019, shortly after arriving at the house on Druid Hills Road, Goode contacted the DeKalb County Police Department, which responded to the scene.

218.

On August 30, 2019, at approximately 10:00 a.m., Goode and the responding DeKalb County Police Department officer found ALBERT's lifeless body, with a plastic turkey bag secured over its head, which plastic turkey bag was connected by a tube to a tank of nitrogen gas.

219.

On August 30, 2019, the Dekalb County Medical Examiner ruled that ALBERT's death was a suicide, caused by asphyxia with plastic bag and nitrogen gas.

220.

On August 30, 2019, at approximately 1:00 p.m., the DeKalb County Police Department advised ALBERT's parents that ALBERT had died by suicide.

221.

Based on the events leading up to his death, ALBERT was not of sound mind, and was not acting rationally, when he committed suicide.

## COUNT I
## EMORY'S NEGLIGENCE

222.

Plaintiffs hereby restate and incorporate herein by reference the allegations contained in paragraphs 1 through 221.

223.

EMORY owed a duty to ALBERT to exercise that degree of care that is used by ordinarily careful persons under the same or similar circumstances

224.

EMORY negligently breached its duty of care to ALBERT in one or more of the following particulars:

(a) EMORY failed to timely and properly inform ALBERT's parents that their minor child had become hopelessly entrapped in an exploitative and abusive sexual relationship with the adult woman;

(b) EMORY failed to timely and properly report, to the police authorities, the adult woman's criminal assault upon ALBERT;

(c) EMORY failed to timely and properly report, to its own internal authorities, the adult woman's criminal assault upon ALBERT;

(d) EMORY failed to timely and properly consult, with its own internal resources, regarding the risk factors, warning signs and behaviors of ALBERT considering, committing or dying from suicide;

(e) EMORY failed to timely and properly initiate a Title IX complaint against the adult woman;

(f) EMORY failed to timely and properly provide, or otherwise arrange for, safe shelter for ALBERT, once it knew that he had become homeless and without safe shelter, and having agreed in advance, and on multiple occasions, to do so;

(g) EMORY failed to timely and properly advise ALBERT's parents once it knew that ALBERT had become homeless, and was without safe shelter;

(h) EMORY failed to timely and properly notify ALBERT's parents of the adult woman's Title IX Complaint against ALBERT;

(i) EMORY failed to timely and properly advise ALBERT as to how to safely and effectively respond to the adult woman's Title IX Complaint against him;

(j) EMORY failed to timely and properly implement and employ its own established suicide response and prevention plan regarding ALBERT;

(k) EMORY failed to timely and properly implement and employ its own practices, policies and procedures so as to recognize that ALBERT was exhibiting the risk factors, warning signs and behaviors associated with considering, committing and dying by suicide; and/or

(l) EMORY failed to timely and properly implement and employ its own methods to protect ALBERT from considering, committing and dying by suicide.

225.

As a direct, proximate, and foreseeable result of EMORY's negligent breach of duty, ALBERT suffered severe personal injuries, pain and suffering, and death, as more fully described below.

## COUNT II
## EMORY'S GROSS NEGLIGENCE

226.

Plaintiffs hereby restate and incorporate herein by reference the allegations contained in paragraphs 1 through 225.

227.

At all times pertinent hereto, EMORY was in a special relationship with ALBERT.

228.

At all times pertinent hereto, EMORY had a duty to exercise reasonable care to protect ALBERT from harm with regard to risks that could arise within the scope of said special relationship.

229.

EMORY negligently breached its duties to ALBERT and, in so doing, was guilty of gross negligence, in that it failed to exercise that degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances, particularly concerning a minor child.

230.

EMORY was guilty of gross negligence when it breached its duty to ALBERT in one or more of the following particulars:

(a) EMORY completely failed to timely and properly inform ALBERT's parents that their minor child had become hopelessly entrapped in an exploitative and abusive sexual relationship with the adult woman;

(b) EMORY completely failed to timely and properly report, to the police authorities, the adult woman's criminal assault upon ALBERT;

(c) EMORY completely failed to timely and properly report, to its own internal authorities, the adult woman's criminal assault upon ALBERT;

(d) EMORY completely failed to timely and properly consult, with its own internal resources, regarding the risk factors, warning signs and behaviors of ALBERT considering, committing or dying from suicide;

(e) EMORY completely failed to timely and properly initiate a Title IX complaint against the adult woman;

(f) EMORY completely failed to timely and properly provide, or otherwise arrange for, safe shelter for ALBERT, once it knew that he had become homeless and without safe shelter, and having agreed in advance, and on multiple occasions, to do so;

(g) EMORY completely failed to timely and properly advise ALBERT's parents once it knew that ALBERT had become homeless, and was without safe shelter;

(h) EMORY completely failed to timely and properly notify ALBERT's parents of the adult woman's Title IX Complaint against ALBERT;

(i) EMORY completely failed to timely and properly advise ALBERT as to how to safely and effectively respond to the adult woman's Title IX Complaint against him;

(j) EMORY completely failed to timely and properly implement and employ its own suicide response and prevention plan regarding ALBERT;

(k) EMORY completely failed to timely and properly implement and employ its own practices, policies and procedures so as to recognize that ALBERT was exhibiting the risk factors, warning

signs and behaviors associated with considering, committing and dying by suicide; and/or

(l) EMORY completely failed to timely and properly implement and employ its own methods to protect ALBERT from considering, committing and dying by suicide.

231.

As a direct, proximate, and foreseeable result of EMORY's gross negligence, ALBERT suffered severe personal injuries, pain and suffering, and death, as more fully described below.

## COUNT III
## DAMAGES - WRONGFUL DEATH
## NEGLIGENCE AND GROSS NEGLIGENCE

232.

Plaintiffs hereby restate and incorporate herein by reference the allegations contained in paragraphs 1 through 231.

233.

ALBERT's death was a direct and proximate result of EMORY's negligence and/or gross negligence.

234.

Plaintiffs TIM ZHANG and LINDA LIANG, in their individual capacities, are entitled to recover for the full value, including the economic value, of the life of ALBERT, their deceased son, as if he had lived, loss of care, companionship, and the intangible benefits the deceased provided to loved ones, including his siblings.

**COUNT IV**
**DAMAGES - SURVIVAL ACTION**
**NEGLIGENCE AND GROSS NEGLIGENCE**

235.

Plaintiffs hereby restate and incorporate herein by reference the allegations contained in paragraphs 1 through 234.

236.

Plaintiff TIM ZHANG, as the duly appointed Independent Administrator of the Estate of ALBERT, his deceased son, also claims damages on behalf of ALBERT's Estate for the conscious pain and suffering undergone by ALBERT as a result of EMORY's negligence and gross negligence.

237.

As a result of his death, ALBERT's Estate has been damaged, which damages include damages for pecuniary losses, such as medical expenses, as

well as for extreme conscious pain and suffering undergone by the deceased, up to and including the time of his untimely death.

238.

Plaintiff, on behalf of ALBERT's estate, is also entitled to recover any and all expenses resulting from the injuries and death of ALBERT, including those allowed in any survival action.

## DEMAND FOR JURY TRIAL

Plaintiffs TIM ZHANG and LINDA LIANG, demand trial by jury on all issues alleged herein so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs TIM ZHANG, LINDA LIANG and TIM ZHANG, as the duly appointed Independent Administrator of the Estate of ALBERT LIANG, respectfully pray for the following:

(a)     A trial by jury on all issues;

(b)     That process issue as required by law;

(c)     That judgment be entered in favor of Plaintiffs TIM ZHANG and/or LINDA LIANG, and against Defendant EMORY UNIVERSITY, for all damages allowed by law;

(d)     That judgment be entered in favor of Plaintiffs TIM ZHANG and LINDA LIANG, and against Defendant EMORY UNIVERSITY, for the full value of ALBERT LIANG's life;

(e)     That judgment be entered in favor of Plaintiffs TIM ZHANG and LINDA LIANG, and against Defendant EMORY UNIVERSITY, for general and special damages;

(f)     That judgment be entered in favor of Plaintiffs TIM ZHANG and LINDA LIANG, and against Defendant EMORY UNIVERSITY, for ALBERT LIANG's funeral and other necessary expenses in an amount to be proven at trial;

(g)     That judgment be entered in favor of Plaintiff TIM ZHANG, as the duly appointed Independent Administrator of the Estate of ALBERT LIANG, and against Defendant EMORY UNIVERSITY, for compensatory damages, including past pain and suffering, in an amount to be determined by the enlightened conscience of a jury;

(h)     That judgment be entered in favor of Plaintiffs TIM ZHANG, LINDA LIANG and Plaintiff TIM ZHANG, as the duly appointed Independent Administrator of the Estate of

ALBERT   LIANG,   and   against   Defendant   EMORY

UNIVERSITY, for costs of court; and

(i)   That Plaintiffs TIM ZHANG, LINDA LIANG and Plaintiff

TIM ZHANG, as the duly appointed Independent

Administrator of the Estate of ALBERT LIANG, have any and

all other relief as this Court may deem just and proper.

Respectfully submitted this 2nd day of March 2021.

**THE MIDDLETON FIRM, L.L.C.**

/s/ *Richard H. Middleton, Jr.*

_____
**RICHARD H. MIDDLETON, JR.**
Georgia Bar No. 504912
58 E. Broad Street
P.O. Box 10006
Savannah, Georgia 31412
rhm@middletonfirm.com
(912) 234 1133 – Tel.
(912) 233 1750 – Fax
Lead trial counsel
**ATTORNEYS FOR PLAINTIFFS**

**MILTON, LEACH,
WHITMAN, D'ANDREA
& ESLINGER, P.A.
JOSHUA A. WHITMAN**
Florida Bar No. 399264
*Pro Hac Vice* forthcoming
3127 Atlantic Blvd
Jacksonville, Florida 32207

jwhitman@miltonleach.com
(904) 346 3800 – Tel.
(904) 346 3692 – Fax

**CUNNINGHAM SWAIM, LLP**
**ALEX J. WHITMAN**
Texas Bar No. 24081210
*Pro Hac Vice* forthcoming
4015 Main Street, Suite 200
Dallas, TX 75226
awhitman@cunninghamswaim.com
(214) 646-1495 – Tel.
(214) 613-1163 - Fax