1  THE FOLLOWING IS THE P.D.F. OF AN OFFICIAL TRANSCRIPT.  OFFICIAL

2  TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT

3  REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS.

4  YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET

5  ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE

6  COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT.  HOWEVER, YOU

7  ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY

8  DOCUMENT FILED WITH THE COURT.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF GEORGIA
 2                              ATLANTA DIVISION

 3
     TIEQIAO ("TIM") ZHANG                    )
 4   Individually, and as the Independent     )
     Administrator of the Estate of           )
 5   ALBERT LIANG (a/k/a ALBERT ZHANG and     )
     f/k/a LIANGSHENG ZHANG), deceased;       )
 6   and JING ("LINDA") LIANG,                )
                                              )
 7            PLAINTIFFS,                      )
                                              )          DOCKET NUMBER
 8       vs.                                   )          1:21-cv-00868-AT
                                              )
 9                                            )
     EMORY UNIVERSITY,                        )          ATLANTA, GEORGIA
10                                            )          July 5, 2022
              DEFENDANT.                      )          9:30 a.m.
11   _____/

12                         TELEPHONE CONFERENCE

13                       TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE AMY TOTENBERG,
14                     UNITED STATES DISTRICT JUDGE

15   APPEARANCES:

16   FOR THE PLAINTIFFS:        JOSHUA J. WHITMAN, ESQ.
                                RICHARD H. MIDDLETON, ESQ.
17                              CHRISTOPHER T. CONWAY, ESQ.

18   FOR THE DEFENDANT:         ALLEGRA J. LAWRENCE, ESQ.
                                LISA M. HALDAR, ESQ.
19                              RODNEY J. GANSKE, ESQ.

20   FOR THE MOVANT:            ROBYN WEBB, ESQ.
                                ATTORNEY AT LAW
21

22              MECHANICAL STENOGRAPHY OF PROCEEDINGS
                AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY
23
     OFFICIAL COURT REPORTER:        DENISE M. STEWART, RPR
24                                   2314 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA 30303
                                     (404)215-1516
</pre>

1          (IN ATLANTA, FULTON COUNTY, GEORGIA, JULY 5, 2022.)

2          THE COURT:  Good morning.  This is Judge Totenberg.

3          MR. MIDDLETON:  Good morning, Judge.

4          Richard Middleton.

5          MS. HALDAR:  Good morning, Judge.

6          MS. WEBB:  Good morning, Your Honor.

7          MR. WHITMAN:  Good morning.

8          THE COURTROOM DEPUTY:  Okay, Judge, for Plaintiff we

9    have Mr. Whitman and Mr. Middleton present.

10          For defendant we have Ms. Lawrence, Ms. Haldar and

11   Mr. Ganske.

12          And for the movant, Ms. Webb is on the call.

13          THE COURT:  Okay.  Very good.

14          I want to tell you I am in a pretty remote location.

15   And so, we just had a phone conference in another matter and we

16   broke up like four different times.  So please excuse me if I

17   disappear on you and have to redial in.  It's just one of those

18   things.

19          And so, you've got a host of issues here and I'm just

20   start -- kind of pulled up a few of these things in front of me at

21   this moment.

22          Tell me what have you discussed in doing anything like

23   this, that's simply having me look at some of the documents on an

24   in camera basis?

25          MS. WEBB:  This is Robin Webb.  I am the attorney for

1   the movant, Jane Doe.

2          I have not had any discussions with plaintiffs' counsel.

3   I would certainly be willing to do that.  I think that makes a lot

4   of sense in this case.

5          You know, as we argued in our motion, she, Jane Doe --

6   we have produced or allowed or permitted the production of 142 out

7   of 166 documents.  There are only 24 that we have held back.

8   Those contain the movant's personal statements.  And as we've

9   argued, have nothing to do with the limited amount of discovery

10  outlined in the Court's order.  I'm happy for the Court to review

11  those 24 documents.

12          THE COURT:  Okay.

13          MS. HALDAR:  And Your Honor -- Your Honor -- I'm sorry.

14          THE COURT:  Go ahead.

15          THE REPORTER:  I'm sorry.  I didn't hear who was

16  speaking.

17          MS. HALDER:  No problem.  This is Lisa Halder for the

18  defendant.

19          And as to any camera review of the text messages between

20  Dr. Goode and his wife that plaintiffs are seeking, we are also

21  open to in camera review of that as well for the Court's review to

22  determine if it's marital -- to be withheld by the marital-

23  privilege communication.

24          MR. WHITMAN:  Your Honor, Josh Whitman on behalf of the

25  plaintiffs.

1    Obviously, the person inclined to review these documents
2  in camera.  We would encourage the Court to do so.
3    Just alerting the Court to the timing issue, as we've
4  all worked collaboratively to comply with the Court's schedule --
5  scheduling order, we have a deposition at Emory on Monday,
6  July 11th.  And the deposition of Dr. Goode on Thursday,
7  July 13th.  So I just wanted to give the Court some context for
8  the timing of this review and whether or not that's even --
9    THE REPORTER:  I'm sorry.  I didn't hear the last part
10  you said, Counsel.
11    THE COURT:  Unless the -- are the documents
12  electronically available for them to be provided to me in Athens?
13    MS. WEBB:  For Jane Doe, yes, Your Honor.  I can get
14  those to Mr. Martin electronically.
15    MS. HALDAR:  The same for defendant, Your Honor.  Yes,
16  Your Honor.
17    THE COURT:  All right.  Well, why don't you do that?
18  Why don't you provide them to Mr. Martin and he'll be sure that
19  I -- I get them so that we can -- more by the end of the week if
20  not before.
21    How many pages?  How many pages are there?
22    MS. WEBB:  For Jane Doe it is 24 pages.  Some of them
23  will -- I don't anticipate it will take you very long at all to --
24    MS. HALDAR:  This is Lisa Haldar for the defendant.
25    Just to follow-up on Ms. Webb's point.  It is actually

1  40 pages total.  It's 24 documents, 40 pages of documents for Jane
2  Doe.

3            MS. WEBB:  Oh, thank you, Lisa.

4            MS. HALDAR:  Of course.  Of course.

5            And it's -- the 13th were text messages -- text messages
6  between Dr. Goode and his wife.

7            THE COURT:  All right.  Well, all of that sounds very
8  doable.

9            MS. LAWRENCE:  Judge, I should also -- this is Allegra
10  Lawrence.

11            I just wanted to know.  We, of course, have some
12  flexibility on the date.  We don't mean to ruin your vacation, if
13  we need to -- if the Court is amenable to -- in that regard in
14  terms of the scheduled depositions.

15            THE COURT:  I think it's fine.

16            Unfortunately, my husband's come down with Covid so --
17  and I can't see anyone.  I can't visit.  And I'm hopeful that my
18  grandbaby is still going to be able to come late on Sunday or
19  Monday.  So we're just going to -- you know, I'd rather get
20  everything I can do in life while we're in this situation.

21            MS. LAWRENCE:  Covid can ruin everything.

22            THE COURT:  It does.  It's really like an ongoing thing.
23  And, of course, I have to worry about am I going to get it?  It
24  does not seem like a very virulent variety.  But, nevertheless, I
25  have a grandbaby who is ten months old.  So, you know, it is

1  just --

2           MS. LAWRENCE:  I'm very sorry to hear that.

3           THE COURT:  But listen, I'm in a beautiful place.  I'm

4  healthy for now.

5           MS. LAWRENCE:  Hopefully you'll stay that way.

6           THE COURT:  Yes.  Yeah.  But anyway, the long and short

7  of it is I can read it.  And the sooner the better because if I'm

8  going to get sick, I might not read it.

9           Okay.  Okay.  So my main concern about the -- let me

10  just say about the Jane Doe documents is simply I understood the

11  argument but I also think that while it may not -- how you --

12  how -- obviously her privacy is paramount to her and at the same

13  time it still might reflect something as to the issues at hand in

14  this case.  And, you know, I'll just see it that way.  And it

15  seems like the most direct way of doing it.

16          So we've taking care of Jane Doe's motion for protective

17  order and we still need to protect -- an additional protective

18  order in light of anything I find and we'll get back in touch with

19  you.  We may -- I think that we'll -- are you-all available this

20  week if we need to talk to you?

21          MS. WEBB:  Yes.

22          MR. WHITMAN:  Yes, Your Honor.

23          MS. LAWRENCE:  Yes, Your Honor.

24          (Pause in proceedings.)

25          MS. LAWRENCE:  Everybody still there.

1          MR. WHITMAN:  We lost Her Honor.

2          THE COURTROOM DEPUTY:  Yes, I think -- I think she lost

3   the call.  She'll be back on in just a moment.

4          (Pause in proceedings.)

5          THE COURT:  All right.  So disconnect number one.

6          I think -- all right.  So I guess this is why one should

7   probably do this even a Zoom audio because it may be -- this is a

8   better connection.  But we'll keep on moving forward.

9          MS. WEBB:  Your Honor, may I ask one question?  This is

10  Robyn Webb for Jane Doe.

11         THE COURT:  Yes.

12         MS. WEBB:  The statement that you made about her privacy

13  and interest -- may I respond to that previously?

14         THE COURT:  Yes.

15         MS. WEBB:  I just want to clarify.  The protective order

16  is for her identity as far as the public.  That certainly, you

17  know -- and I do respect the parties' efforts to keep her identity

18  confidential.  The thing I would point out with these documents --

19  and you'll see it when you read them -- it's a very personal

20  situation that is discussed within the documents.  I've heard a

21  lot of women in Title IX matters and it's not something that she

22  ever thought would be public, which is why she raised the

23  objection here.  In other words, it's not just about her identity.

24  It's about the things that she talks about within the documents.

25  And so --

1          THE COURT:  I understand that.  I understood.  I totally

2    understand that was the issue.

3          MS. WEBB:  Thank you.

4          THE COURT:  Okay.

5          MS. WEBB:  Thank you, Your Honor.

6          THE COURT:  Yeah.  But I understand why you're saying

7    it.  I did understand that was the essence and the problem.

8          So, then, Emory objects to producing the suicide

9    prevention and training policy?  What is -- and I understand -- I

10   mean, is it -- it can't be because of the confidential -- is it

11   too voluminous?  What really is the essence and the issue?

12         MS. HALDAR:  Your Honor, this is Lisa Haldar for the

13   defendant.

14         We'd just like to say despite the clarity of the Court's

15   order, we believe that the plaintiffs' are pushing the boundary of

16   that order as far as the narrowly termed -- tailored topics.  I

17   know the Court knows what it says in its order.  We believe it was

18   very clear.  But it said the factor is that Emory took a suicide

19   prevention program, that Albert's age, gender, ethnicity -- that

20   they were not sufficient without more to support a factual

21   inference that anyone was in position to reasonably foresee that

22   Albert might attempt to take his own life.

23         And we've dutifully followed the direction of the Court

24   with those narrowly various topics.  And we've provided over 3,500

25   pages of documents and over 60 pages of texts and GroupMe messages

1   from Dr. Goode's personal cell phone and over 150 e-mails, e-mails
2   from 10 other Emory custodians.  We've also provided verified
3   interrogatory responses talking about direct knowledge of --
4   having no direct knowledge of Albert considering suicide or self
5   harm.
6           And as you know, we're producing Dr. Goode next week and
7   a 30(b)(6) witness next week --
8           THE COURT:  Right.
9           MS. WEBB:  -- on the five different topics.  So our
10  position is we've engaged in significant discovery already,
11  directly going through what the Court has ordered.  And if the
12  defendant can't find anyone at Emory with direct knowledge, based
13  on the discovery they've received or will receive, we submit that
14  they're not going to find that evidence with their outstanding
15  discovery requests.  Like, there are no topics on suicide
16  prevention training or policies on minor students.  This goes
17  to -- kind of follows the topics they're looking for.  And it
18  would be just an additional burden on Emory to continue
19  collecting, interviewing and producing documents and preparing the
20  30(b)(6) witness on those topics, Your Honor.
21          THE COURT:  So this goes as to the suicide prevention
22  training policies objection, the Title IX coordinator information
23  and the Emory school policies -- policies as to that?
24          MS. HALDAR:  Yes, Your Honor.
25          THE COURT:  Okay.  Given the Court's focus and the

1  limited discovery authorized, even though I think it in fact has
2  provided plaintiff with some new information; why do you need --
3  at this juncture, Counsel, why do you -- why do you need any of
4  that?

5         MR. WHITMAN:  Yes, Your Honor.  Thank you for inquiring
6  with us.

7         Your Honor, it's true we have gone through some 3,500
8  pages that Emory has produced.  We believe that we've made
9  significant progress towards complying with the Court's order in
10 being able to amend our complaint in order to make the allegations
11 that the Court is looking for in order for the complaint to go
12 forward and survive a motion to dismiss.

13        However, in light of the discovery that the Court has
14 permitted, we believe that Emory has all along read the Court's
15 order much too narrowly.  Plus, the -- these depositions -- these
16 upcoming depositions can't be taken in a vacuum.  Significant
17 allegations have been made regarding Emory's long history of being
18 at the forefront of suicide prevention in the university setting.

19        Dr. Goode has been part of the administration there for
20 years.  He was exposed to this training.  Part of the plaintiff's
21 allegations are that this training has given him the tools to be
22 able to recognize a student's intent to do self harm.  And knowing
23 this information, having the same materials that Dr. Goode would
24 have been provided or exposed to in the years leading up to
25 Albert's death, would be extremely helpful, not outside the

1   Court's order.  And, again, it will allow us to conduct this

2   discovery not in a vacuum and with context.  And it is not a

3   significant burden in our view for Emory to provide these

4   documents to the plaintiff.

5           THE COURT:  So what is -- what is the volume of

6   documents just as to the suicide prevention training policy?  I

7   need counsel to tell me that.

8           MS. HALDAR:  Your Honor, this is Haldar.

9           We have taken the position that we are -- we're focused

10  primarily on -- solely on addressing the directions in the Court's

11  order.  So we have not taken the opportunity of searching

12  everything else to -- I mean, because we've had to go through all

13  the custodians and searching of the e-mails.

14          Again, counsel's coming back on the Court's language

15  that it -- those allegations are evidence that university faculty

16  or staff were more directly alerted to the danger of potential

17  suicides.  So we don't have an exact number of that volume because

18  our -- understanding our objections, Your Honor, at this point, on

19  not subjecting Emory to the additional burden of more discovery.

20  Frankly, if plaintiffs were allowed this pre -- this additional

21  discovery, the significance of it -- we still have you, Your

22  Honor?

23          THE COURTROOM DEPUTY:  Hold that thought.  It seems we

24  lost her.

25          MS. HALDAR:  Okay.

1          (Pause in proceedings.)

2          THE COURT:  All right.  Well, I -- I'm sorry.

3          I got the gist of what you were saying.  So do you have

4   any -- plaintiffs' intent -- obviously pled this -- there were

5   suicide prevention policies.

6          Had you obtained any of those policies before you filed

7   the lawsuit?

8          MR. WHITMAN:  No, Your Honor.

9          We did request them.  They were not provided.  And the

10  allegations to the complaint are based on what was available in

11  the public records.

12         MS. HALDAR:  And, Your Honor, this is Lisa Haldar for

13  the defendant.  So --

14         THE COURT:  Go ahead.

15         MS. HALDAR:  Dr. Goode is also prepared to talk next

16  week.  And he is being deposed as far as his training on suicide

17  prevention policies.  So, we submit there's not -- there's not

18  anything else to discover as far as direct knowledge, again, as to

19  knowing that Albert was considering suicide.

20         THE COURT:  Tell me about -- would you go ahead and tell

21  me about what you're looking for about the Emory Scholar Program

22  being relevant to -- in the context of my order.

23         MR. WHITMAN:  Yes, Your Honor.  Let me pull that part of

24  the discovery statement.

25         Your Honor, we thought this was important before we

1  reviewed the 3,500 pages of documents produced by Emory.  But it

2  has become clear that the SAS and scholar program of which Albert

3  was a member -- the scholar program for the entire time he was in

4  Emory and the SAS which is the summer scholar's program.  It was

5  very -- months before he took his life.

6  And the SAS program, as the Court read from these

7  allegations, it's about dozens of students in the scholar program,

8  housed in a particular place together for the summer.  And

9  Mr. Goode -- Dr. Goode -- not only was he Albert's mentor,

10  counselor and advisor, he was also the director of that program.

11  And the documents that have been produced so far reveal

12  that this was the time during which Albert was -- his relationship

13  with Jane Doe was unraveling, that this was known to Dr. Goode.

14  And we now have information, thanks to the Court's discovery

15  order, the production by Emory, as noted in our argument that

16  there was tension.  There was -- at Emory Document 003246 an

17  indication in the aftermath investigation into Albert's death, a

18  note that a member of that group -- that there was some friction

19  with the group that was together.  This goes to the heart of

20  the -- as the director of the program knew when the relationship

21  was unraveling.  Albert was spiraling towards his suicide.

22  THE COURT:  What goes to the heart of that, the

23  information you had about Albert or the information about

24  something related to the policy -- the program and the policy?

25  MR. WHITMAN:  Your Honor, I can't -- I can't separate

1  them, because I don't have interrogatory aid and the deposition
2  pulled up in front of me in terms of the specific categories
3  requested.  But they were designed, everything -- if you can pull
4  that up, of course, and cite them to the Court -- we'll go over
5  them together.  But they were specifically designed to obtain
6  information about the structure of the SAS's scholar program and
7  Emory's knowledge and conduct regarding its minor students,
8  students under the age of 18 such as Albert.

9          Because, again, I hate to keep repeating myself, but it
10  bears repeating, we're going into these two limited depositions
11  next week and two of these witnesses are prepared to testify.  But
12  discovery is only meaningful if we have the tools in which to test
13  the testimony and discover the depth and breadth and the knowledge
14  of the deponent.  So I'm happy to go through the interrogatory in
15  each category and notes and deposition, but they were carefully
16  structured to elicit discovery that would help us understand what
17  Goode and Emory intended to provide Albert in the scholar program
18  as a minor student and how that could have impacted the prevention
19  of Albert's suicide.

20          MS. HALDAR:  Your Honor, the defendant may respond?
21          THE COURT:  Yes.
22          MS. HALDAR:  Thank you.

23          I just, first, wanted to point out that the staff
24  program that they're referring -- that ended well before the
25  Court's limited time frame and it included -- it was August 1st to

1 | September 13, 2019 for discovery.

2 |         And, additionally, I just wanted to point out, as Your
3 | Honor's hearing, the discovery requests talking about how many
4 | students were enrolled in Emory during the academic year, the job
5 | descriptions, the scholar programs, the directors and also the job
6 | descriptions of advisors and requirements for participation and
7 | staff -- they just -- they do not go to whether Emory or Dr. Goode
8 | was having direct knowledge of Albert contemplating suicide.

9 |         And, again, they will be able to ask Dr. Goode about the
10 | document and the friction in the house.  Even though it was
11 | outside the time period, Dr. Goode can talk to that.  And
12 | producing these general job descriptions and policies simply do
13 | not go to that direct knowledge that the Court's order indicates
14 | and the case law indicates.

15 |         THE COURT:  So are all the items -- I'm just looking at
16 | Emory's response on Document 63-1.  Are all these in contest or is
17 | it that you are -- or is it just some of them?

18 |         MS. HALDAR:  Your Honor, as far as Interrogatory 8 and
19 | then the documents -- the objections regarding staff and scholar
20 | programs and minor students, they're all under objection just as
21 | far being outside of the scope of the Court's order.  But we have
22 | produced documents.  And I'll speak to again -- we've talked about
23 | over 3,500 pages and they will be able to talk to Dr. Goode next
24 | week about those items as well about the direct knowledge.

25 |         We're simply objecting to these broader ranges of

1  searching for policies, suicide policies, minor students' policies
2  and all these broader based topics that do not go to the direct
3  knowledge of the staff at Emory regarding Albert specifically.

4         MR. WHITMAN:  Your Honor, I just pulled up the request.
5  They are -- all are in dispute and we did work out quite a bit but
6  these remain.

7         THE COURT:  I just wanted to be sure I'm looking at the
8  same thing.  We're talking about what's listed under the -- on
9  page -- starting on duces tecum, page 13 -- the bottom of page 13
10 of Emory's response.

11        MR. WHITMAN:  Actually, Your Honor, the page before it,
12 Roman numeral IV, that identifies a category regarding the SAS
13 program, the scholar program, and minor student issues.  That's
14 one category.  And then Roman Numeral V is --

15        THE COURT:  All right.  Tell me -- can you give me the
16 docket -- the page number?

17        MR. WHITMAN:  Yes, Your Honor.

18        At page number 8 of 63-1, Roman numeral IV.

19        THE COURT:  Okay.

20        MR. WHITMAN:  And I have pulled up the interrogatory --
21 the single interrogatory for the notice of deposition of --

22        THE COURT:  All right.  You're on interrogatories and
23 I'm on the documents.

24        MR. WHITMAN:  I'm referring to the joint discovery
25 statement at 64.  So document 63.  If you look at page 9, very

1  bottom -- I'm sorry.  Page 8, Roman numeral IV.  It lists a single
2  interrogatory in the heading.  And five categories in the notice
3  of deposition of Emory.  And they are at issue regarding the
4  scholar program and issues regarding minor students.

5        Has the Court found it?

6        THE COURT:  All right.  Well, I must be looking at the
7  wrong thing because I'm looking at the actual -- it looks like a
8  document in fact.  It's 63-1 on page 8 and I'm not seeing any
9  Roman numeral.  So...

10       MS. HALDAR:  Your Honor.  Your Honor, that's the
11 defendant's -- Lisa Haldar for the defendant.

12       Yes, Your Honor, that's Exhibit 1.  For 63-1 if you go
13 to page -- looking at the ECF stamp, if you look, starting on
14 page 10 of that --

15       THE COURT:  Okay.

16       MS. HALDAR:  -- of the ECF stamp, that would show you
17 the notice of the 30(b)(6) topics; 11, 12, 13, 16 and 20.  And if
18 you'll just flip back a bit and look at Interrogatory Number 8,
19 and I can tell you that page as well.  Looking at page 6 and
20 page 10 of 63-1.

21       (Pause in proceedings.)

22       THE COURT:  Counsel for Emory just indicated to me --
23 obviously you have to know.  Is there a package of documents that
24 described what the suicide prevention program and policy is?

25       MS. HALDAR:  Your Honor, we don't have a specific

1  package we are withholding that we know of.  We would have to

2  search through various personnel and figure out exactly where

3  those policies are and what they are.

4          And I will also submit it may be a bit problematic this

5  week.  We have -- our clients, the people that we would have look

6  for these issues are on vacation this week and we want to go by

7  the deposition schedule this week.  So I don't have a great answer

8  for you.  I apologize.  We can get that answer but we don't know

9  exactly -- we don't have the package that we're withholding and

10 don't want to produce.  We just -- we have -- they're everywhere.

11 And we have to talk to different people in different departments

12 and figure out exactly what we need to produce.

13         And, again, Dr. Goode is going to testify next week as

14 far as his own personal training on suicide prevention.

15         THE COURT:  Well, it seems like he would be able to --

16 even if there is a -- have you asked him whether he has a copy of

17 the policy -- what policy he has?

18         MS. HALDAR:  Your Honor, I can tell that Dr. Goode, --

19 as they'll find out next week, Dr. Goode did not have any formal

20 training at Emory on suicide prevention policies.  And, also, the

21 30(b)(6) witness will also testify to that.

22         So I guess we can answer that, that we are not aware --

23 and we talked to the witnesses.  There is no specific policy or

24 training they've had.  So that is the issue.  It would be a more

25 general policy that none of our witnesses have been trained on.

1          MR. WHITMAN:  Your Honor, this is new information in
2  light of the materials that we have been able to access.  Emory
3  has --

4          THE REPORTER:  I can't hear you, Counsel.

5          MR. WHITMAN:  Yes, Your Honor.  This is new information.
6  Based on the information we would be able to access to date,
7  plaintiff was under the impression, based on Emory's
8  representations, that every member of the faculty and staff and
9  administration -- I think the Court is down to the water boy on
10 the sports team.  I'd love to find the chapter, but it's buried in
11 my 500 pages of materials.

12         But, Judge, we were offered and under the assumption
13 that every single person on campus has been exposed to suicide
14 training and prevention.  So this does -- if they're -- if they're
15 on the record that Dr. Goode has never received any, then we --
16 then we may be able to short circuit some of this.

17         MS. HALDAR:  And, Your Honor, this is Lisa Haldar for
18 the defendant.

19         If plaintiff can point out the document where we ever
20 made that representation, we'd be happy to look at it.  But Emory
21 has never made that representation on the record, in the
22 documents.  And we're talking about Dr. Goode.  And we've never
23 made a record -- in this case has ever made any representation.

24         Again, we didn't answer the complaint.  So -- and we've
25 never made that representation in any of the discovery responses

1   that everybody on campus has had suicide prevention training.

2            THE COURT:  All right.  Well, it seems to me that

3   there's -- if there is a policy -- and I don't know if there is --

4   that whatever policy was in effect at the time of the plaintiff's

5   -- of Albert's period of time at the school as a student, that

6   that -- that policy should be provided to them -- to counsel.

7            If there was no policy, then -- then someone needs to

8   indicate that there is no policy.  And I think that we'll also be

9   able to get into the bottom of this and whatever -- the 30(b)(6)

10  deposition.  I'm not looking for you -- for counsel to look and

11  find and piece together five million different documents about

12  training and whatever else but -- at this juncture.  But to the

13  extent there is a policy, and you may or may not have included

14  anything about training, that should be produced.

15           And that would seem to me if even -- even while everyone

16  is out on vacation, something that somebody should be able to find

17  before next week before the 30(b)(6).

18           MS. HALDAR:  Yes, Your Honor.

19           THE COURT:  What day is the other -- what day are each

20  of the depositions?

21           MR. WHITMAN:  Your Honor, Emory's deposition.

22           MS. HALDER:  Your Honor --

23           MR. WHITMAN:  Emory's deposition is on Monday,

24  July 11th, and Goode's deposition is on Thursday July 13th.

25           THE COURT:  Okay.  Okay.  Well, today is Tuesday.

1   Hopefully you-all can find this by Friday and provide it to them.
2   But if not, absent -- you can come up with it first thing on
3   Monday morning before the deposition or else in the middle of the
4   deposition.  It can't be that long.

5          MS. HALDAR:  Yes, Your Honor.  Okay.  Yeah.

6          THE COURT:  Okay.  All right.  So I don't see at this
7   juncture we are open to finding out -- producing information about
8   the Title IX coordinator position.  If the lawsuit proceeds, I can
9   understand your going into that but I don't know that that is
10  necessary now.

11         And in terms of any SARS program, is there something in
12  particular that plaintiff is looking for with the victim?

13         MR. WHITMAN:  Your Honor, I'm looking at the specific
14  requests and see if we can come to an agreement on any of them.

15         And what was the category the Court was inquiring about.
16         THE COURT:  The policies related to the Emory SARS
17  program.

18         MS. HALDAR:  I'll point out, Your Honor, and to point of
19  counsel for defendant, prior to this lawsuit being filed, we did
20  produce all of Albert's scholar program materials and policies
21  that he had to sign and agreement to sign.  Plaintiffs do already
22  have that information.  Anything produced would just be more
23  general.  Again, I'm not even sure what we would produce.  It's
24  kind of just like -- there's no real policy, again, that we're
25  withholding sort of a smoking gun.  We produced pretty much

1 | everything.

2 | MR. WHITMAN:  Your Honor -- I'm sorry.

3 | Counsel, are you finished?

4 | MS. HALDAR:  I was.  Thank you.

5 | MR. WHITMAN:  Thank you.

6 | Your Honor, I'm now looking at the notice of taking

7 | Emory's deposition.  And looking at the specific duces tecum list;

8 | 11, 12, 13 and 15 go to -- 11 and 12 go to the job description.

9 | And I'm thinking this is a single document.  This is a job

10 | description of -- directly to the scholar program which has

11 | significant relevance here.  Particular because there wasn't one

12 | during this time.  So Dr. Goode was the assistant director of the

13 | scholar program.  He was doing double duty and, you know, the

14 | delegation of responsibility for the scholar program as Albert

15 | went through the program leading up to the events at the end of

16 | his life are -- again, give some context to the testimony of the

17 | witnesses.

18 | Number -- Numbers 13 and 15 -- 13 goes to the job

19 | description for individual selected advisors.  So -- so Dr. Goode

20 | was Albert's individual selected advisor and the Court can recall

21 | the very detailed allegations in the complaint about what that

22 | individual selected advisor was expected to do; what

23 | representations were made to what would be done and what -- what

24 | was expected of the relationship between them.

25 | So as to those three items, the job description as

1  director of the scholar program, the job description of the
2  assistant director and the job description of the individually
3  selected advisor within the scholar's program.  I don't think we
4  are talking about voluminous documents.  I think they'd go a long
5  way to giving us a context for Dr. Goode's deposition.
6              MS. HALDAR:  And Your Honor --
7              THE COURT:  Well, it doesn't sound -- yes.  Go ahead.
8              MS. HALDAR:  I apologize.
9              I just wanted you to know we are not objecting that it's
10  voluminous.  It's, again, relevance and following the very limited
11  scope of the Court's order as to what information we're looking at
12  this initial stage.
13              THE COURT:  Well, I understand the concerns.  And at the
14  same time it seems pretty narrow to me to ask for the job
15  descriptions.  I will say, though, to plaintiffs' counsel, the
16  more you go to a different negligence theory and in some ways that
17  you didn't do it the way the program was set up to be, it's not
18  going to be very helpful to you in terms of how the Court is going
19  to address it.
20              So, you know, I understand you don't want to spend -- I
21  can understand that you would prefer to be able to meet the job
22  descriptions ahead of time so that you're not wasting time in the
23  depositions in deposing Dr. Goode.  And that's the reason I'm
24  allowing this because I think it will allow you to zone in and not
25  be asking questions about the very things that could be provided

1  already in the job descriptions.

2          But this is not an invitation to basically go off on the
3  original negligence theory.

4          MR. WHITMAN:  Understood.

5          THE COURT:  Okay.

6          MR. WHITMAN:  Your Honor, in terms of notice of
7  deposition, could you just keep 15 and --

8          THE REPORTER:  I'm sorry, Counsel.  I didn't hear you.
9  Counsel, could you repeat that?

10         MR. WHITMAN:  Yes.

11         Number -- Number 15 speaks to the requirements of
12 Albert's participation in SAS.  We'll withdraw that and inquire as
13 to Dr. Goode.

14         And as to Number 20, guidelines regarding Emory's
15 treatment of minor students -- in light of the Court's comments
16 and kind of focus on what we're here about, I'm going to withdraw
17 that as well.

18         THE COURT:  All right.

19         MR. WHITMAN:  That only -- that only leaves one.  Just
20 leaves a few others that I think -- I think the Court has given us
21 sufficient materials to be able to conduct meaningful depositions
22 next week.  We'll -- we'll withdraw all remaining requests.

23         THE COURT:  Thank you.

24         The job descriptions could be provided to the
25 plaintiffs' counsel by Tuesday, whatever time on Tuesday.  You

1  will have an opportunity to look at them before they walk in and
2  take the deposition of Dr. Goode on Thursday.

3          MS. HALDAR:  Yes, Your Honor.

4          MR. WHITMAN:  Thank you, Your Honor.

5          THE COURT:  All right.  So does that resolve everything
6  outstanding?

7          MS. HALDAR:  Your Honor, this is Lisa Haldar for the
8  defendant.

9          I believe the only -- as long as plaintiffs'
10  withdrawing, I just want to clarify.  There were a few remaining
11  topics in 30(b)(6) as far as suicide prevention and statistics.
12  And also any document -- one of the topics is any documents for
13  Emory's response to plaintiffs' first request for production.
14  We're also objecting to that.  Again, it was over 3,500 pages as
15  far as them identifying specific documents for the 30(b)(6) to
16  testify about.

17          And also duces tecum documents, I guess notwithstanding
18  the ones that are just the job descriptions and the policies the
19  Court's already ruled on.  We're objecting to as far as outside
20  the scope.

21          So as long as plaintiffs are withdrawing those, we're
22  fine there.  I just wanted to clarify.

23          MR. WHITMAN:  Your Honor, we are withdrawing -- we're
24  withdrawing any issue -- and I will be specific on the record,
25  regarding topics one, four, five and six, without any prejudice to

1  inquire of witnesses on those matters.  So we're not asking for

2  any documents but these are areas of inquiry.

3          MS. HALDAR:  So we object to those areas of inquiry in

4  the 30(b)(6) as being outside the scope of what's being allowed.

5          MR. WHITMAN:  Understood.

6          And, Your Honor, I apologize.  I'm pinch hitting today

7  for Mr. Alex Whitman.  Who did the -- he did the heavy lifting on

8  the negotiations with Ms. Haldar.  And I commend them both for

9  narrowing the issues as much as they did.  Again, I'm playing the

10 backup role.

11         I think those four categories as to what need to be

12 looked at -- number one, he's asking that the witness be able to

13 testify to the documents produced.  We always include that just as

14 an assurance that the witness is not "place holder" as somebody

15 who has significant knowledge based on their relationship with the

16 entity.  And Ms. Haldar is telling us the person going to be

17 produced, whose identity's not been provided -- that this person

18 would be able to speak intelligently about the policies listed.

19         THE COURT:  Let's just deal with each one of them

20 separately.  All right.

21         MR. WHITMAN:  And that's -- I'm on duces tecum

22 number one.  And that is -- that is worded to assure that the

23 deponent is familiar with the documents that have been produced by

24 Emory.

25         THE COURT:  All right.  With those people you're dealing

1  with, page 7, or are you not taking on --

2         MS. HALDAR:  Your Honor, page 7 on the --

3         THE REPORTER:  I'm sorry.  I didn't hear that, Counsel.

4         MR. WHITMAN:  Thank you very much.

5         THE COURT:  Can the court reporter -- let me just let

6  the court reporter know.  We're discussing Document 63-1 at

7  page 7, under the heading, "Plaintiff's notice of taking video

8  deposition dues tecum of defendant Emory University.  An

9  objection.

10        THE REPORTER:  Yes, Your Honor.  Thank you.

11        THE COURT:  All right.  So what I'm not clear about,

12 you're totally on the one -- are you saying that you want the

13 deponent to be familiar with any document produced by Emory in

14 response to the request for production?

15        MR. WHITMAN:  Primarily the e-mails that have been

16 produced.

17        THE COURT:  How many -- how many e-mails were produced?

18        MS. HALDAR:  Your Honor, it's over 9,500 pages of

19 e-mails.  So we've -- we've already been preparing our 30(b)(6) on

20 the five topics.  So if they have a specific document she can

21 testify about, we are happy to consider that.  But as far as her

22 being prepared on all those pages, we stand by our objection in

23 the case in the Southern District of Georgia, the *Castle-Foster*

24 case, in that it's just an unreasonable topic for a 30(b)(6) to be

25 familiar with all documents produced.

1  THE COURT:  What is plaintiffs' counsel response to
2  that?

3  MR. WHITMAN:  Your Honor, my response is a generic one.
4  I've never litigated with Ms. Haldar or her firm or against Emory.
5  I'm sure the Court has had more hearings in a case to remember
6  over the scope of the knowledge of a 30(b)(6) witness to
7  produce -- and this request is made only to assure that the person
8  who is produced to testify on behalf of Emory has knowledge
9  regarding the matters that we are going to be asking Emory about
10  that.

11  THE COURT:  I think the problem here is normally it's,
12  do you have knowledge of the matters and what's this scope of the
13  knowledge?  But it's not normally, can you tell me anything about
14  any of the doc- -- all thousands of documents produced.  That's --
15  that sort of should be the -- that's what's of particular concern
16  of defense counsel.  And I understand that.

17  I mean, I have ordered 30(b)(6) plenty of times.  But
18  the 30(b)(6) witness needed to be prepared on a particular issue
19  or even when they weren't, had to take action in that light.  But
20  I just -- it seems to me a little bit both broad and overwhelming
21  to think that the witness would know everything about these
22  documents.  They might know what they -- you know, were -- were
23  they going to find documents or how would they go about
24  identifying documents?

25  But I agree with defense counsel that if you want to

1  know something about a specific document, you ought to send it to
2  them.  Tell them which one it is.
3              MR. WHITMAN:  Will do, Your Honor.  Thank you.
4              THE COURT:  Okay.
5              MS. HALDAR:  And, Your Honor, I just request that they
6  submit that early enough given that our 30(b)(6) deposition is on
7  Monday.  So that would give us time to prepare the witness on
8  those e-mails.
9              THE COURT:  All right.  Provide that to them by
10 4:00 o'clock on Thursday.  And provide it on a running basis so
11 that they at least -- anything you have by tomorrow morning, let
12 them know and update it again at 4:00 o'clock on Thursday.  All
13 right.
14             MR. WHITMAN:  Will do.  Will do, Your Honor.
15             MS. HALDAR:  Your Honor, may we have a standing
16 objection as to who they -- if plaintiff decides to designate
17 there are a thousand documents.  If this is to occur by Monday,
18 any sort of limitation on the --
19             THE COURT:  Sure.  I mean, you won't have -- obviously
20 nothing in excess of 50 documents.  And I'm really thinking that
21 would take too much time as it is.  So, you know, I think you
22 ought to think about ten documents that are -- would be the kernel
23 of your issue.
24             MR. WHITMAN:  Yes, Your Honor.  I don't think that's
25 going to be an issue.

1        THE COURT:  All right.

2        MR. WHITMAN:  The next -- the next item is number four

3  -- four, five and six kind of go together, Your Honor, and it has

4  to do with suicide intervention undertaken by Emory in the

5  five-year period prior to Albert's suicide.  It has to be -- we

6  would be inquiring as of Emory and, of course, Dr. Goode

7  personally.

8        But as of Emory whose public statistics indicate that

9  suicide efforts at Emory are high percentage.  That they're -- and

10  the documents produced reflect that there's a protocol in place

11  once a student suicides.  So we would -- we would ask leave of

12  Court to be able to inquire into these areas.

13        MS. HALDAR:  Your Honor, for the defendant.

14        Those topics don't go to protocol.  Four, five and six

15  talk about suicide intervention taken which comes before suicide.

16  I believe -- at least the plaintiffs' are talking about the

17  protocols enacted after the suicide is completed.

18        But at any rate, for topic six as far as -- we are going

19  on specific to the Court's order, talking about suicide

20  intervention undertaken by Dr. Goode.  We would just ask that it

21  not be the five-year period prior to August 29, 2019, and go

22  within the Court's limited time frame of August 1st to the date of

23  Albert's death.  Even at least Dr. Goode's time at Emory and not

24  five years back.  We believe that's overreaching the Court's

25  order.

1          THE COURT:  What is his time at Emory?  What time is
2    that, of Dr. Goode at Emory?

3          MS. HALDAR:  We believe it's about 2016, Your Honor.

4          THE COURT:  Okay.  Well, that's fine.  We'll start with
5    Dr. Goode was --

6          MS. HALDAR:  I just want to leave it to 2016 but I just
7    want to make it clear I'm not stating that for the record.

8          THE COURT:  Let me just say I'm looking at number four
9    and it seems too broad which is, "Any actual suicide intervention
10   undertaken by any Emory employee during the five-year period prior
11   to August 2019."  That seems enormously broad.  And of course it
12   could include graduate students.  It could take -- it could deal
13   with employees.  It's just way too broad.

14         It seems to me that the one involving number five, which
15   is anyone in the Emory scholar's program, though, that's limited
16   enough that it's still under the three-year period from
17   Dr. Goode's presence forward, whatever that was, 2016, 2017 -- or
18   2015.  That's just -- because that would be more realistic and I
19   don't know that there was any mark.

20         MS. HALDAR:  Yes, Your Honor.  That's correct.

21         THE COURT:  Okay.

22         MS. HALDAR:  And I can say the same point to topic
23   number six.  I mean, I can also state for the record during Dr.
24   Goode's time at Emory -- during his time at Emory through the date
25   that Albert passed away, there was no active suicide intervention

1  by Dr. Goode.

2          THE COURT:  All right.  But I'm saying, basically,

3  number five and number six are alike but just subtract the time

4  period.

5          MS. HALDAR:  Adjust Dr. Goode's time at Emory?

6          THE COURT:  Right.

7          Is there anything of any of those others listed here in

8  dispute?

9          MR. HALDAR:  I believe at this point it would just be

10  the documents in the subpoena duces tecum.  And, again,

11  notwithstanding the job descriptions, the Court's discussed and if

12  there is any policy to produced, I think they were also withdrawn

13  by the plaintiffs as I understand.

14          THE COURT:  That's my understanding, too.

15          Is there any -- is there anything else?

16          MR. WHITMAN:  Not for the plaintiffs.  No, Your Honor.

17          THE COURT:  Okay.

18          MS. HALDAR:  And to clarify if I may at this point, Your

19  Honor, for the defendant; it was August 2017, I apologize, for

20  Dr. Goode's time at Emory.

21          THE COURT:  Okay.  And the suicide was in 2019?

22          MS. HALDAR:  Yes, Your Honor.

23          THE COURT:  Okay.  That's fine.

24          All right.  So we've resolved everything other than the

25  fact that you are going to send me the materials to look at and

1  we'll get back with you as soon as possible once we've reviewed

2  them.

3        MS. HALDAR:  Yes, Your Honor.  I believe that's all for

4  the defendant.  We appreciate the Court's time today very much.

5        MR. WHITMAN:  Thank you very much.

6        THE COURT:  I guess I stayed on the line for at least

7  20 minutes.

8        MS. HALDAR:  Thank you, Your Honor.

9        THE COURT:  All right.  Good luck.  I hope we are able

10  to get everything moving forward it looks like.  Thank you.  Be

11  well.

12        MR. WHITMAN:  Thank you.

13        MS. HALDAR:  Thank you.

14        THE COURT:  All right.  Bye-bye.

15        (Proceedings were adjourned at 10:30 a.m.)

16                  Reporter's Certification

17  I certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled matter.

19

20

21                        /S/Denise M. Stewart, RPR
                          Official Court reporter
22                        United States District Court
                          Northern District of Georgia

23  Date:  July 8, 2022

24

25