**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| Plaintiffs' Allegations | Corresponding Documents/Deposition Testimony Upon Which Plaintiffs Rely or Otherwise Reference |
|---|---|
| **EXAMPLE #1** ||
| During EMORY's Spring 2019 Semester, Goode had gotten to know ALBERT very well, and ALBERT told Goode that he was engaged in an ongoing, intimate sexual relationship with a woman who was older than ALBERT. (Am. Compl. ℙ 151; *id.* ℙ 143.) | Q. All right. So let's look at Emory -103, part of Exhibit 9 -- Plaintiff's Exhibit 19. And I'm looking at the fourth line and the only full sentence in that line. "Albert was part of SAS this year, and I got to know him very well this spring and summer." **A. Uh-huh.** Q. Is that an accurate statement? **A. That is an accurate statement. Along with -- . . . all the other scholars that were part of SAS.** Q. So of those 14 SAS participants, you got to know them all very well? **A. I believe so, yeah.** Q. So at the time of Albert's death on August 30, 2019, you knew him very well; correct? **A. I felt that I knew him and the other scholars very well."** <br><br> (Goode Dep. 178:11-179:4.)[1] <br><br><br> Q. It's true, sir, at the beginning of the spring 2019 semester you knew that Albert was engaged in a ongoing intimate sexual relationship with Jane Doe. . . . **A. I did not know anything about any sexual nature of the relationship, no.** <br><br> (Goode Dep. 202:13-20.) |

---

[1] All cited excerpts from the deposition transcript of Dr. Goode are hyperlinked and attached hereto as **Exhibit A-I.**

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| EXAMPLE #2 |
|---|

| | |
|---|---|
| During the 2019 SAS Summer Program, Goode became aware of many instances of friction between other SAS participants and ALBERT, who was the only minor participating in the 2019 SAS Summer Program. (Am. Compl. ¶ 144.) | Q. As the program director for the SAS program in the summer of 2019, did you observe or learn of any friction with the group that lived together that summer? **A. Yes, I did.** Q. Okay. And could you describe it for us. **A. So friction with the group -- I mean, the group is a living/learning community. They were living together. They were going on tours through the city. They -- we had some conversations around, for example, about washing the dishes. So one source of friction was students were -- participants were a little concerned that not everybody was washing dishes. There was another point of friction where there was -- students were maybe in -- there's a communal refrigerator, and students were eating food that they hadn't necessarily prepared. So that was one of the points of friction. Another point of friction was about timeliness. They were -- when we would go on our field trips, we would ask the students to report to the van, which I would usually be driving, at, like, 9 in the morning or 8:30 in the morning. And so we had a point of friction because not all the students were ready at the time. That was a point of friction. We had -- yeah. They -- we had -- we had friction. I mean, I can -- there was some friction, but that's also to be expected. I mean, that's not anomalous in a program like this. This is kind of -- you know, this is part of the design. There's friction when people live together.** Q. Was there friction between Albert and any specific members of the group that you're aware of? **A. Yes.** Q. Can you describe that? **A. Yes. There was friction around Albert's conduct at the Stewart Detention Facility in Americus, Georgia, during an overnight visit that we took as** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | **a group down there. And there were some students who felt that Albert had spoken inappropriately, disrespectfully in the presence of family members who had been admitted and checked into the Stewart Detention Facility and were waiting in the sort of communal waiting room to be ushered inside and to have an appointment with a family member inside. There was -- there were students who objected to comments that Albert had made, and they felt that they were insensitive.** Q. Are you aware of any other friction between Albert and any other members of the SAS summer 2019 group? **A. Yes.** Q. Continue. **A. In the early weeks of the program -- it may have been during orientation -- one of the participants was talking, and Albert fell asleep. And the group was a little bit -- I think that person felt offended and insulted that Albert had fallen asleep.** Q. Any the other friction between Albert and any of the other SAS members that you're aware of? **A. There were some -- a SAS participant broached the subject of Albert's just participation in the program and wanted him to be sort of fully engaged when he was there and present and -- so that was -- that was one of the points of friction. He was spending, you know -- there was – he was -- it was a question for him whether or not he was going to be staying in the house. So I had to have a conversation with him and say, "If you're going to be part of SAS during -- you should stay in the house. You need to stay in the house, and that's something that the community feels is important." And for Albert, as for the rest of the participants, what we really were referring to was during the weekdays. But at the -- on the weekends we were going to as a group -- because the group in large part got to determine its own norms that that would be allowed. So that was** |
|---|---|

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| | **another, I guess, friction point that we negotiated.** Q. Any other friction that you can remember between Albert and other members of SAS? **A. No.**<br><br>(Goode Dep. 189:15-192:22) |
| **EXAMPLE #3** | |
| A colleague of Druss, who met ALBERT during this internship, considered ALBERT to be "just a kid". (Am. Compl. ¶ 147.) | PROVISIONALLY REDACTED<br><br><br><br><br><br>(Emory_002655.)[2] |
| **EXAMPLE #4** | |
| In his mandatory, bi-annual written report to the EMORY Scholar Program in May 2019, ALBERT reported to Goode and EMORY that he was "juggling" a lot of activities and responsibilities. (Am. Compl. ¶ 152.)<br><br>In his mandatory, bi-annual written report to the EMORY Scholar Program in May | PROVISIONALLY REDACTED |

---

[2] Emory_002655 is hyperlinked and attached hereto as **Exhibit A-II**.

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| 2019, ALBERT reported to Goode and EMORY that he was in a serious, committed relationship. (Am. Compl. ₱ 153.) | PROVISIONALLY REDACTED |
| In his mandatory, bi-annual written report to the EMORY Scholar Program in May 2019, ALBERT reported to Goode and EMORY that he intended to go to EMORY's Counseling & Psychological Services ("CAPS"), to keep himself "sane". (Am. Compl. ₱ 154.) | (Goode Dep. Pls.' Ex. 24 at Emory_00772 (bi-annual report Plaintiffs quote.)[3] |
| Goode neglected to review ALBERT's May 2019 mandatory, bi-annual written report prior to ALBERT's suicide, and nonetheless considered the information provided by ALBERT in his May 2019 mandatory, bi-annual written report merely as "data-points". (Am. Compl. ₱ 155.) | Q. So going back to this description of his relationship as a "serious, committed relationship with my significant other," you knew that as of May 2019; correct? **A. I don't think I read this on May 20, 2019.** Q. You knew in May of 2019 that Albert was in a serious, committed relationship with Jane Doe, though; correct? . . . **A. So this was created and submitted on the 20th of May. I don't -- I cannot tell you when I read it. I doubt -- I just can't tell you when I read it.** Q. Same paragraph, three lines from the bottom, in the middle of the line -- **A. Okay.** Q. -- on his to-do list, "and continue going to CAPS to keep me sane through all of this." Do you see that? **A. Yeah.** Q. Yeah. I guess you didn't read that in May of 2019 either? **A. Sir, I don't know when I read it is what I'm trying to tell you.** |
| | (Goode Dep. 209:7-210:8.) |
| **EXAMPLE #5** ||
| By EMORY's Spring 2019 Semester, Goode had already become aware of a | Q. During Albert's life, did you sense that there was a stigma among the Emory scholars regarding seeking help at CAPS? **A. Among the Emory** |

---

[3] Plaintiffs' Exhibit 24 from the deposition of Dr. Goode is hyperlinked and attached hereto as **Exhibit A-III**.

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| stigma that participants in the EMORY Scholar Program associated with seeking mental health counseling at CAPS. (Am. Compl. ¶ 156.) | **scholars as a group? No.** Q. Did you come to understand that there was a stigma among some Emory scholars regarding seeking help at CAPS? **A. I assume there was. I think it's stigmatized for some people.** Q. Did you assume that during Albert's life? **A. Did I assume that there were some Emory scholars for whom it was a stigma to go to CAPS during Albert's life? I would assume that, yes. I would assume that would be the case. There's cultural beliefs rooted in personal histories, family histories, ethnic communities. Values are just different.**<br><br>(Goode Dep. 229:23-230:14.) |
| **EXAMPLE #6** ||
| During EMORY's Spring 2019 Semester, Goode also knew that ALBERT had a fraught, enigmatic and rocky relationship with his parents, and was receiving limited emotional support from them. (Am. Compl. ¶ 165.) | Q. Can you tell me what you meant when you used the word "fraught"? **A. What I meant by "fraught" is that Albert was trying to change his surname from Liang to Zhang and -- for example. That's -- and that's one of things I was referring to.** Q. What are some of the others? **A. Albert had talked about -- Albert talked to me about academic planning, cocurricular planning, strategic planning for his future; and one of the themes of these discussions was where Albert would physically be. And he talked about -- he said he was interested in being in places other than Texas with his family.** Q. Anything else that you were referring to when you used the term "fraught"? **A. I think Albert had also expressed to me concerns about the parenting that his parents were providing to his younger siblings. He was concerned about how those children were being raised and, I think, in terms of the quality of the parenting that those -- his siblings were receiving, and he had some concerns about that.** Q. Anything else? **A. Albert -- I -- Albert had --** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| | **that's – that is -- that's the main of it. I mean, I'm recollecting in the moment, Counsel, and I'm just trying to go through my -- search my memory banks here. I mean, if you give me more time, I'd be happy to kind of think through what other things I would associate with a --** . . . Q. What did you mean when you used the term "enigmatic"? **A. I don't know. I think Albert told me that he was not comfortable discussing his feelings, his interiority, these kinds of things.** Q. What was the word after "feelings"? **A. Well, it's a word that I'm using. It's not a word that he's using. But he didn't --** Q. What was -- **A. -- feel comfortable --** Q. What was the -- **A. I said "interiority."** Q. What does that mean? **A. What I'm referring to is just his inner world. And so part of the enigma is Albert was not disclosing his emotional inner world to me. So I understood from what he had said that he had a fraught relationship with his parents, but what was enigmatic is in terms of deep layers of feeling, history, he did not -- I do not recall him talking to me about that.** . . . Q. If you could complete the sentence today, how would you complete it? And for completion, "Albert's fraught -- and in many ways enigmatic -- relationship with his parents is part of what makes." **A. I might say that makes this question important. Because one of the things that I understood the president wanted to do and was enlisting our help to do was to address Albert's parents with absolute respect and in an appropriate way. Part of what makes this difficult is that Albert himself was using or trying to change his surname to a different surname. So I think it's like -- that's a difficult -- I just think that is difficult. That's difficult. The student was sort of referring to himself in one way, and so now you got to kind of switch gears and refer to the parent in another** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  | way. Q. So would you agree with me that this statement made by you and as described by you today made on September 11, 2019, reflects that you had developed an understanding of both Albert and his relationship with his parents while he was still alive? . . . **A. I would say I had an impression. I don't know that I would call it an understanding.** (Goode Dep. 75:9-78:22.) |
|---|---|
| **EXAMPLE #7** ||
| On June 6, 2019, after the conclusion of EMORY's Spring 2019 Semester, ALBERT sought assistance from CAPS; ALBERT's effort to do so was known to Goode. (Am. Compl. ¶ 167.)<br><br>At his June 6, 2019 CAPS encounter, ALBERT was seeking help to process how his relationship with his parents had impacted his relationship with himself and others. (Am. Compl. ¶ 168.)<br><br>At the conclusion of ALBERT's June 6, 2019 encounter at CAPS, because he was a minor child, CAPS refused to provide | Q. . . . All right. You said that Albert had no suicidal tendencies. **A. Correct.** Q. None? **A. None. He was future-oriented. In the line that -- where he says he does not want to -- well, the last thing --** PROVISIONALLY REDACTED PROVISIONALLY REDACTED **-- which indicates that he had plans on being alive on his birthday. And for a clinician, that is a safety factor. As long -- when you -- we look for students -- or for clients, individuals, to be forward-thinking and future-oriented. An indicator of suicide is that somebody is not forward-thinking or future-oriented, and that's a part of the assessment.** Q. All right. That assessment was made in June; correct? **A. Correct.**<br><br>(Bryant-Smith (30(b)(6)) Dep. 129:3-20 & Def. Ex. 1 (Emory  00782 – 00805) (Albert's June 6, 2019, CAPS records).)[4] |

---

[4] Cited excerpts from the deposition transcript of Adrienne Bryant-Smith are hyperlinked and attached hereto as **Exhibit A-IV**. Defendant's Exhibit 1 from the deposition of Adrienne Bryant-Smith is hyperlinked and attached hereto as **Exhibit A-V**.

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)



| | |
|---|---|
| ALBERT with any counseling without first obtaining his parents' permission, which ALBERT declined to authorize because of the very nature of the counseling he was seeking. (Am. Compl. ⸿ 169.) | PROVISIONALLY REDACTED<br><br>(Bryant-Smith (30(b)(6)) Dep. Def. Ex. 1 (Emory_00782).)<br><br>PROVISIONALLY REDACTED<br><br>(Bryant-Smith (30(b)(6)) Dep. Def. Ex. 1 (Emory_00783).) |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  |  |
|---|---|
|  | Q. He went to CAPS. Were you aware of that? **A. I was aware that he had made a visit to CAPS, yes.** Q. When did you become aware of that? **A. When did I become aware. I believe it was within days. I can't know for certain, but it's my understanding that -- I was told that -- I had seen him, and I asked a question to somebody, oh, I – or not even asked a question. I said, "Oh, I just saw Albert riding on his bike." And that person said, "Oh, I think he was going to CAPS." That's -- so -- later -- I don't know that I -- I'm trying to recall if Albert ever talked to me about that CAPS visit. I did learn subsequently, after his death, about a visit that he made to CAPS. I mean, I'm just assuming that they're the same one, but I --** Q. So you knew during Albert's lifetime that he had gone to CAPS; correct? **A. I knew -- I mean, I guess I was told.** Q. Okay. **A. I'm trying to recall if Albert -- Albert may have told me too that he went to CAPS.** Q. Do you know why Albert went to CAPS? **A. No. I mean, I could assume why -- I can -- Albert specifically that day -- I know generally it's counseling and -- I can't remember the acronym right now, but usually it's for mental health reasons. It's a resource that's available to all Emory students. And so I guess I had some assumptions about why he would go there.** Q. Did you -- were you aware, during his lifetime, that Albert went to CAPS to process how his relationship with his parents had impacted his relationship with himself and others? **A. I don't -- I don't know --** Q. You did not? **A. -- what might -- may or may not have been discussed in the CAPS meeting.**<br><br>(Goode Dep. 224:8-225:21.) |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  |  |
|---|---|
|  | [by Emory] Q. Are there any circumstances under which CAPS would have treated Albert as a minor without his parents' consent? **A. Yes.** Q. What are those circumstances? **A. If he presented with suicidal ideation at the time of his intake, he would have been referred to hospitalization.** Q. And would he have needed his parents' consent for that hospitalization? **A. No.** <br><br> (Bryant-Smith (30(b)(6)) Dep. 121:6-16.) |
| **EXAMPLE #8** ||
| During the Summer of 2019, Goode also knew that, even though ALBERT was required to live at the SAS house as part of EMORY's 2019 SAS Summer Program, ALBERT frequently stayed overnight in an off-campus apartment being subleased by the adult woman, which Goode permitted, thereby fostering ALBERT's relationship with the adult woman. (Am. Compl. ¶ 170.) | Q. You said earlier you had a conversation with Albert about not sleeping overnight at the SAS house? **A. I talked to him about -- well, I mean, I talked to him about commitment and his commitment to the program and our agreement. And in that conversation we clarified that the expectation was that he was going to be in the SAS house on -- I think we agreed on Sunday through, like, Friday evening or -- like, through the programming. Like, the Sunday night and then through the -- through the week.** Q. And you knew that, on the nights that he wasn't staying at the SAS house, he was staying at Jane Doe's apartment; correct? **A. Albert told me that that's what he was doing.** <br><br> (Goode Dep. 193:5-19.) |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| EXAMPLE #9 | |
|---|---|
| During the August 15 encounter, ALBERT told Goode that, since he had been thrown out of the adult woman's apartment where he had been living, as a result, he was homeless and without safe shelter, a crisis of basic needs. (Am. Compl. ⁋ 180.) | Q. Did he tell you that he felt like he was homeless in the moment until the dorm opened for the fall semester? . . . **A. No. To the contrary, he talked to me about multiple housing options that he had.**<br><br>(Goode Dep. 254:18-23.) |

| EXAMPLE #10 | |
|---|---|
| During the August 15 encounter, ALBERT told Goode that he had been in an abusive relationship with the adult woman, and that the end of the relationship was precipitated by a physical altercation, during which ALBERT had been physically assaulted by the adult woman. (Am. Compl. ⁋ 181.) | Q. Did he tell you that this recently ended relationship had been an abusive relationship with Jane Doe abusing him physically? **A. No.** Q. Did he tell you that he had sustained a physical injury as a result of an altercation with her? **A. No.** Q. Did he tell you that in the altercation his glasses were broken, his body was scratched, and his testicles had been punctured? . . . **A. No.**<br><br>(Goode Dep. 254:25-255:1-12.) |
| During the August 15 encounter, ALBERT told Goode that, as a result of the assault by the adult woman, ALBERT's glasses were broken, his body was scratched, and his testicles had been punctured. (Am. Compl. ⁋ 182.) | Q. Did you ever have a person-to-person, face-to-face meeting with Albert Zhang during which you saw a red mark on his neck? **A. I had an in-person face-to-face conversation with Albert in which my eye caught something. I mean, it was -- I don't know that I would even characterize it as red. It was fleeting. And I -- so I didn't -- you know, and that's -- I thought I saw something. I didn't know if I saw something.** Q. Can you |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| At the time of the August 15 encounter, ALBERT had a red mark on the left side of his neck, and a large and discolored bruise on his chest, evidence of a traumatic physical injury. (Am. Compl. ℙ 183.)<br><br>At the time of the August 15 encounter, Goode saw and acknowledged ALBERT's traumatic physical injury. (Am. Compl. ℙ 184.)<br><br>The traumatic physical injury visible to Goode at the time of the August 15 encounter was evidence of an assault upon ALBERT by the adult woman. (Am. Compl. ℙ 185.) | see a -- can you see -- can you appreciate that, if this is, in fact, the left side of Albert's body, that just below his clavicle there appears to be a bruise? Is that an accurate description? **A. It would appear there's -- yes --** Q. Okay. **A. -- on this image.** Q. During the interaction with Albert during which you had a fleeting note -- notice of something -- **A. Uh-huh.** Q. -- did you see that bruise on his body? **A. This bruise? No. . . .** Q. . . . Didn't you tell me that you had a fleeting image of some -- something on his neck? . . . **A. Something. But I -- whether -- what – the color of it is just -- it was -- something caught my eye, and I -- that was it. That's what I recall.** Q. But you wouldn't have described it as a red mark on the left side of his neck; is that right? **A. I wouldn't -- I wouldn't have described it to whom?** Q. To anyone. **A. To anyone. I don't think so.** Q. Did you appreciate it to be a sign of a physical injury? **A. I didn't know.** Q. Did Albert tell you what the cause of that mark on his body was? **A. We never established that there was a mark, and he didn't talk about it.**<br><br>(Goode Dep. 135:21-137:19.) |
| **EXAMPLE #11** | |
| During the August 15 encounter, ALBERT told Goode that he was upset and worried over the fact that the adult woman was unfairly blaming ALBERT for the physical altercation, during which the adult woman claimed to also have been hurt. (Am. Compl. ℙ 187.) | Q. During that August 15 encounter, Albert was sad about the breakup with Jane Doe, wasn't he? **A. I don't know if he was sad. He seemed – he seemed kind of surprised, like it had surprised him.** Q. During this August 15 encounter, he was upset and worried over the fact that Jane Doe was blaming him for the physical altercation. **A. I'm -- . . . A. I knew nothing about a physical altercation.** . . . Q. During that encounter, Albert expressed his feelings of isolation and loneliness; correct? **A. No.** Q. Did Albert -- **A. He never expressed feelings of isolation and loneliness.** Q. |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| During the August 15 encounter, ALBERT further expressed his feelings of isolation, loneliness and hopelessness to Goode, telling Goode that, although he had many friends, he did not have any friends with whom he could share these unpleasant circumstances: the violent end of his relationship with the adult woman, the abuse he had suffered at the hands of the adult woman who had abruptly ended the relationship, and his feelings of loneliness. (Am. Compl. ⁋ 188.) | Did Albert express feelings of hopelessness to you? **A. No, he never expressed feelings of hopelessness to me.** Q. Did Albert tell you during that encounter that, although he had many friends, he did not have any with whom he could share these unpleasant circumstances? . . . . **A. What unpleasant circumstances are you referring to in your question?** . . . Q. His breakup with Jane Doe. **A. No. I don't remember him saying anything like that.**<br><br>(Goode Dep. 256:2-257:9.) |
| **EXAMPLE #12** | |
| During the August 15 encounter, Goode knew that ALBERT was distraught over the break-up of his relationship with the adult woman, a fact which Goode told officers with the EPD on the day of ALBERT's suicide. (Am. Compl. ⁋ 198.) | Q. Yeah. Okay. So did you tell Officer – an officer present at the scene that PROVISIONALLY REDACTED PROVISIONALLY REDACTED **A. I do not recall using that language. I do -- I don't recall using that language.**<br><br>(Goode Dep. 127:10-15 & Pls.' Ex. 12.)[5] |
| **EXAMPLE #13** | |
| During the August 15 encounter, fifteen (15) days before ALBERT's death by | PROVISIONALLY REDACTED |

<hr>

[5] Plaintiffs' Exhibit 12 from the deposition of Dr. Goode is hyperlinked and attached hereto as **Exhibit A-VI**.

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| suicide, ALBERT appeared to Goode to be suicidal, a fact which Goode told officers with the EPD on the day of ALBERT's suicide. (Am. Compl. ¶ 199.)<br><br>Before ALBERT's body was discovered, Goode told officers of the EPD that he had a student who appeared to be suicidal. Goode also told officers of the EPD at the scene that: he had recently spoken to ALBERT, who was distraught because ALBERT and the adult woman had broken up; he had observed a red mark on the left side of ALBERT's neck; Goode had told ALBERT that he was a mandatory Title IX reporter, and that what ALBERT told Goode would have to be reported, at which time ALBERT asked if they could just talk about other things, and not the adult woman. (Am. Compl. ¶ 259.)<br><br>While at the scene on August 30, 2019 and before it was known that ALBERT had already died by suicide, Goode further told officers of the EPD that there was a pending Title IX complaint | PROVISIONALLY REDACTED<br><br>(Goode Dep. Pls.' Ex. 12 (Emory_002674) (EPD Supplemental Case Report).)<br><br>Q. Dr. Goode, before Albert's death, did you suspect that he was suicidal? **A. No.** MR. JOSHUA WHITMAN: Let's mark for the record Plaintiff's Exhibit 12. This is Emory -2674 through -2676. It is the supplemental case report from the Emory Police Department. . . . Q. Dr. Goode, have you ever seen this document before? **A. If you'll just give me a moment, sir. No, I don't believe I've ever seen this.** Q. All right. Let me draw your attention to the first page, Emory -2674. I'm looking at the first paragraph at the top of the page, looking at the second sentence that begins with -- the part of the sentence that begins with your name. And I'll read to you part of that paragraph that says, PROVISIONALLY REDACTED PROVISIONALLY REDACTED past tense, PROVISIONALLY REDAC _____ " Do you see that? **A. I do.** Q. And I understand that this is a document that was written by someone else. Did you tell that person that you had a student who appeared to be suicidal? **A. No.** Q. In looking at the second paragraph – before we leave that, do you have any idea where this reporter would have obtained that information that you stated that you had a student who appeared to be suicidal? **A. So can you tell me who wrote this** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| regarding ALBERT, an indication of Goode's awareness of the impact the Title IX Complaint had upon ALBERT. (Am. Compl. ¶ 260.) | **report?** Q. According to the report, Bryan Barnett. **A. Okay. Sir, can you -- I'm not familiar with Mr. Barnett. Can you describe him to me?** Q. I cannot. **A. Okay. Then I don't know.** Q. Okay. So Officer Barnett writes PROVISIONALLY REDACTED . Do you know who that is? **A. You're asking me who Deputy TJ Brackett is?** Q. Yes. Do you know who that is? **A. I don't know for certain. I could speculate.** Q. Okay. Do you think that Officer Brackett might have been the individual who came to the Zhang home the morning of Albert's death? **A. Counselor, as I recall, there were multiple police officers who were at the house, and I don't know -- I can recall at least -- at least two of them. So I don't know which one, if either of them, were TJ Brackett or . . .** Q. Okay. **A. That's what I recall.** Q. According to this official report of Emory Police Department written by Officer Barnett -- MS. HALDAR: And objection. I just want to point out that it's not -- we're just not conceding there or stipulating it's an official or who wrote it, but I can see that we produced it. BY MR. JOSHUA WHITMAN: Q. So, Dr. Goode, according to this Emory Police Department supplement case report, Officer Barnett wrote PROVISIONALLY REDACTED And you have denied making that statement to anyone; correct? **A. I do not recall making that statement. I'm also not an Emory professor, as we've established. But that's also reflected there in the sentence.** . . . Q. Okay. Let's go to the second paragraph. And I'm on the second line, and I'm starting with the -- let's just read it from the end of the first line where it says, PROVISIONALLY REDACTED |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

PROVISIONALLY REDACTED

**A. Uh-huh.** Q. And would that be you? **A. I believe that's me, yes.** Q. Okay. PROVISIONALLY REDACTED -- earlier referred to as Albert Liang or Albert Zhang -- PROVISIONALLY REDACTED PROVISIONALLY REDACTED It's hard to read that PROVISIONALLY REDACTED part -- **A. Uh-huh.** Q. -- but you can kind of -- kind of see that -- right? -- through that redaction? **A. I believe I can, yeah.** Q. Yeah. Okay. So did you tell Officer – an officer present at the scene PROVISIONALLY REDACTED **A. I do not recall using that language. I do -- I don't recall using that language.** Q. If you put your English professor hat on, would you equate the word -- the word "distraught" with the term "acute distress"? **A. Would -- well, language needs to be contextualized. I mean, I don't know -- I didn't write this report. So I don't know what this person meant by "distraught."** Q. So I -- **A. So I don't --** Q. I want to withdraw the question. Let me rephrase it, please. **A. Okay.** Q. Would you agree with me that a synonym of the word "distraught" could be "acute duress," d-u-r-e-s-s? **A. So you're asking me -- I don't know. We could find out, I suppose. I'm not a thesaurus.** Q. Well, you're the one with the Ph.D. in English. I'm asking the question. Would you equate the word "distraught" with the term "acute duress"? **A. Not necessarily, no.** Q. Okay. It goes on to say that, PROVISIONALLY REDACTED Do you remember telling the officer that? **A. I do not recall telling the officer that, no.** Q. Do you remember telling the officer, as it reflects here next, that, PROVISIONALLY REDACTED

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  | PROVISIONALLY REDACTED Do you remember telling the officer that? **A. So, sir, I -- what you've just described does not match with what I read in this report, though.**<br><br>(Goode Dep. 123:3-129:1 & Pls.' Ex. 12.) |
|---|---|
| **EXAMPLE #14** ||
| On August 20, 2019, ALBERT sent an email that was received by Professor Druss (ALBERT's boss at his Summer 2019 EMORY internship), Professor Druss's administrative aide, and one of EMORY's medical school Psychiatry residents, in which email ALBERT described what had happened between ALBERT and the adult woman as a "recent series of unfortunate events", and advised that he had become homeless, and was without safe shelter, a crisis of basic needs. (Am. Compl. ¶ 201.) | Hi All,<br><br>Bad news? Unfortunately, I don't think I'll be able to make it to tomorrow's meeting. I'm very sorry for the late notice. A recent unfortunate series of events has caused me to become temporarily homeless myself (ironic, I know). I will be fine and I do have a place to stay, but I just don't think I'll be able to make the meeting tomorrow.<br><br>Could I get back to you later in the week to find another time?<br><br>Apologies,<br><br>Albert<br><br>(Emory_002221.)[6] |
| **EXAMPLE #15** ||
| During the August 26 encounter, ALBERT told Goode that the adult | Q. Now, during this August 26th encounter, is that the last time you saw Albert alive? **A. Yes.** Q. Did he tell you during that encounter that Jane Doe |

---

[6] Emory_002221 is hyperlinked and attached hereto as **Exhibit A-VII**.

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| woman was planning to file a Title IX complaint against ALBERT. (Am. Compl. ⁋ 207.)<br><br>During the August 26 encounter, ALBERT told Goode, and Goode himself observed, that ALBERT had begun to feel trapped by the circumstances surrounding the recent painful events, losses, and changes in his life that he was experiencing. (Am. Compl. ⁋ 213.)<br><br>During the August 26 encounter, despite his knowledge that the adult woman's Title IX complaint against ALBERT would likely result in little, or no (and certainly not severe), consequences for ALBERT, Goode advised ALBERT, a minor child, to hire an attorney to defend himself against the adult woman's allegations, advice that further led ALBERT to believe that he was facing serious consequences. (Am. Compl. ⁋ 214.) | was planning to file a Title IX complaint against him? **A. He -- what he said was -- I don't remember if he said that. What he said was, as I recall, that he had access to her calendar. So he said, "I still have access to Jane Doe's calendar." And so that's what he said. And he said he -- he reached to his phone, and he, like, moved it over as if he was going to show me. And I said, "Albert, I don't want to see any -- I don't know what -- I don't need to see anything about anybody's calendar." And he said she has scheduled an appointment -- something related to Title IX. And I said, "Okay. Okay." And just to – I mean, if that's what you're saying, if that's what she's done, okay. And I said, "It doesn't -- so she -- doesn't she get to, as an Emory student, if she wants to, schedule an appointment with a Title IX coordinator?" That's what I recall.** Q. Did Albert tell you during that encounter that he had begun to feel trapped by the circumstances surrounding the recent changes in his life? . . . **A. No, he did not mention being trapped and -- no.** Q. Did you advise Albert during that encounter to consult with an attorney to defend himself against Jane Doe's allegations? **A. What I recall saying is I -- I said, "Albert, imagine whatever the focus -- if there is a Title IX investigation, think about whatever that might be, but don't tell me. Imagine that it's in a box." And he said, "Okay." I said, "Now, take that box. Let's say that you were to show it to somebody. Like, don't show it to me. But how might they react to what's in there?" And he said something like, "It's not good." And I said, "Well, then, Albert, I want you -- I think you should find somebody with whom you can talk openly about whatever's in that box." And Albert said, "Should I get a lawyer?" And I said, "Albert, I think that you should talk to somebody, someone you trust, someone** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  |  |
|---|---|
|  | **with whom you can be perfectly open and honest about whatever it is that's in that box." And he said, "Should I call my father?" And I said, "Yes. If that person -- if you feel like you can have that conversation with your father, then I think you should call your father. But I think you need to talk to somebody that can help you have that conversation."** Q. Did you recommend that he talk to a lawyer? **A. Did I recommend? I -- what I said – I said, "Whomever you can talk to -- you need somebody that you can talk to about whatever's in that box. And he asked me, "Should I get a lawyer?" I said, "That -- you know, Albert, that's up to you."** <br><br> (Goode Dep. 273:16-276:5.) |
| **EXAMPLE #16** ||
| At the time of Goode's August 2019 final encounters with ALBERT, the EMORY Scholar Program had no Director, who would likely have been an individual who had been trained to have a greater appreciation of the suicide risk factors and behaviors being exhibited by ALBERT. (Am. Compl. ¶ 233) <br><br> As a further result of the vacancy in EMORY's Title IX Coordinator position, the Interim Title IX Coordinator, who prepared and sent the notice of the adult | [By Emory] Q. . . . did Albert portray any signs of suicide risk that a nonclinician could recognize -- someone without medical training? MR. MIDDLETON: Same -- **A. No.** MR. MIDDLETON: -- objection. **A. Absolutely not.** BY MS. HALDAR: Q. Did Albert portray any signs of suicide risk -- and I can tie this to Topic No. 3 -- that a clinician, such as Dr. Duffy, would have recognized when he visited CAPS? **A. No, he did not.** Q. Had Dr. Goode received QPR training, do you believe it would have made a difference in his responses to meeting with Albert? Mr. Middleton: Objection. **A. No.** <br><br> (Bryant-Smith (30(b)(6)) Dep. 120:12-121:4.) |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| woman's Title IX Complaint against ALBERT, was deprived of the supervision of, and guidance from, the person to whom she would typically report, the person who EMORY would have placed in a position to advise her, and a person who likely would have been known that the lodging of a Title IX complaint could potentially be a trigger for student suicide, could cause a student distress or to be placed in a situation of crisis, and could cause a student to become suicidal. (Am. Compl. ¶ 245)<br><br>At the time that the August 26, 2019 Title IX Complaint was sent to ALBERT, EMORY had no highly trained Title IX Coordinator who would have had a full appreciation of the suicide risk created by the Title IX Complaint notice to ALBERT. (Am. Compl. ¶ 247.) | |
| **EXAMPLE #17** ||
| On August 30, 2019, at approximately 8:00 a.m., Goode received an automated email from ALBERT's personal Gmail | PROVISIONALLY REDACTED  |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

| | |
|---|---|
| account, advising Goode that ALBERT could be found at the vacant, unfurnished, and uninhabitable house on Druid Hills Road owned by LINDA LIANG. (Am. Compl. ¶ 256.) | PROVISIONALLY REDACTED <br><br>(Goode Dep. Pls.' Ex. 33 (Emory_000032).)[7] |
| **EXAMPLE #18** | |
| Shortly after arriving at the house on Druid Hills Road, Goode contacted the DeKalb County Police Department, which responded to the scene. Officers of the EPD were also called to the scene. (Am. Compl. ¶ 258.) | Q. And you sent two messages at 8:33. First, "Albert, I am outside the house. Please call me," followed by your telephone number. **A. Yes.** Q. All right. And -- **A. Because he didn't have it. I don't think he had it.** Q. And what happened next after you sent this text? **A. What happened next. In terms of next, Counselor, let me just give you sort of like -- I'm not sure exactly the very next thing. But I recall walking the grounds of the house, and it appeared -- what I was looking for was Albert. And I could see that there was a bicycle inside. There -- as I approached the house, there was, like, a window that I could look into, almost like a living room. And I could see there was a bicycle there. And I was looking around to see if Albert was there. I was also looking over my shoulder to see if he was going to come around the corner. Because one** |

---

[7] Plaintiffs' Exhibit 33 from the deposition of Dr. Goode is hyperlinked and attached hereto as **Exhibit A-VIII**.

Exhibit A-22

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  | of the things that I was thinking about at that time was Albert had said that, when he stayed at the house previously, he had walked down the street to go -to McDonald's. And so in my mind I'm thinking, "Did he just park his bike in there and did he go down to the McDonald's? And is he going to appear with, like, McDonald's?" And -- which, I mean, like McDonald's food, like a bag of food. And I was waiting outside. And I started to walk around, and I'm thinking -- and it just seemed peculiar. And I -- I walked around the back, knocked on the door. As I recall, there may have been two doors in that house -- in the front of that house. So knocked on one; knocked on the other. And then I began to get concerned. And I was rereading that email message, and I began to worry that -- it was possible, in my mind, that maybe he was -- he was -- actively needed me at that moment. That there was something -- I don't know. He was stuck somewhere, that he was -- that he -- I mean, the "please come find me." And so I was out there, and I knew that I had to make a decision. I began to go around -- I was looking if there were neighbors there, knocking on the window, seeing if I could see him, knocking again on the door. And that's what I did next. And I came to a moment where I thought, "Okay. I don't -- I have to make a decision here. What am I going to do?" And I thought it could be that he's going to come right around that corner, in which case I'll just talk to him and go to work. And I thought, if he is asking me for help and he's in there and he's given me the address, then maybe he's in trouble, and I've got to decide what I'm going to do. So I made a decision. And I said, "Okay. I'm just going to decide. This is my choice." And I remember thinking, "Okay. If I'm wrong, I'm going to have to explain |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  | **this to Albert. I'm going to have to explain this to I don't know who." But I was like, "Okay. Here we go." So I tried to -- tried -- not, like, force my way into the door, began to yell out Albert's name. And then I started to -- and I don't know the exact sequence, Counselor. I mean, I'm sure we could put the exhibits out and look at the timeline. At some point I contacted an Emory staff member to try to get Albert's phone number because I didn't have it. And so I do that at some point. And then -- I can't even remember actually right now if I called or not. But I'm -- and then at some point I decided, okay, I'm going to call 911. I'm going to call 911. He may be in there. He may be in trouble.** Q. So you called 911. **A. I called 911.** Q. And the DeKalb Police Department came to the scene? **A. Well, sir, there were multiple responders. The first to respond was actually the fire department.** Q. And without getting into detail, who accessed the home? A first responder? **A. Who accessed the home?** Q. Yeah. **A. Well, we had -- sorry. I don't mean to be difficult. So we were all there in the front yard. So we had -- can you tell me what you mean by "accessed the home"?** Q. Who actually breached the home, went inside, and found Albert? **A. Yeah. The fire department used a crowbar to break the sort of seal, the lock; and then a police officer drew his weapon, mule-kicked the door in, and went through his protocols. And one of the reasons why was because the fire department had actually gotten out a ladder, and they were in the back of the house. They had climbed the ladder. And I was actually at the front of the house at the time waiting -- it's a very busy street. I was just waiting for whomever else was going to – you know, might show up. And then they began to yell and shout. And then that's when the police showed up.** |

**EXHIBIT A** (cited documents/deposition testimony attached and hyperlinked)

|  | **And they were gesturing to him. They crowbar -- he tries to mule-kick the door. He can't get in. They crowbar the door. Then he does the mule kick, draws his weapon, and then he goes in. So -- I don't know. So who accessed it? Fire department opens the door with a crowbar. Police officer kicks it in with a drawn weapon and goes through what I imagine is his protocol for clearing a house or whatever.** Q. And are you advised within a short period of time after these first responders enter the home that Albert was found deceased in the home? **A. Everybody went running in, sir, and then, when they came walking out, that's the first thing that I noticed. And then was -- what was I advised. I was advised that a body had been discovered.** Q. Did you -- **A. Yes.** Q. Did you see the body at the scene? **A. I did not see the actual body. I think at one point I did see -- I may have seen the body with a sheet essentially draped over it -- like, a white sheet.**<br><br>(Goode Dep. 281:24-287:1.) |
|---|---|

# Exhibit A-I

Cited Excerpts From Deposition Transcript of Dr. Goode

In The Matter Of:
### *Zhang vs. Emory*

Deposition Of:
### *Ed Goode, PhD*

Taken On:
### *7/14/2022*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TIEQIAO ("TIM") ZHANG,          )
Individually, and as the       )
Independent Administrator of   )
the Estate of ALBERT LIANG     )
(a/k/a ALBERT ZHANG and f/k/a  )
LIANGSHENG ZHANG), deceased;   )
and JING ("LINDA") LIANG,      )
                               )
     Plaintiffs,               )
                               )    CIVIL ACTION
v.                             )    NO. 1:21-cv-868-CC
                               )
EMORY UNIVERSITY,              )
                               )
        Defendant.             )

_____

VIDEOTAPED DEPOSITION OF ED GOODE, Ph.D.
_____

July 14, 2022
10:06 A.M.

Lawrence & Bundy LLC
1180 West Peachtree Street NW
Suite 1650
Atlanta, Georgia


By Jennifer Davis-McLain, RMR, CRR, CRC, CCR-2496

```
 1    APPEARANCES OF COUNSEL:
      (*Appearing remotely via Zoom.)
 2
      On behalf of the Plaintiffs:
 3
              JOSHUA A. WHITMAN, ESQUIRE
 4            Milton Leach Whitman D'Andrea & Eslinger,
                 P.A.
 5            3127 Atlantic Boulevard
              Jacksonville, Florida 32207
 6            904.346.3800
              jwhitman@miltonleach.com
 7
              ALEX J. WHITMAN, ESQUIRE (as noted)
 8            Cunningham Swaim, LLP
              4015 Main Street
 9            Suite 200
              Dallas, Texas 75226
10            214.646.1495
              awhitman@cunninghamswaim.com
11
              *RICHARD H. MIDDLETON, JR., ESQUIRE
12            Middleton LLC
              317 East Liberty Street
13            Savannah, Georgia 31401
              912.660.3039
14            rhm@middletonfirm.com

15
      On behalf of the Defendant:
16
              LISA M. HALDAR, ESQUIRE
17            ALLEGRA J. LAWRENCE-HARDY, ESQUIRE (as
                 noted)
18            Lawrence & Bundy LLC
              1180 West Peachtree Street NW
19            Suite 1650
              Atlanta, Georgia 30309
20            404.400.3350
              lisa.haldar@lawrencebundy.com
21            allegra.lawrence-hardy@lawrencebundy.com

22

23

24

25
```

```
 1    ALSO PRESENT:

 2            ERIC LUCAS, VIDEOGRAPHER

 3            AMY ADELMAN, ESQUIRE
              Emory University
 4

 5

 6

 7                        — — —

 8

 9

10

11

12

13            (Reporter disclosure made pursuant to
       Article 10.B of the Rules and Regulations of the Board
14     of Court Reporting of the Judicial Council of
       Georgia.)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX TO EXAMINATIONS

 2                                                    PAGE

 3    ED GOODE, Ph.D.

 4    Examination by Mr. Joshua Whitman ................9
      Examination by Ms. Haldar ....................302
 5    Further Examination by Mr. Joshua Whitman .......310

 6

 7

 8                     INDEX TO EXHIBITS

 9    EXHIBIT              DESCRIPTION              PAGE

10    Exhibit 1    Emory Scholars Pre-major Advisors .56
                   for 2018-2019 (Emory_000018)
11
      Exhibit 2    The Emory Scholar Handbook ........62
12                 (Zhang_00001-00016)

13    Exhibit 3    Email chain ending Wednesday, .....73
                   11 September 2019, from Edmund R.
14                 Goode (Emory_000111)

15    Exhibit 4    Albert Zhang curriculum vitae .....79
                   (Emory_002322-002325)
16
      Exhibit 5    Emory University Suicide ..........85
17                 Prevention Resource Center
                   Organization Contact
18                 (Zhang_00017-00018)

19    Exhibit 6    Photographs (Zhang_00019-00020) ...93

20    Exhibit 7    Suicide Facts (Zhang_00021-00023) .95

21    Exhibit 8    "Suicide prevention app awarded ..101
                   $50,000 prize at White House
22                 conference" (Zhang_00024-00025)

23    Exhibit 9    Save a Life Week: QPR Suicide ....115
                   Prevention Training screenshots
24                 (Zhang_00026-00027)

25
```

```
 1                   INDEX TO EXHIBITS (cont.)

 2      EXHIBIT               DESCRIPTION               PAGE

 3      Exhibit 12    Emory Police Department .........123
                      Supplement Case Report
 4                    (Emory_002674-002676)

 5      Exhibit 13    Photograph .....................130

 6      Exhibit 14    Emory University Policy 8.2 ......142
                      Sexual Misconduct
 7                    (Emory_002910-002923)

 8      Exhibit 15    Emory University Policy 4.119 ....144
                      Child Abuse Reporting
 9                    (Zhang_00033-00035)

10      Exhibit 16    Emory Scholars Program ..........149
                      Scholarship and Service Program
11                    Profile Book Summer 2019
                      (Emory_000020-000027)
12
        Exhibit 17    Emory University Permission for ..150
13                    Medical Care Emory Scholar
                      Finalists' Week
14                    (Emory_00605-00607)

15      Exhibit 18    Email thread ending Wednesday, ...172
                      June 12, 2019, from Albert Zhang
16                    Liang (Zhang_00036)

17      Exhibit 19    Email chain ending Monday, .......177
                      9 September 2019, from Edmund R.
18                    Goode (Emory_000103-000104)

19      Exhibit 20    "Ed Goode Mention 2" text message 179
                      exchange (Zhang_00037)
20
        Exhibit 21    Photograph (Emory_00147) .........181
21
        Exhibit 22    Email chain ending Friday, .......187
22                    30 August 2019, from Suzanne
                      Onorato (Emory_003246-003247)
23
        Exhibit 23    ESP Advising Notes - Albert Zhang 203
24                    (Emory_00642-00643)

25
```

Zhang vs. Emory                       Ed Goode, PhD                        7/14/2022

```
 1              INDEX TO EXHIBITS (cont.)

 2    EXHIBIT               DESCRIPTION                PAGE
```

```
 3    Exhibit 24    ESP End of Year Report - .........205
               Spring 2019 (Emory_00767-00772)
 4
      Exhibit 25    Email chain ending Thursday, .....213
 5             August 1, 2019, from Edmund R.
               Goode (Zhang_00038)
 6
      Exhibit 27    Email chain ending Friday, .......231
 7             6 September 2019, from Edmund R.
               Goode (Emory_000095-000095)
 8
      Exhibit 28    Email chain ending Tuesday, ......238
 9             10 September 2019, from Edmund R.
               Goode (Emory_003265-003267)
10
      Exhibit 29    Email chain ending Friday, .......249
11             9 August 2019, from Edmund R.
               Goode (Emory_00006)
12
      Exhibit 30    Dan Dillard text exchange ........250
13             (Emory_000178-000181)

14    Exhibit 31    Tuesday, 20 August 2019, email ...269
               from Albert Zhang Liang
15             (Emory_002219)

16    Exhibit 32    Email chain ending Sunday, .......271
               25 August 2019, from Albert Zhang
17             Liang (Emory_000014-000015)

18    Exhibit 33    Email chain ending Friday, .......277
               30 August 2019, from Edmund R.
19             Goode (Emory_000032)

20    Exhibit 34    Message exchanges between Albert .280
               Zhang and Edmund R. Goode
21             (Emory_000183)

22    Exhibit 35    Friday, 30 August 2019, email ....288
               from Wanda Collins (Emory_003207)
23
      Exhibit 36    Text message (Emory_003290) ......290
24
      Exhibit 37    Text messages exchanged with .....295
25             Maggie Mang (Emory_000119-000135)
```

```
 1                  INDEX TO EXHIBITS (cont.)

 2     EXHIBIT                  DESCRIPTION                    PAGE

 3
       Exhibit 38      "The Emory Wheel," "Emory ........300
 4                     Students, Take Care of
                       Yourselves" (Zhang_00039-00044)
 5

 6

 7              (Exhibits 10, 11, and 26 were not marked.)

 8

 9

10                          ―― ―― ――

11

12

13

14              (The following transcript may contain quoted
       material; such material is reproduced as read or
15     spoken.)

16

17
                            ―― ―― ――
18

19

20

21

22

23

24

25
```

```
 1    would call that a sentence fragment.  Would I be

 2    right?

 3         A.    Correct.

 4         Q.    Okay.  Can you tell me what you meant when

 5    you wrote this?

 6         A.    Are you asking me -- I don't exactly recall

 7    what I meant.  Are you asking me to speculate on what

 8    I might have meant?

 9         Q.    Can you tell me what you meant when you used

10    the word "fraught"?

11         A.    What I meant by "fraught" is that Albert was

12    trying to change his surname from Liang to Zhang

13    and -- for example.  That's -- and that's one of

14    things I was referring to.

15         Q.    What are some of the others?

16         A.    Albert had talked about -- Albert talked to

17    me about academic planning, cocurricular planning,

18    strategic planning for his future; and one of the

19    themes of these discussions was where Albert would

20    physically be.  And he talked about -- he said he was

21    interested in being in places other than Texas with

22    his family.

23         Q.    Anything else that you were referring to

24    when you used the term "fraught"?

25         A.    I think Albert had also expressed to me
```

```
 1    concerns about the parenting that his parents were

 2    providing to his younger siblings.  He was concerned

 3    about how those children were being raised and, I

 4    think, in terms of the quality of the parenting that

 5    those -- his siblings were receiving, and he had some

 6    concerns about that.

 7         Q.   Anything else?

 8         A.   Albert -- I -- Albert had -- that's -- that

 9    is -- that's the main of it.  I mean, I'm recollecting

10    in the moment, Counsel, and I'm just trying to go

11    through my -- search my memory banks here.  I mean, if

12    you give me more time, I'd be happy to kind of think

13    through what other things I would associate with a --

14         Q.   When's the --

15         A.   -- fraughtness.

16         Q.   -- last -- when's the last time you read

17    this email?

18         A.   When's the last time I read this email.

19    I've read this email within the last month.

20         Q.   What did you mean when you used the term

21    "enigmatic"?

22         A.   I don't know.  I think Albert told me that

23    he was not comfortable discussing his feelings, his

24    interiority, these kinds of things.

25         Q.   What was the word after "feelings"?
```

1          A.   Well, it's a word that I'm using.  It's not
2      a word that he's using.  But he didn't --
3          Q.   What was --
4          A.   -- feel comfortable --
5          Q.   What was the --
6          A.   I said "interiority."
7          Q.   What does that mean?
8          A.   What I'm referring to is just his inner
9      world.  And so part of the enigma is Albert was not
10     disclosing his emotional inner world to me.  So I
11     understood from what he had said that he had a fraught
12     relationship with his parents, but what was enigmatic
13     is in terms of deep layers of feeling, history, he did
14     not -- I do not recall him talking to me about that.
15         Q.   Did you hit the send button before you
16     finished your thought?
17         A.   Sir, I don't know.  This is strange.  It
18     would appear, based on how it looks, that I actually
19     sent this.  It was -- it was incomplete.  It's not a
20     complete sentence.
21         Q.   If you could complete the sentence today,
22     how would you complete it?  And for completion,
23     "Albert's fraught -- and in many ways enigmatic --
24     relationship with his parents is part of what makes."
25         A.   I might say that makes this question

```
 1    important.  Because one of the things that I

 2    understood the president wanted to do and was

 3    enlisting our help to do was to address Albert's

 4    parents with absolute respect and in an appropriate

 5    way.

 6              Part of what makes this difficult is that

 7    Albert himself was using or trying to change his

 8    surname to a different surname.  So I think it's

 9    like -- that's a difficult -- I just think that is

10    difficult.  That's difficult.  The student was sort of

11    referring to himself in one way, and so now you got to

12    kind of switch gears and refer to the parent in

13    another way.

14         Q.   So would you agree with me that this

15    statement made by you and as described by you today

16    made on September 11, 2019, reflects that you had

17    developed an understanding of both Albert and his

18    relationship with his parents while he was still

19    alive?

20              MS. HALDAR:  Objection.  Form.

21         A.   I would say I had an impression.  I don't

22    know that I would call it an understanding.

23    BY MR. JOSHUA WHITMAN:

24         Q.   Did Albert ever tell you that he loved and

25    cared for his parents?
```

```
 1   video record.

 2   BY MR. JOSHUA WHITMAN:

 3       Q.   Dr. Goode, before Albert's death, did you

 4   suspect that he was suicidal?

 5       A.   No.

 6            MR. JOSHUA WHITMAN:  Let's mark for the

 7   record Plaintiff's Exhibit 12.  This is Emory -2674

 8   through -2676.  It is the supplemental case report

 9   from the Emory Police Department.

10            Mark that and hand that to the witness,

11   please.

12            (Plaintiff's Exhibit 12 marked.)

13   BY MR. JOSHUA WHITMAN:

14       Q.   Dr. Goode, have you ever seen this document

15   before?

16       A.   If you'll just give me a moment, sir.

17            No, I don't believe I've ever seen this.

18       Q.   All right.  Let me draw your attention to

19   the first page, Emory -2674.  I'm looking at the first

20   paragraph at the top of the page, looking at the

21   second sentence that begins with -- the part of the

22   sentence that begins with your name.  And I'll read to

23   you part of that paragraph that says, "Edmund Goode

24   stating that he had a student (Albert Liang, preferred

25   name Albert Zhang) who appeared," past tense, "to be
```

```
 1   suicidal."

 2           Do you see that?

 3      A.   I do.

 4      Q.   And I understand that this is a document

 5   that was written by someone else.  Did you tell that

 6   person that you had a student who appeared to be

 7   suicidal?

 8      A.   No.

 9      Q.   In looking at the second paragraph -- before

10   we leave that, do you have any idea where this

11   reporter would have obtained that information that you

12   stated that you had a student who appeared to be

13   suicidal?

14      A.   So can you tell me who wrote this report?

15      Q.   According to the report, Bryan Barnett.

16      A.   Okay.  Sir, can you -- I'm not familiar with

17   Mr. Barnett.  Can you describe him to me?

18      Q.   I cannot.

19      A.   Okay.  Then I don't know.

20      Q.   Okay.  So Officer Barnett writes that he

21   received a call from DeKalb Deputy TJ Brackett.  Do

22   you know who that is?

23      A.   You're asking me who Deputy TJ Brackett is?

24      Q.   Yes.  Do you know who that is?

25      A.   I don't know for certain.  I could
```

1    speculate.

2        Q.    Okay.  Do you think that Officer Brackett

3    might have been the individual who came to the Zhang

4    home the morning of Albert's death?

5        A.    Counselor, as I recall, there were multiple

6    police officers who were at the house, and I don't

7    know -- I can recall at least -- at least two of them.

8    So I don't know which one, if either of them, were

9    TJ Brackett or . . .

10       Q.    Okay.

11       A.    That's what I recall.

12       Q.    According to this official report of Emory

13   Police Department written by Officer Barnett --

14           MS. HALDAR:  And objection.  I just want to

15   point out that it's not -- we're just not conceding

16   there or stipulating it's an official or who wrote it,

17   but I can see that we produced it.

18   BY MR. JOSHUA WHITMAN:

19       Q.    So, Dr. Goode, according to this Emory

20   Police Department supplement case report,

21   Officer Barnett wrote that he received a call from

22   Deputy Brackett and Deputy Brackett stated that they

23   had received a report from an Emory professor, Edmund

24   Goode, stating that he had a student, Albert, who

25   appeared to be suicidal.  And you have denied making

1    that statement to anyone; correct?

2        A.    I do not recall making that statement.  I'm

3    also not an Emory professor, as we've established.

4    But that's also reflected there in the sentence.

5        Q.    Are you aware of any other Emory employee

6    with the name Edmund Goode?

7        A.    Am I aware of any other -- I -- given the

8    nature of my email address and my sign-in at Emory, I

9    will infer that there is more than one or has been

10   more than one Edmund Goode.

11       Q.    Okay.  Were there any other Edmund Goodes

12   present at 3709 North Druid Hills Road in Decatur,

13   Georgia, on the morning of August 30, 2019, while you

14   were there?

15       A.    Not that I'm aware of.

16       Q.    Okay.  Let's go to the second paragraph.

17   And I'm on the second line, and I'm starting with

18   the -- let's just read it from the end of the first

19   line where it says, "When I arrived" -- and that would

20   have been Officer Barnett -- "I met with assistant

21   program director for undergrad education Edmund

22   Goode."

23       A.    Uh-huh.

24       Q.    And would that be you?

25       A.    I believe that's me, yes.

1      Q.   Okay.  "Goode stated that he had recently

2   spoken with Liang" -- earlier referred to as Albert

3   Liang or Albert Zhang -- "who was distraught because

4   he and his girlfriend had broken up."  It's hard to

5   read that "broken up" part --

6      **A.   Uh-huh.**

7      Q.   -- but you can kind of -- kind of see

8   that -- right? -- through that redaction?

9      **A.   I believe I can, yeah.**

10     Q.   Yeah.  Okay.  So did you tell Officer -- an

11  officer present at the scene that you had recently

12  spoken with Albert, who was distraught because he and

13  his girlfriend had broken up?

14     **A.   I do not recall using that language.  I**

15  **do -- I don't recall using that language.**

16     Q.   If you put your English professor hat on,

17  would you equate the word -- the word "distraught"

18  with the term "acute distress"?

19     **A.   Would -- well, language needs to be**

20  **contextualized.  I mean, I don't know -- I didn't**

21  **write this report.  So I don't know what this person**

22  **meant by "distraught."**

23     Q.   So I --

24     **A.   So I don't --**

25     Q.   I want to withdraw the question.  Let me

 1    rephrase it, please.

 2         **A.    Okay.**

 3         Q.    Would you agree with me that a synonym of

 4    the word "distraught" could be "acute duress,"

 5    d-u-r-e-s-s?

 6         **A.    So you're asking me -- I don't know.  We**

 7    **could find out, I suppose.  I'm not a thesaurus.**

 8         Q.    Well, you're the one with the Ph.D. in

 9    English.  I'm asking the question.  Would you equate

10    the word "distraught" with the term "acute duress"?

11         **A.    Not necessarily, no.**

12         Q.    Okay.  It goes on to say that, "Mr. Goode

13    stated that he observed a red mark on the left side of

14    Liang."

15              Do you remember telling the officer that?

16         **A.    I do not recall telling the officer that,**

17    **no.**

18         Q.    Do you remember telling the officer, as it

19    reflects here next, that, "Goode advised Liang,"

20    Albert, "that he," Goode, "was a mandatory reporter to

21    Title IX and that what he," Albert, "told him," Goode,

22    "would have to be reported"?  Do you remember telling

23    the officer that?

24         **A.    So, sir, I -- what you've just described**

25    **does not match with what I read in this report,**

 1   though.

 2       Q.   Okay.

 3       **A.   How would you like us --**

 4       Q.   Let --

 5       **A.   -- to proceed?**

 6       Q.   Let me -- let me read the sentence into

 7   the --

 8       **A.   Okay.**

 9       Q.   -- report, and then we can dissect it

10   together.

11            Before we go there, "Mr. Goode stated he

12   observed a red mark on the left side neck of Liang,"

13   Albert -- is that a true statement?

14       **A.   You'd have to ask the person who wrote the**

15   **report.**

16       Q.   Is it true that you had observed a red mark

17   on the left side of Albert's neck?

18       **A.   Are you asking about during that morning or**

19   **when -- at what time?**

20       Q.   Sir, I actually wasn't going to ask anything

21   about what you observed about Albert that morning out

22   of respect for Albert and you and the sanctity of the

23   situation.  If you want to talk about it, we can.  But

24   right now I'm referring to the statement where it says

25   you had recently spoken to Albert, who was distraught

```
 1                MS. LAWRENCE-HARDY:  Me too.

 2    BY MR. JOSHUA WHITMAN:

 3         Q.   Let me ask you to assume, Dr. Goode, that

 4    the orientation of this photograph is that we are

 5    looking at Albert's -- the left side of Albert's

 6    face --

 7         A.   Okay.

 8         Q.   -- and his left shoulder.

 9         A.   Okay.

10         Q.   And with compliments to your counsel, let me

11    first ask you if you had ever seen, in his life,

12    Albert without his shirt on.

13         A.   No.

14         Q.   During your encounter with him on August 15,

15    2019, did you observe Albert -- did you observe

16    Albert's person?

17         A.   So the date, Counselor -- I have to refresh

18    my memory.  August 15th -- could you say a little bit

19    more about that date to sort of contextualize it for

20    me?

21         Q.   Did you ever have a person-to-person,

22    face-to-face meeting with Albert Zhang during which

23    you saw a red mark on his neck?

24         A.   I had an in-person face-to-face conversation

25    with Albert in which my eye caught something.  I mean,
```

1  **it was -- I don't know that I would even characterize**

2  **it as red.  It was fleeting.  And I -- so I didn't --**

3  **you know, and that's -- I thought I saw something.  I**

4  **didn't know if I saw something.**

5       Q.   Can you see a -- can you see -- can you

6  appreciate that, if this is, in fact, the left side of

7  Albert's body, that just below his clavicle there

8  appears to be a bruise?  Is that an accurate

9  description?

10       **A.   It would appear there's -- yes --**

11       Q.   Okay.

12       **A.   -- on this image.**

13       Q.   During the interaction with Albert during

14  which you had a fleeting note -- notice of

15  something --

16       **A.   Uh-huh.**

17       Q.   -- did you see that bruise on his body?

18       **A.   This bruise?  No.**

19       Q.   With regard to the red mark that you

20  observed --

21            MS. HALDAR:  I mean, objection that he

22  didn't testify to that but --

23  BY MR. JOSHUA WHITMAN:

24       Q.   I'm sorry, Doctor.  Didn't you tell me that

25  you had a fleeting image of some -- something on his

1   neck?

2              MS. HALDAR:  Yeah.

3        A.   Something.  But I -- whether -- what -- the

4   color of it is just -- it was -- something caught my

5   eye, and I -- that was it.  That's what I recall.

6   BY MR. JOSHUA WHITMAN:

7        Q.   But you wouldn't have described it as a red

8   mark on the left side of his neck; is that right?

9        A.   I wouldn't -- I wouldn't have described it

10  to whom?

11       Q.   To anyone.

12       A.   To anyone.  I don't think so.

13       Q.   Did you appreciate it to be a sign of a

14  physical injury?

15       A.   I didn't know.

16       Q.   Did Albert tell you what the cause of that

17  mark on his body was?

18       A.   We never established that there was a mark,

19  and he didn't talk about it.

20       Q.   The officer goes on to say -- and this is

21  the sentence you wanted to deconstruct.  In the middle

22  of the second paragraph, it says, "Goode advised Liang

23  that he was a mandatory reporter to Title IX and that

24  what he told him would have to be reported."

25              And this is the sentence that maybe you

```
 1              COURT REPORTER:   (Reads record.)

 2   BY MR. JOSHUA WHITMAN:

 3        Q.   Okay.

 4        A.   Oh.

 5        Q.   So that's why I have an understanding that

 6   you tend to be pretty explicit in your emails.  Is

 7   that accurate?

 8        A.   When I'm asking for a meeting, I tend to be

 9   pretty explicit about the nature of the meeting and

10   who I want to meet with.

11        Q.   All right.  So let's look at Emory -103,

12   part of Exhibit 9 -- Plaintiff's Exhibit 19.  And I'm

13   looking at the fourth line and the only full sentence

14   in that line.  "Albert was part of SAS this year, and

15   I got to know him very well this spring and summer."

16        A.   Uh-huh.

17        Q.   Is that an accurate statement?

18        A.   That is an accurate statement.  Along

19   with --

20        Q.   So --

21        A.   -- all the other scholars that were part of

22   SAS.

23        Q.   So of those 14 SAS participants, you got to

24   know them all very well?

25        A.   I believe so, yeah.
```

1         Q.    So at the time of Albert's death on

2    August 30, 2019, you knew him very well; correct?

3         **A.    I felt that I knew him and the other**

4    **scholars very well.**

5         Q.    Did Albert ever get the chance to tell you

6    that he thought you were absolutely phenomenal and

7    made SAS an awesome experience?

8         **A.    Perhaps.  I don't know.**

9         Q.    All right.  Let's mark Plaintiff's

10   Exhibit 20.  And I'll represent to you that this is a

11   chat exchange extracted from Albert's laptop with

12   another individual in which he -- put it in front of

13   you.  Do you have a copy in front of you?

14              MS. HALDAR:  He does not.

15              (Plaintiff's Exhibit 20 marked.)

16              THE WITNESS:   Thank you.

17   BY MR. JOSHUA WHITMAN:

18        Q.    So if you'll just look at the very top

19   right-hand corner, there's three entries made by

20   Albert.  I'll read them into the record.  And this is

21   done on August 14, 2019.  Is that after the conclusion

22   of SAS that summer?

23        **A.    If you're asking me if on August 14, 2019,**

24   **SAS was over --**

25        Q.    Okay.

1   responsibility, close -- parens, (shared by student

2   who did not live with them), close parens."

3          So in the context of challenging

4   relationships, do you know which ones are being

5   referred to here?

6       A.   I don't know exactly what Suzanne was

7   referring to.  I don't.

8       Q.   Okay.  Do you know what she's referring to

9   when she writes, "Some friction with the group that

10  lived together this summer"?

11      A.   I -- again, I don't know what Suzanne

12  intended.  I don't know exactly what she's referring

13  to.  So in the context of what she meant, I couldn't

14  tell you.

15      Q.   As the program director for the SAS program

16  in the summer of 2019, did you observe or learn of any

17  friction with the group that lived together that

18  summer?

19      A.   Yes, I did.

20      Q.   Okay.  And could you describe it for us.

21      A.   So friction with the group -- I mean, the

22  group is a living/learning community.  They were

23  living together.  They were going on tours through the

24  city.  They -- we had some conversations around, for

25  example, about washing the dishes.  So one source of

1 friction was students were -- participants were a

2 little concerned that not everybody was washing

3 dishes.

4     There was another point of friction where

5 there was -- students were maybe in -- there's a

6 communal refrigerator, and students were eating food

7 that they hadn't necessarily prepared.  So that was

8 one of the points of friction.

9     Another point of friction was about

10 timeliness.  They were -- when we would go on our

11 field trips, we would ask the students to report to

12 the van, which I would usually be driving, at, like,

13 9 in the morning or 8:30 in the morning.  And so we

14 had a point of friction because not all the students

15 were ready at the time.  That was a point of friction.

16     We had -- yeah.  They -- we had -- we had

17 friction.  I mean, I can -- there was some friction,

18 but that's also to be expected.  I mean, that's not

19 anomalous in a program like this.  This is kind of --

20 you know, this is part of the design.  There's

21 friction when people live together.

22  Q.   Was there friction between Albert and any

23 specific members of the group that you're aware of?

24  A.   Yes.

25  Q.   Can you describe that?

1       A.    Yes.   There was friction around Albert's

2   conduct at the Stewart Detention Facility in Americus,

3   Georgia, during an overnight visit that we took as a

4   group down there.   And there were some students who

5   felt that Albert had spoken inappropriately,

6   disrespectfully in the presence of family members who

7   had been admitted and checked into the Stewart

8   Detention Facility and were waiting in the sort of

9   communal waiting room to be ushered inside and to have

10  an appointment with a family member inside.

11           There was -- there were students who

12  objected to comments that Albert had made, and they

13  felt that they were insensitive.

14       Q.   Are you aware of any other friction between

15  Albert and any other members of the SAS summer 2019

16  group?

17       A.    Yes.

18       Q.    Continue.

19       A.    In the early weeks of the program -- it may

20  have been during orientation -- one of the

21  participants was talking, and Albert fell asleep.   And

22  the group was a little bit -- I think that person felt

23  offended and insulted that Albert had fallen asleep.

24       Q.    Any the other friction between Albert and

25  any of the other SAS members that you're aware of?

1     A.    There were some -- a SAS participant

2  broached the subject of Albert's just participation in

3  the program and wanted him to be sort of fully engaged

4  when he was there and present and -- so that was --

5  that was one of the points of friction.

6           He was spending, you know -- there was -- he

7  was -- it was a question for him whether or not he was

8  going to be staying in the house.  So I had to have a

9  conversation with him and say, "If you're going to be

10  part of SAS during -- you should stay in the house.

11  You need to stay in the house, and that's something

12  that the community feels is important."

13           And for Albert, as for the rest of the

14  participants, what we really were referring to was

15  during the weekdays.  But at the -- on the weekends we

16  were going to as a group -- because the group in large

17  part got to determine its own norms that that would be

18  allowed.  So that was another, I guess, friction point

19  that we negotiated.

20     Q.    Any other friction that you can remember

21  between Albert and other members of SAS?

22     A.    No.

23     Q.    You said that you had to counsel Albert

24  about not staying overnight at the SAS house; correct?

25           MS. HALDAR:  I believe he had a conversation

1    with him.  He didn't say "counsel."

2            MR. JOSHUA WHITMAN:  Let me rephrase the

3    question.

4    BY MR. JOSHUA WHITMAN:

5        Q.   You said earlier you had a conversation with

6    Albert about not sleeping overnight at the SAS house?

7        **A.   I talked to him about -- well, I mean, I**

8    **talked to him about commitment and his commitment to**

9    **the program and our agreement.  And in that**

10   **conversation we clarified that the expectation was**

11   **that he was going to be in the SAS house on -- I think**

12   **we agreed on Sunday through, like, Friday evening**

13   **or -- like, through the programming.  Like, the Sunday**

14   **night and then through the -- through the week.**

15       Q.   And you knew that, on the nights that he

16   wasn't staying at the SAS house, he was staying at

17   Jane Doe's apartment; correct?

18       **A.   Albert told me that that's what he was**

19   **doing.**

20       Q.   The next part of this statement is with --

21   regarding the friction within the group, it concludes

22   by saying, "They are feeling some responsibility."

23            Did you -- were you aware of members of the

24   SAS 2019 summer group that were feeling some

25   responsibility for Albert's suicide?

```
 1   advice?

 2        A.   Did I offer him advice.  I don't know that I

 3   would -- I don't recall.  It's possible, but it

 4   doesn't . . .

 5        Q.   Did you ever ask Albert about his

 6   relationship with Jane Doe?

 7        A.   Did I ever ask about his relationship.  We

 8   talked about his relationship.

 9        Q.   Were you ever in the presence of both Albert

10   and Jane Doe at the same time?

11        A.   I don't believe so, no.  I don't think I've

12   ever met her.

13        Q.   It's true, sir, at the beginning of the

14   spring 2019 semester you knew that Albert was engaged

15   in a ongoing intimate sexual relationship with Jane

16   Doe.

17        A.   I --

18             MS. HALDAR:  Objection.  Compound.

19        A.   I did not know anything about any sexual

20   nature of the relationship, no.

21   BY MR. JOSHUA WHITMAN:

22        Q.   You knew that he considered himself to be in

23   a committed relationship with her; correct?

24        A.   I don't know the level of commitment.

25             MR. JOSHUA WHITMAN:  Let's look -- mark
```

1    **significant other."**

2         Q.    Sure.   I'm more interested in the -- in the

3    verbiage that is directly related to his suicide.

4         **A.    Oh.**

5         Q.    So --

6         **A.    Okay.**

7         Q.    So going back to this description of his

8    relationship as a "serious, committed relationship

9    with my significant other," you knew that as of

10   May 2019; correct?

11        **A.    I don't think I read this on May 20, 2019.**

12        Q.    You knew in May of 2019 that Albert was in a

13   serious, committed relationship with Jane Doe, though;

14   correct?

15             MS. HALDAR:   He testified -- objection --

16   that -- the opposite.   You're mischaracterizing his

17   earlier testimony.

18   BY MR. JOSHUA WHITMAN:

19        Q.    You may answer.

20        **A.    So this was created and submitted on the**

21   **20th of May.   I don't -- I cannot tell you when I read**

22   **it.   I doubt -- I just can't tell you when I read it.**

23        Q.    Same paragraph, three lines from the bottom,

24   in the middle of the line --

25        **A.    Okay.**

1        Q.   -- on his to-do list, "and continue going to

2    CAPS to keep me sane through all of this."

3             Do you see that?

4        **A.   Yeah.**

5        Q.   Yeah.  I guess you didn't read that in May

6    of 2019 either?

7        **A.   Sir, I don't know when I read it is what I'm**

8    **trying to tell you.**

9        Q.   And these are the biannual reports that were

10   designed to allow you to discern patterns in Albert's

11   thinking, learning, and experience over time,

12   according to the description of the advising program

13   in the scholars --

14            MS. HALDAR:  Objection.

15   BY MR. JOSHUA WHITMAN:

16       Q.   -- program; correct?

17            MS. HALDAR:  Asked and answered.

18   BY MR. JOSHUA WHITMAN:

19       Q.   Is that right?

20       **A.   This is the -- this is one of the biannual**

21   **reports that is referred to in the scholars manual --**

22   **handbook, yes.**

23       Q.   You knew Jane Doe was also a student

24   actively enrolled at Emory?

25       **A.   I knew at what point?**

1    looking at the moon and then I was approached by

2    Albert, no, that did not happen.

3         Q.    Were you aware that Albert had an encounter

4    at CAPS in June of 2019?

5         A.    Had an encounter at CAPS?

6         Q.    Yes.

7         A.    What is an encounter at CAPS?

8         Q.    He went to CAPS.  Were you aware of that?

9         A.    I was aware that he had made a visit to

10   CAPS, yes.

11        Q.    When did you become aware of that?

12        A.    When did I become aware.  I believe it was

13   within days.  I can't know for certain, but it's my

14   understanding that -- I was told that -- I had seen

15   him, and I asked a question to somebody, oh, I -- or

16   not even asked a question.  I said, "Oh, I just saw

17   Albert riding on his bike."  And that person said,

18   "Oh, I think he was going to CAPS."

19              That's -- so -- later -- I don't know that

20   I -- I'm trying to recall if Albert ever talked to me

21   about that CAPS visit.  I did learn subsequently,

22   after his death, about a visit that he made to CAPS.

23   I mean, I'm just assuming that they're the same one,

24   but I --

25        Q.    So you knew during Albert's lifetime that he

 1   had gone to CAPS; correct?

 2        A.    I knew -- I mean, I guess I was told.

 3        Q.    Okay.

 4        A.    I'm trying to recall if Albert -- Albert may

 5   have told me too that he went to CAPS.

 6        Q.    Do you know why Albert went to CAPS?

 7        A.    No.  I mean, I could assume why -- I can --

 8   Albert specifically that day -- I know generally it's

 9   counseling and -- I can't remember the acronym right

10   now, but usually it's for mental health reasons.  It's

11   a resource that's available to all Emory students.

12   And so I guess I had some assumptions about why he

13   would go there.

14        Q.    Did you -- were you aware, during his

15   lifetime, that Albert went to CAPS to process how his

16   relationship with his parents had impacted his

17   relationship with himself and others?

18        A.    I don't -- I don't know --

19        Q.    You did not?

20        A.    -- what might -- may or may not have been

21   discussed in the CAPS meeting.

22        Q.    Did you ever encourage Albert to go to CAPS?

23        A.    I did one time ask him to consider going to

24   CAPS.

25        Q.    And can you tell me when that was in

1   needed their parents' consent?

2        A.   I'm not -- I -- if you -- I'm not sure

3   they -- do they need their parents' consent?  I'm not

4   sure that's the case.  That's -- right now, I mean, I

5   could be in an imperfect understanding, sir, but

6   that's not my understanding of how CAPS works, at

7   least at Emory.

8        Q.   So let's drill down a little bit again when

9   this conversation might have occurred where you

10  suggested to Albert that he may want to consider going

11  to CAPS.  Do you think it was within the month of

12  August?

13       A.   I don't know.  It was sometime -- I -- you

14  know what?  I believe it was in the summer.  I believe

15  it was subsequent to the conversation I had had with

16  all the SAS participants.

17       Q.   And when in the SAS program in June and July

18  did that larger conversation occur?

19       A.   That's -- middle.  Maybe early.  I --

20  actually -- maybe it was early, actually.  I don't

21  recall.  I mean, perhaps I should just say that.  I

22  don't exactly recall at the moment.

23       Q.   During Albert's life, did you sense that

24  there was a stigma among the Emory scholars regarding

25  seeking help at CAPS?

1      **A.    Among the Emory scholars as a group?  No.**

2      Q.   Did you come to understand that there was a

3  stigma among some Emory scholars regarding seeking

4  help at CAPS?

5      **A.   I assume there was.  I think it's**

6  **stigmatized for some people.**

7      Q.   Did you assume that during Albert's life?

8      **A.   Did I assume that there were some Emory**

9  **scholars for whom it was a stigma to go to CAPS during**

10  **Albert's life?  I would assume that, yes.  I would**

11  **assume that would be the case.  There's cultural**

12  **beliefs rooted in personal histories, family**

13  **histories, ethnic communities.  Values are just**

14  **different.**

15           MR. JOSHUA WHITMAN:  Okay.  Let's take a

16  break.

17           VIDEOGRAPHER:  The time is 4:19.  We're

18  going off the video record.

19           (OFF THE RECORD)

20           VIDEOGRAPHER:  The time is 4:44.  We are

21  back on the video record.

22           MR. JOSHUA WHITMAN:  All right.  We are not

23  going to mark Plaintiff's 26, and let's move to

24  Plaintiff's 27.  This is --

25           MS. HALDAR:  I'm sorry.  What was 26?

1    suggested that Albert might consider going to CAPS?

2        **A.   I don't know.**

3        Q.   During this encounter, Albert told you that

4    his relationship with Jane Doe had ended; correct?

5        **A.   It did.  He said I -- yeah.  He said I --**

6    **said something like** ▮▮▮▮▮ **has broken up with me" or**

7    **"We've broken up," "I've broken up."  Something about**

8    **that, yeah.**

9        Q.   During this encounter, Albert told you that

10   she -- that Jane Doe demanded that Albert abruptly

11   leave her apartment; correct?

12       **A.   Well, what I recall is he said that they had**

13   **broken up, that it was her apartment, and she'd asked**

14   **him to leave.**

15       Q.   Okay.  Did he tell you that, if he refused

16   to leave, she threatened to call the police?

17       **A.   No.  I don't recall that.**

18       Q.   Did he tell you that he felt like he was

19   homeless in the moment until the dorm opened for the

20   fall semester?

21           MS. HALDAR:  Objection.  Compound.

22       **A.   No.  To the contrary, he talked to me about**

23   **multiple housing options that he had.**

24   BY MR. JOSHUA WHITMAN:

25       Q.   Did he tell you that this recently ended

1    relationship had been an abusive relationship with

2    Jane Doe abusing him physically?

3        **A.    No.**

4        Q.    Did he tell you that he had sustained a

5    physical injury as a result of an altercation with

6    her?

7        **A.    No.**

8        Q.    Did he tell you that in the altercation his

9    glasses were broken, his body was scratched, and his

10   testicles had been punctured?

11          MS. HALDAR:  Objection.  Form.

12       **A.    No.**

13   BY MR. JOSHUA WHITMAN:

14       Q.    Did you tell Albert's father that during

15   this April 15, 2019, encounter Albert showed you the

16   bruise that is depicted in Plaintiff's Exhibit 13?

17       **A.    Absolutely --**

18          MS. HALDAR:  I'm just going to say

19   objection.  I'll clarify the record for you.  I think

20   you mean August, not April.

21          MR. JOSHUA WHITMAN:  Sorry.

22   BY MR. JOSHUA WHITMAN:

23       Q.    With that clarification.

24       **A.    Absolutely not.  This is the first -- this**

25   **image is the first time I've seen any bruise on**

1   **Albert.**

2       Q.   During that August 15 encounter, Albert was

3   sad about the breakup with Jane Doe, wasn't he?

4       **A.   I don't know if he was sad.  He seemed -- he**

5   **seemed kind of surprised, like it had surprised him.**

6       Q.   During this August 15 encounter, he was

7   upset and worried over the fact that Jane Doe was

8   blaming him for the physical altercation.

9       **A.   I'm --**

10          MS. HALDAR:  Is that a question?

11          MR. JOSHUA WHITMAN:  Yes.

12      **A.   I knew nothing about a physical altercation.**

13  BY MR. JOSHUA WHITMAN:

14      Q.   During that encounter, Albert expressed his

15  feelings of isolation and loneliness; correct?

16      **A.   No.**

17      Q.   Did Albert --

18      **A.   He never expressed feelings of isolation and**

19  **loneliness.**

20      Q.   Did Albert express feelings of hopelessness

21  to you?

22      **A.   No, he never expressed feelings of**

23  **hopelessness to me.**

24      Q.   Did Albert tell you during that encounter

25  that, although he had many friends, he did not have

```
 1   any with whom he could share these unpleasant

 2   circumstances?

 3             MS. HALDAR:  Objection.  Form.

 4        A.   What unpleasant circumstances are you

 5   referring to in your question?

 6   BY MR. JOSHUA WHITMAN:

 7        Q.   His breakup with Jane Doe.

 8        A.   No.  I don't remember him saying anything

 9   like that.

10        Q.   At the time of this encounter, you were

11   still a mandatory reporter under Title IX; correct?

12        A.   I continue to be a mandatory reporter under

13   Title IX.

14        Q.   Is this the conversation with Albert that

15   you referred to when you told the investigating

16   officer on --

17             MS. HALDAR:  Can you point us to a document

18   so he can look at it for you?

19   BY MR. JOSHUA WHITMAN:

20        Q.   -- on August 30, 2019, that you had

21   really -- recently spoken with Albert, who was

22   distraught because he and his girlfriend had broken

23   up?  That's in Exhibit 12.

24             MS. HALDAR:  Thank you.  You can tell him is

25   it the first page of Exhibit 12 or --
```

```
 1                "I'm feeling . . . pretty decent?"  How
 2    would you interpret that in terms of how Albert was
 3    really feeling?
 4        A.    I would interpret that to mean that he's
 5    feeling pretty decent.
 6        Q.    And then you respond on August 25th.  "Very
 7    glad to hear you're well."  What does tomorrow or
 8    Tuesday look like?
 9                He responds.  "Thanks for getting back to
10    me."  And you arranged to meet on August 26th;
11    correct?
12                (Ms. Lawrence-Hardy enters.)
13        A.    "Would 10am be too early?"
14                Yeah, it appears so.
15    BY MR. JOSHUA WHITMAN:
16        Q.    Now, during this August 26th encounter, is
17    that the last time you saw Albert alive?
18        A.    Yes.
19        Q.    Did he tell you during that encounter that
20    Jane Doe was planning to file a Title IX complaint
21    against him?
22        A.    He -- what he said was -- I don't remember
23    if he said that.  What he said was, as I recall, that
24    he had access to her calendar.  So he said, "I still
25    have access to Jane Doe's calendar."  And so that's
```

1    what he said.

2          And he said he -- he reached to his phone,

3    and he, like, moved it over as if he was going to show

4    me.  And I said, "Albert, I don't want to see any -- I

5    don't know what -- I don't need to see anything about

6    anybody's calendar."

7          And he said she has scheduled an

8    appointment -- something related to Title IX.

9          And I said, "Okay.  Okay."  And just to -- I

10   mean, if that's what you're saying, if that's what

11   she's done, okay.  And I said, "It doesn't -- so

12   she -- doesn't she get to, as an Emory student, if she

13   wants to, schedule an appointment with a Title IX

14   coordinator?"  That's what I recall.

15        Q.   Did Albert tell you during that encounter

16   that he had begun to feel trapped by the circumstances

17   surrounding the recent changes in his life?

18             MS. HALDAR:   Objection.   Form.

19        A.   No, he did not mention being trapped and --

20   no.

21   BY MR. JOSHUA WHITMAN:

22        Q.   Did you advise Albert during that encounter

23   to consult with an attorney to defend himself against

24   Jane Doe's allegations?

25        A.   What I recall saying is I -- I said,

```
 1    "Albert, imagine whatever the focus -- if there is a
 2    Title IX investigation, think about whatever that
 3    might be, but don't tell me.  Imagine that it's in a
 4    box."
 5              And he said, "Okay."
 6              I said, "Now, take that box.  Let's say that
 7    you were to show it to somebody.  Like, don't show it
 8    to me.  But how might they react to what's in there?"
 9              And he said something like, "It's not good."
10              And I said, "Well, then, Albert, I want
11    you -- I think you should find somebody with whom you
12    can talk openly about whatever's in that box."
13              And Albert said, "Should I get a lawyer?"
14              And I said, "Albert, I think that you should
15    talk to somebody, someone you trust, someone with whom
16    you can be perfectly open and honest about whatever it
17    is that's in that box."
18              And he said, "Should I call my father?"
19              And I said, "Yes.  If that person -- if you
20    feel like you can have that conversation with your
21    father, then I think you should call your father.  But
22    I think you need to talk to somebody that can help you
23    have that conversation."
24         Q.   Did you recommend that he talk to a lawyer?
25         A.   Did I recommend?  I -- what I said was -- I
```

```
 1    said, "Whomever you can talk to -- you need somebody

 2    that you can talk to about whatever's in that box."

 3               And he asked me, "Should I get a lawyer?"

 4               I said, "That -- you know, Albert, that's up

 5    to you."

 6         Q.   Did you discuss that interaction with Albert

 7    on August 26th with anybody else at Emory before

 8    Albert's suicide?

 9         A.   No.

10         Q.   Who was the directory of -- the director of

11    Emory's scholar program on August 30, 2019?

12         A.   Who was the director?  There -- so the,

13    like, interim functioning presiding supervisor would

14    have been Shari Obrentz.

15         Q.   Okay.  Did you speak to Shari Obrentz about

16    this encounter with Albert on August 26th?

17         A.   No.  I had no reason to.

18         Q.   And the director of the scholar program --

19    that position at the time was vacant?

20         A.   Yeah.  I mean, the position itself was

21    vacant.  I think the responsibilities, though -- the

22    sort of chain of command was intact, and that was

23    Shari.  Shari was the point person.

24         Q.   Did you become aware during Albert's life

25    that he received a notification of Jane Doe's Title IX
```

```
 1    exchange at -- on -- at the bottom -- text exchange on

 2    August 30, 2019, at 8:33 a.m.

 3           MS. HALDAR:  And we'd object to the

 4    characterization of this as a text message, for the

 5    record.  And that's in our discovery responses as

 6    well.

 7    BY MR. JOSHUA WHITMAN:

 8       Q.   What type of messaging service is this,

 9    Dr. Goode?

10       A.   Yeah.  It's not -- it's not Messenger.  It's

11    not text.  It's -- oh, my goodness.  It is -- I think

12    it's GroupMe.

13       Q.   Okay.

14       A.   Forgive me.  It's just -- it's -- I think

15    that's right.  It's just another -- it's another app.

16       Q.   And it's a way that you and Albert have

17    communicated in the past, according to this exhibit;

18    correct?

19       A.   And Exhibit 34 I think -- I think reflects

20    all of the direct contact that Albert and I had on

21    this --

22       Q.   All right.

23       A.   -- app.

24       Q.   And you sent two messages at 8:33.  First,

25    "Albert, I am outside the house.  Please call me,"
```

```
 1    followed by your telephone number.

 2         A.   Yes.

 3         Q.   All right.  And --

 4         A.   Because he didn't have it.  I don't think he

 5    had it.

 6         Q.   And what happened next after you sent this

 7    text?

 8         A.   What happened next.  In terms of next,

 9    Counselor, let me just give you sort of like -- I'm

10    not sure exactly the very next thing.  But I recall

11    walking the grounds of the house, and it appeared --

12    what I was looking for was Albert.

13              And I could see that there was a bicycle

14    inside.  There -- as I approached the house, there

15    was, like, a window that I could look into, almost

16    like a living room.  And I could see there was a

17    bicycle there.  And I was looking around to see if

18    Albert was there.

19              I was also looking over my shoulder to see

20    if he was going to come around the corner.  Because

21    one of the things that I was thinking about at that

22    time was Albert had said that, when he stayed at the

23    house previously, he had walked down the street to go

24    to McDonald's.

25              And so in my mind I'm thinking, "Did he just
```

 1  park his bike in there and did he go down to the

 2  McDonald's?  And is he going to appear with, like,

 3  McDonald's?"  And -- which, I mean, like McDonald's

 4  food, like a bag of food.

 5         And I was waiting outside.  And I started to

 6  walk around, and I'm thinking -- and it just seemed

 7  peculiar.  And I -- I walked around the back, knocked

 8  on the door.  As I recall, there may have been two

 9  doors in that house -- in the front of that house.  So

10  knocked on one; knocked on the other.

11         And then I began to get concerned.  And I

12  was rereading that email message, and I began to worry

13  that -- it was possible, in my mind, that maybe he

14  was -- he was -- actively needed me at that moment.

15  That there was something -- I don't know.  He was

16  stuck somewhere, that he was -- that he -- I mean, the

17  "please come find me."

18         And so I was out there, and I knew that I

19  had to make a decision.  I began to go around -- I was

20  looking if there were neighbors there, knocking on the

21  window, seeing if I could see him, knocking again on

22  the door.  And that's what I did next.

23         And I came to a moment where I thought,

24  "Okay.  I don't -- I have to make a decision here.

25  What am I going to do?"  And I thought it could be

1   that he's going to come right around that corner, in

2   which case I'll just talk to him and go to work.  And

3   I thought, if he is asking me for help and he's in

4   there and he's given me the address, then maybe he's

5   in trouble, and I've got to decide what I'm going to

6   do.

7           So I made a decision.  And I said, "Okay.

8   I'm just going to decide.  This is my choice."  And I

9   remember thinking, "Okay.  If I'm wrong, I'm going to

10  have to explain this to Albert.  I'm going to have to

11  explain this to I don't know who."  But I was like,

12  "Okay.  Here we go."

13          So I tried to -- tried -- not, like, force

14  my way into the door, began to yell out Albert's name.

15  And then I started to -- and I don't know the exact

16  sequence, Counselor.  I mean, I'm sure we could put

17  the exhibits out and look at the timeline.

18          At some point I contacted an Emory staff

19  member to try to get Albert's phone number because I

20  didn't have it.  And so I do that at some point.  And

21  then -- I can't even remember actually right now if I

22  called or not.  But I'm -- and then at some point I

23  decided, okay, I'm going to call 911.  I'm going to

24  call 911.  He may be in there.  He may be in trouble.

25          Q.   So you called 911.

```
 1        A.    I called 911.

 2        Q.    And the DeKalb Police Department came to the

 3   scene?

 4        A.    Well, sir, there were multiple responders.

 5   The first to respond was actually the fire department.

 6        Q.    And without getting into detail, who

 7   accessed the home?  A first responder?

 8        A.    Who accessed the home?

 9        Q.    Yeah.

10        A.    Well, we had -- sorry.  I don't mean to be

11   difficult.  So we were all there in the front yard.

12   So we had -- can you tell me what you mean by

13   "accessed the home"?

14        Q.    Who actually breached the home, went inside,

15   and found Albert?

16        A.    Yeah.  The fire department used a crowbar to

17   break the sort of seal, the lock; and then a police

18   officer drew his weapon, mule-kicked the door in, and

19   went through his protocols.  And one of the reasons

20   why was because the fire department had actually

21   gotten out a ladder, and they were in the back of the

22   house.  They had climbed the ladder.

23             And I was actually at the front of the house

24   at the time waiting -- it's a very busy street.  I was

25   just waiting for whomever else was going to -- you
```

```
 1    know, might show up.  And then they began to yell and

 2    shout.  And then that's when the police showed up.

 3    And they were gesturing to him.

 4             They crowbar -- he tries to mule-kick the

 5    door.  He can't get in.  They crowbar the door.  Then

 6    he does the mule kick, draws his weapon, and then he

 7    goes in.

 8             So -- I don't know.  So who accessed it?

 9    Fire department opens the door with a crowbar.  Police

10    officer kicks it in with a drawn weapon and goes

11    through what I imagine is his protocol for clearing a

12    house or whatever.

13        Q.   And are you advised within a short period of

14    time after these first responders enter the home that

15    Albert was found deceased in the home?

16        A.   Everybody went running in, sir, and then,

17    when they came walking out, that's the first thing

18    that I noticed.  And then was -- what was I advised.

19    I was advised that a body had been discovered.

20        Q.   Did you --

21        A.   Yes.

22        Q.   Did you see the body at the scene?

23        A.   I did not see the actual body.  I think at

24    one point I did see -- I may have seen the body with a

25    sheet essentially draped over it -- like, a white
```

1    sheet.

2         Q.    Who is the first person at Emory who you

3    called after -- who you contacted after you learned

4    that Albert had died?

5         A.    The first person I contacted after Albert

6    had died.  It would be one of two people, sir.  It

7    would either have been Shari Obrentz or Joanne

8    Brzinski.  I mean, I referenced the line of the sort

9    of chain of command, as it were, and that goes --

10   that's where it was in the Office of Undergraduate

11   Education.

12        Q.    And when you did reach out to one of those

13   people, did you already know that Albert had completed

14   a suicide?

15        A.    As you can imagine, it's kind of a blur.  I

16   think I -- that was -- I believe so.  I believe so.

17        Q.    And had you known it when you made that

18   call, would you have communicated it to that person --

19   that Albert had died by suicide?

20             MS. HALDAR:  Objection.  Form.

21        A.    Oh, I see.  So, Counsel, allow me to respond

22   in this way:  I think the determination of a death

23   hadn't happened at that time.  I think that -- in the

24   identification, I don't think it happened.  So what I

25   recall is that I was told that a body was in there,

# Exhibit A-II

Emory_002655

# FILED PROVISIONALLY UNDER SEAL

# Exhibit A-III

Plaintiffs' Exhibit 24 From Deposition of Dr. Goode (Albert Bi-Annual Report)

# FILED PROVISIONALLY UNDER SEAL

# Exhibit A-IV

Cited Excerpts From Deposition Transcript of Adrienne Bryant-Smith

In The Matter Of:
## *Zhang vs. Emory*

Deposition Of:
## *30(b)(6) Adrienne Smith*

Taken On:
## *7/11/2022*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



```
              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION

TIEQIAO ("TIM") ZHANG,         )
Individually, and as the       )
Independent Administrator of   )
the Estate of ALBERT LIANG     )
(a/k/a ALBERT ZHANG and f/k/a  )
LIANGSHENG ZHANG), deceased;   )
and JING ("LINDA") LIANG,      )
                               )
     Plaintiffs,               )
                               )    CIVIL ACTION
v.                             )    NO. 1:21-cv-868-CC
                               )
EMORY UNIVERSITY,              )
                               )
       Defendant.              )
```

_____

       VIDEOTAPED 30(b)(6) DEPOSITION OF EMORY UNIVERSITY
                   ADRIENNE BRYANT SMITH
_____

                      July 11, 2022
                       9:41 A.M.

                  Lawrence & Bundy LLC
            1180 West Peachtree Street NW
                     Suite 1650
                   Atlanta, Georgia


     By Jennifer Davis-McLain, RMR, CRR, CRC, CCR-2496

```
 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiffs:

 3            RICHARD H. MIDDLETON, JR., ESQUIRE
              Middleton LLC
 4            317 East Liberty Street
              Savannah, Georgia 31401
 5            912.660.3039
              rhm@middletonfirm.com
 6
              JOSHUA A. WHITMAN, ESQUIRE
 7            Milton Leach Whitman D'Andrea & Eslinger,
                 P.A.
 8            3127 Atlantic Boulevard
              Jacksonville, Florida 32207
 9            904.346.3800
              jwhitman@miltonleach.com
10
              ALEX J. WHITMAN, ESQUIRE (as noted)
11            Cunningham Swaim, LLP
              4015 Main Street
12            Suite 200
              Dallas, Texas 75226
13            214.646.1495
              awhitman@cunninghamswaim.com
14

15    On behalf of the Defendant:

16            LISA M. HALDAR, ESQUIRE
              ALLEGRA J. LAWRENCE-HARDY, ESQUIRE
17            Lawrence & Bundy LLC
              1180 West Peachtree Street NW
18            Suite 1650
              Atlanta, Georgia 30309
19            404.400.3350
              lisa.haldar@lawrencebundy.com
20            allegra.lawrence-hardy@lawrencebundy.com

21

22

23

24

25
```

```
 1    ALSO PRESENT:

 2             JESS WIGGINS, VIDEOGRAPHER

 3             AMY ADELMAN, ESQUIRE
               Emory University
 4

 5

 6

 7                      — — —

 8

 9

10

11

12

13          (Reporter disclosure made pursuant to
      Article 10.B of the Rules and Regulations of the Board
14    of Court Reporting of the Judicial Council of
      Georgia.)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    INDEX TO EXAMINATIONS

 2                                                    PAGE

 3    ADRIENNE BRYANT SMITH

 4    Examination by Mr. Middleton .....................8
      Examination by Ms. Haldar .....................118
 5    Further Examination by Mr. Middleton ...........126

 6

 7

 8                     INDEX TO EXHIBITS

 9    EXHIBIT               DESCRIPTION                PAGE

10    For the Plaintiffs:

11    Exhibit 1      Plaintiffs' Second Amended Notice .19
                     of Taking Videotaped Deposition
12                   Duces Tecum of Defendant Emory
                     University
13
      Exhibit 2      Defendant's Objections and ........19
14                   Responses to Plaintiff's Second
                     Amended Notice of Taking
15                   Videotaped Deposition Duces Tecum
                     of Defendant Emory University
16
      Exhibit 3      Save a Life Week: QPR Suicide .....27
17                   Prevention Training screenshots

18    Exhibit 4      Email chain ending Friday, ........52
                     30 August 2019, from Tomika
19                   DePriest (Emory_003065)

20    Exhibit 5      Counseling & Psychological ........60
                     Services (CAPS) Client Notes for
21                   Albert Zhang

22    Exhibit 6      American Psychological ...........67
                     Association "Suicide prevention
23                   goes to school"

24

25
```

```
 1                 INDEX TO EXHIBITS (cont.)

 2     EXHIBIT              DESCRIPTION              PAGE

 3     Exhibit 7      Emory University Suicide ..........85
                      Prevention Resource Center
 4                    Organization Contact

 5     Exhibit 8      Wednesday, 28 August 2019, email .104
                      from Judith Pannell
 6                    (Emory_002432-002433)

 7     Exhibit 9      Emory University Office of .......106
                      Title IX documents (Emory_002998
 8                    and Emory_002989)

 9     Exhibit 10     Friday, 30 August 2019, email ....114
                      from Wanda Collins (Emory_003207)
10
       For the Defendant:
11
       Exhibit 1      Counseling & Psychological .......124
12                    Services (CAPS) Notes for Albert
                      Zhang (Emory_00782-00805)
13

14

15

16
                         ___ ___ ___
17

18

19

20         (The following transcript may contain quoted
       material; such material is reproduced as read or
21     spoken.)

22

23
                         ___ ___ ___
24

25
```

```
  1    BY MS. HALDAR:

  2        Q.   When I say "nonclinician," to clarify, I

  3    mean somebody without medical training.

  4             MR. MIDDLETON:  Objection.

  5    BY MS. HALDAR:

  6        Q.   You can answer.

  7             MR. MIDDLETON:  It's outside the scope of

  8    her training.

  9    BY MS. HALDAR:

 10        Q.   You can answer, Ms. Smith.

 11        A.   Yes.  Say that again.  I'm --

 12        Q.   Let me -- did Albert portray any signs of

 13    suicide risk that a nonclinician could recognize --

 14    someone without medical training?

 15             MR. MIDDLETON:  Same --

 16        A.   No.

 17             MR. MIDDLETON:  -- objection.

 18        A.   Absolutely not.

 19    BY MS. HALDAR:

 20        Q.   Did Albert portray any signs of suicide

 21    risk -- and I can tie this to Topic No. 3 -- that a

 22    clinician, such as Dr. Duffy, would have recognized

 23    when he visited CAPS?

 24        A.   No, he did not.

 25        Q.   Had Dr. Goode received QPR training, do you
```

```
 1   believe it would have made a difference in his

 2   responses to meeting with Albert?

 3            MR. MIDDLETON:  Objection.

 4       A.   No.

 5   BY MS. HALDAR:

 6       Q.   Are there any circumstances under which CAPS

 7   would have treated Albert as a minor without his

 8   parents' consent?

 9       A.   Yes.

10       Q.   What are those circumstances?

11       A.   If he presented with suicidal ideation at

12   the time of his intake, he would have been referred to

13   hospitalization.

14       Q.   And would he have needed his parents'

15   consent for that hospitalization?

16       A.   No.

17       Q.   Can you tell us about Emory's suicide

18   prevention coordinator?

19       A.   Dr. Romero Huffstead?

20       Q.   Yes.

21       A.   Yes.  Dr. Huffstead has been at Emory, I

22   believe, since 2017.  He is a therapist in CAPS, and

23   he pretty much goes into different place -- spaces,

24   whether they're orientation spaces, student group

25   spaces, and talks about suicide prevention and how to
```

```
 1        A.    Right.

 2        Q.    Passed away.

 3              All right.  You said that Albert had no

 4   suicidal tendencies.

 5        A.    Correct.

 6        Q.    None?

 7        A.    None.  He was future-oriented.  In the line

 8   that -- where he says he does not want to -- well, the

 9   last thing -- "He will contact CAPS for case

10   assignment after 10/21" -- which indicates that he had

11   plans on being alive on his birthday.  And for a

12   clinician, that is a safety factor.

13              As long -- when you -- we look for

14   students -- or for clients, individuals, to be

15   forward-thinking and future-oriented.  An indicator of

16   suicide is that somebody is not forward-thinking or

17   future-oriented, and that's a part of the assessment.

18        Q.    All right.  That assessment was made in

19   June; correct?

20        A.    Correct.

21        Q.    Doesn't take into account, of course,

22   because it couldn't, what happened involving Albert

23   later and before he actually passed away; correct?

24              MS. HALDAR:  Objection.  Vague.  I'm not

25   sure -- okay.  I would ask you --
```

# Exhibit A-V

Defendant's Exhibit 1 From Deposition of Adrienne Bryant-Smith (Albert's CAPS
records)

# FILED PROVISIONALLY UNDER SEAL

# Exhibit A-VI

Plaintiffs' Exhibit 12 From Deposition of Dr. Goode (EPD Supplemental Case Report)

# FILED PROVISIONALLY UNDER SEAL

# Exhibit A-VII

Emory_002221

**Date:** Wed, 21 Aug 2019 7:42:14 AM -0400
**Sent:** Wed, 21 Aug 2019 7:40:07 AM -0400
**Subject:** RE: Tomorrow's Meeting
**From:** Druss, Benjamin G
**To:** Liang, Albert Zhang <aliang6@emory.edu >; Ku, Benson Steven <benson.steven.ku@emory.edu >; Lally, Cathy <clally@emory.edu >;

Hi Albert,
No problem, I hope everything is OK.
No rush on meeting –let's wait until you have something written up that we can discuss.
Keep us posted and let us know if anything would be helpful.

Ben

Benjamin Druss MD, MPH
Professor and Rosalynn Carter Chair in Mental Health
Rollins School of Public Health
1518 Clifton Rd, NE Room 638
Atlanta GA 30322
404-712-9602 (office phone)
404-727-9198 (fax)
bdruss@emory.edu

**From:** Liang, Albert Zhang <aliang6@emory.edu>
**Sent:** Tuesday, August 20, 2019 7:14 PM
**To:** Druss, Benjamin G <bdruss@emory.edu>; Ku, Benson Steven <benson.steven.ku@emory.edu >; Lally, Cathy <clally@emory.edu >
**Subject:** Tomorrow's Meeting

Hi All,

Bad news? Unfortunately, I don't think I'll be able to make it to tomorrow's meeting. I'm very sorry for the late notice. A recent unfortunate series of events has caused me to become temporarily homeless myself (ironic, I know). I will be fine and I do have a place to stay, but I just don't think I'll be able to make the meeting tomorrow.

Could I get back to you later in the week to find another time?

Apologies,
Albert

Emory_002221

# Exhibit A-VIII

Plaintiffs' Exhibit 33 From Deposition of Dr. Goode (Emory_000032)

## FILED PROVISIONALLY UNDER SEAL