IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TIEQIAO ("TIM") ZHANG, Individually, and as the Independent Administrator of the Estate of ALBERT LIANG (a/k/a ALBERT ZHANG and f/k/a LIANGSHENG ZHANG), deceased; and JING ("LINDA") LIANG, <br><br>Plaintiffs, <br><br>v. <br><br>EMORY UNIVERSITY, <br><br>Defendant. | CIVIL ACTION NO. <br><br>1:21-cv-00868-AT |

## REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

In further support of its motion to dismiss Plaintiffs' Amended Complaint, Defendant Emory University ("Emory") states as follows:

**I. Plaintiffs gloss over the purpose of (and issue raised by) the materials attached to Exhibit A of Emory's motion to dismiss.**

Repeating the same arguments from their separate objection and objection reply, (ECF Nos. 82, 84), Plaintiffs claim Emory's Exhibit A asks this "Court to consider a one-sided evidentiary record," (Pls.' Br. Opp'n Mot. Dismiss Am. Compl. 5-8, ECF No. 81 ["Pls.' Br."]). Plaintiffs are mistaken. Plaintiffs' initial complaint lacked a sufficient factual basis to plead foreseeability plausibly. (Order 22, Mar. 8, 2022, ECF No. 41 ["Order"].) Plaintiffs claim they have now alleged sufficient facts based on the pre-dismissal, plausibility discovery they were

1

permitted. (Pls.' Br. 2, 3, 11-12.) Yet, their new (and recycled) allegations contradict discrete documents and deposition testimony Plaintiffs obtained in that discovery. While Emory is not asking the Court to weigh evidence or make credibility determinations, Plaintiffs should not be given a motion-to-dismiss pass by purporting to base their claims upon information gathered in discovery while cherry-picking from that information to create a false impression. Under these circumstances, ample case law supports the Court's ability to consider the Exhibit A materials without summary judgment conversion.[1]

Moreover, contrary to Plaintiffs' claim of a "spurious accusation," (Pls.' Obj. Reply 14), Exhibit A does implicate Plaintiffs' counsel's obligations under Federal Rule of Civil Procedure 11(b)(3) to ensure their "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" Because despite having had an opportunity for both further investigation *and* discovery, Exhibit A demonstrates the use of that opportunity only to bolster Plaintiffs' new complaint with an ongoing assortment of falsely pled facts and half-truths. Rule 11 exists in part because unfounded allegations result in real-life impact, beyond the burden of legal fees,

---

[1] (*See* Def.'s Br. Supp. Mot. Dismiss Am. Compl. 4-7 ["MTD"], ECF No. 75-1; Def.'s Opp'n to Pls.' Obj. 5-11, ECF No. 83.) Plaintiffs' later attempts to distinguish the generally applicable holdings by focusing on inconsequential details or facts of those cases are unavailing. (*See, e.g.*, Pls.' Obj. Reply 6-9, 12-13, ECF No 84.)

particularly in a tragic and sensitive case such as this. Indeed, Plaintiffs' counsel have acknowledged they are "not insensitive to the emotions that have been at play on the other side in that this was not an easy matter for Dr. Goode to be involved in and exposed to." (Tr. Tel. Conf. Proceedings, July 6, 2022, 17:20-23, ECF No. 71.) Yet, Exhibit A reflects anything but sensitivity as Plaintiffs continue to accuse Dr. Goode, Emory, and Albert's ex-girlfriend of distressing conduct Plaintiffs know (or have every reason to know) lacks the evidentiary support Rule 11(b)(3) requires. Exhibit A is not, as Plaintiffs claim, a ground to deny Emory's motion.

**II. Plaintiffs' response brief does not cure the Amended Complaint's continued failure to plead foreseeability plausibly.**

**A. Plaintiffs cannot overcome the absence of any concrete knowledge that Albert was considering suicide.**

"Plaintiffs do not dispute that a direct statement alerting Emory of Albert's potential for self-harm has not been uncovered . . . ." (Pls.' Br. 9; *see also id.* at 11.) Recognizing this shortcoming, Plaintiffs argue that an explicit statement of suicidal intent is unnecessary to establish foreseeability, (Pls.' Br. 8-9), later characterizing the law as "still-developing," (Pls.' Obj. Reply 15). But Plaintiffs are asking the Court to rule differently from the law that *is* developed, which, even without an explicit statement of suicidal intent, still involves "some allegations or evidence that university faculty or staff were more directly alerted to the danger of a potential suicide . . . ." (Order 22.) Rather than address these analogous cases discussed by

3

both this Court and Emory, (Order 22-24; MTD 8-10 & n.6), Plaintiffs relegate them to a footnote, (Pls.' Br. 9 n.2), focusing instead on two cases that only reinforce Plaintiffs' inability to allege foreseeability plausibly.[2]

Specifically, in *Leary v. Wesleyan University*, (Pls.' Br. 9), the student called the university "emergency line" at 1 AM, complained he was suffering from an anxiety attack, and stated, "It's really getting to the point where [he] could no longer function." No. CV055003943, 2009 WL 865679, at *1, *9 (Conn. Super. Ct. Mar. 10, 2009). The university's public safety officers—who were subject to a public policy manual that addressed how to respond to student mental health crises and explained the corresponding risk of the student harming himself or others—responded to the call, transported the student to the hospital, and "dropped him off without further investigating or securing medical attention for him." *Id.* The court found the student's resultant suicide could have been foreseeable because the university's public safety policy "provided evidence that the defendant was aware that suicide was a general risk, *when dealing with an individual who was in mental distress, and the plaintiff provided evidence that Leary was suffering from mental*

---

[2] The case Plaintiffs later cite in their objection reply, (Pls.' Obj. Reply 4 n.2 (citing *Brantley v. Jones*, 871 S.E.2d 87 (Ga. App. 2022))), provides the same reinforcement, given the record in *Brantley*, unlike any allegations here, reflected the inmate "was known to be under the influence of both drugs and alcohol . . . [and] acted in an emotionally disturbed manner." 871 S.E.2d at 97.

*distress at the time he made the call.*" *Id.* at *10 (emphasis added). Plaintiffs' allegations, however, center upon the actions of Dr. Goode, who was an academic advisor and not a public safety officer responding to a mental health emergency like the Wesleyan public safety officers. Nor can Plaintiffs allege Albert indicated to Dr. Goode (or anyone else) that Albert, like Mr. Leary, was suffering from mental distress, having an anxiety attack, or stating he could no longer function.[3]

Plaintiffs also rely on *Roohbakhsh v. Board of Trustees*, 409 F. Supp. 3d 719 (D. Neb. 2019). (Pls.' Br. 10.) Ironically, *Roohbakhsh* involves the Title IX "deliberate indifference" standard that Plaintiffs later disclaim as a distinction rendering inapplicable *Wyke v. Polk County School Board*, 129 F.3d 560 (11th Cir. 1997), (Pls.' Br. 24)—which case Emory cited to support the absence of a duty to train school personnel in suicide prevention, (MTD 19). Even so, *Roohbakhsh* involved concrete awareness Plaintiffs cannot allege here. There, various high-level "school officials, including coaches, the athletic director, the residence hall director, and the vice-president of student affairs had *actual knowledge*" that the decedent-student was a victim of dating violence, including from hearing the decedent scream at the perpetrator to get his hands off her from within the dorm room. *Roohbakhsh*,

---

[3] Plaintiffs' reference to the purported expert report they filed with the Court, (Pls.' Br. 11 n.3)—offered by a doctor who never met or talked to Albert and who reached an opinion well before Dr. Goode was deposed—provides no factual basis to allege Emory had a more concrete awareness that Albert was contemplating suicide.

5

409 F. Supp. 3d at 736 (emphasis added). The same college officials were also aware the decedent "exhibited troubling behavior in that she was withdrawn and emotional and had cut off relationships with friends." *Id.* Here, however, Plaintiffs have no factual basis to allege Emory knew Albert was a victim of dating violence; and even taking as true Plaintiffs' baseless allegations otherwise, they fall short of the level of knowledge the *Roohbakhsh* college officials held.[4] Moreover, Plaintifffs' pre-dismissal discovery revealed the opposite of the record in *Roohbakhsh*: Albert was not withdrawn or emotional, he continued to have friends, and he was making plans for the future.[5]

### B. Plaintiffs' "totality" of factors did not directly alert Emory that Albert's suicide was even a tangible possibility, let alone a plausible likelihood.

Federal Rule of Civil Procedure 8 requires a plaintiff to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.*

---

[4] *Cf. Benefield ex rel. Benefield v. Bd. of Trs. of Univ. of Ala.*, 214 F. Supp. 2d 1212, 1219 (N.D. Ala. 2002) (finding failure to state a claim under deliberate indifference standard where "the plaintiff here never complained [about sexual harassment] to her parents and never complained to the UAB administration").

[5] The other two cases Plaintiffs cite, (Pls.' Br. 10-11), likewise highlight that suicide foreseeability requires more concrete knowledge than is alleged here—e.g., knowledge of extensive and pervasive bullying or harassment of the student resulting in serious injuries; known diagnoses of mental-health disorders of the student; and/or knowledge that two other students had attempted suicide due to bullying in the months prior to the student's suicide. *See ElSharkawy v. Chisago Lakes Sch. Dist. Bd. of Educ.*, No. 20-1971, 2021 WL 3293627, at *8 (D. Minn. Aug. 2, 2021); *Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 810-11 (S.D. Ohio 2018).

*Twombly*, 550 U.S. 544, 555-56 (2007). But *Iqbal* and *Twombly* distinguish plausibility and possibility: "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 550 U.S. at 679 (second alteration in original) (quoting Fed. Rule Civ. P. 8(a)(2)); *id.* at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." (citing *Twombly*, 550 U.S. at 556)).

Plaintiffs acknowledge this Court has determined Plaintiffs' initially alleged totality of factors was not enough to plausibly state foreseeability. (Pls.' Br. 11.) Plaintiffs nevertheless believe their totality is now sufficient because of their "significant new allegations based on the limited discovery permitted by the Court." (Pls.' Br. 11-12.) But as demonstrated in Emory's motion, (MTD 13-17), and as further described below, Plaintiffs' three new foreseeability allegations, (Am. Compl. ¶¶ 270, 277, ECF No. 78), fail to "nudge[]" their claim of foreseeability "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

### 1. Dr. Goode's Alleged Statement to Emory Police Department ("EPD")

Plaintiffs allege that "fifteen (15) days before ALBERT's death by suicide, ALBERT appeared to Goode to be suicidal, a fact which Goode told officers with the EPD on the day of ALBERT's suicide." (Am. Compl. ¶ 199.[6]) While Plaintiffs

---

[6] (*Cf.* MTD Ex. A-VI, ECF No. 75-2 (EPD Report) ("He stated that they had

know Dr. Goode has admitted nothing of the kind, Emory is not asking the Court to consider whether Dr. Goode was or was not telling the truth under oath. What is an appropriate consideration, however, is whether, under Rule 8, this alleged statement "*plausibly* allege[s] foreseeability . . . ." (Order 26-27 (emphasis added).) And "[o]n a Rule 12(b)(6) motion to dismiss, when a court considers the range of possible interpretations of the defendant's alleged conduct, if the 'more likely explanations' involve lawful, non-actionable behavior, the court should find that the plaintiff's claim is not plausible." *Heng v. Donald*, No. 7:08-CV-5 HL, 2011 WL 925726, at *12 (M.D. Ga. Jan. 25, 2011) (quoting *Iqbal*, 556 U.S. at 681-82); *accord Candlelight Mini Storage, Inc. v. Chubb Grp. Ins. Cos.*, No. 8:12-CV-393-T-30MAP, 2012 WL 2154344, at *1 (M.D. Fla. June 13, 2012) ("[W]hen the factual allegations are 'not only compatible with, but indeed [are] more likely explained by' lawful activity, the complaint must be dismissed." (second alteration in original) (quoting *Iqbal*, 556 U.S. at 681)).

Even had Plaintiffs not had the benefit of Dr. Goode's own, sworn explanation during plausibility discovery, Dr. Goode's alleged statement to EPD officers at the scene of Albert's death—that he had a student who appeared to be suicidal—is not only compatible with but is more likely explained by the very facts

---

received a report from an Emory Professor, Edmund Goode, stating that he had a student (Albert Liang, preferred name Albert Zhang) who appeared to be suicidal and provided the address of 3709 N Druid Hills Rd.").)

8

alleged in Plaintiffs' Amended Complaint: Dr. Goode receiving a cryptic early-morning email from Albert asking Dr. Goode to meet at an off-campus address, receiving no response from Albert, arriving at the address of an abandoned home; and still not finding Albert or receiving any response from him. Conversely, Plaintiffs' interpretation of Dr. Goode's alleged statement to mean he somehow knew Albert was suicidal two weeks before his death, (Am. Compl. ¶ 199), hardly qualifies as possible, let alone plausible, considering Plaintiffs possess pre-dismissal discovery revealing Dr. Goode's sworn, unequivocal testimony that he never suspected Albert was suicidal. *Cf. McCurdy v. Auburn Univ.*, No. 3:14CV226-MHT, 2015 WL 2064248, at *5 (M.D. Ala. May 4, 2015) (recognizing a defendant's ability to undermine the plausibility requirement if the defendant's interpretation of an alleged statement had been a more likely explanation than the plaintiff's interpretation of the statement as racially tinged). Plaintiffs therefore cannot, at least not in good faith, posit they have "a reasonable expectation that discovery will reveal evidence" supporting their interpretation. *Twombly*, 550 U.S. at 556.[7] Given the more likely explanation, the EPD report statement itself is incapable of

---

[7] Plaintiffs want to depose the EPD officers at the scene. (Pls.' Br. 6 n.1.) Even if the officers were to testify they recalled Dr. Goode making the statement written in the report, such would not shed light on, nor would it create an issue of fact for a jury as to, what Dr. Goode knew or believed about Albert's potential for suicide prior to his death. Such information resides only with Dr. Goode, and he has already been required to testify to that information in a seven-hour deposition.

establishing the foreseeability of Albert's suicide, i.e., it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2. Albert's Alleged Homelessness

Plaintiffs allege, "Emory knew ALBERT was in crisis as a result of his homelessness[.]" (Am. Compl. ¶ 270(iii)(e); *id.* ¶ 277(iii)(e).) To combat this allegation's inability to establish foreseeability, Plaintiffs claim Emory "ignores the full context." (Pls.' Br. 18.) But Plaintiffs' conclusory allegation about the content of the Emory QPR program, (*id.* (citing Am. Compl. ¶ 72)), is irrelevant given Plaintiffs have no factual basis to plead anyone at Emory believed Albert to be homeless. Moreover, the "confluence of factors" Plaintiffs cite, (*id.*), are the same factors from their original complaint that this Court said were "not sufficient, without more, to support a factual inference" of foreseeability. (Order 22.)[8]

### 3. Counseling & Psychological Services ("CAPS") Information

Plaintiffs' foreseeability argument based on Albert informing CAPS about his inability to communicate adequately with his parents is puzzling. (Pls.' Br. 19-20.)

---

[8] Plaintiffs also criticize Emory's reliance on *Johnson v. 3M*, (Pls.' Br. 18), which establishes negligence liability "if, in *ordinary prudence*, [the defendant] might have foreseen that some injury would result from [its] act or omission." 563 F. Supp. 3d 1253, 1321 (N.D. Ga. 2021) (emphasis added) (citation omitted). Yet, Plaintiffs point to no case law suggesting an ordinarily prudent person would have foreseen suicide because someone expressed they were homeless (or, in this case, expressing they were *not* homeless, were fine, and had a place to stay)

10

Indeed, Plaintiffs have known since shortly after Albert's death that nothing in the CAPS records revealed him to be a suicide risk. Plaintiffs' continued focus on Albert's age does not change this deficiency. Nor does it effectively distinguish the analogous cases of *Sacchetti v. Gallaudet University*, 181 F. Supp. 3d 107 (D.D.C. 2016) and *Nguyen v. MIT*, 96 N.E.3d 128 (Mass. 2018). (Pls.' Br. 19-20 & 25.) Because even if Albert's age is relevant to the creation of a duty, (*see* Order 18),[9] Albert's age is not determinative of foreseeability.

***

That Emory should have foreseen Albert's suicide by piecing together the attenuated factors Plaintiffs allege—*none* of which directly alerted Emory that Albert was contemplating suicide—is neither factually plausible nor sound legal policy.

---

[9] The United States District Court for the Northern District of Alabama rejected the creation of a special duty to minor college students under Title IX, providing an analysis Emory posits should be equally applicable here:

> Clearly, college students are uniquely different from high school, junior high school and elementary school students. This court can find no notice to the defendant from which it should have been aware it stood *in loco parentis*, nor does the court believe the creation of such a duty is in the public interest. . . .
>
> "It is not reasonable to conclude today that seventeen year old college students necessarily require parental supervision. If they did, society might place more limitations upon the ability of a minor to attend college than currently exist. A college freshman is just that; whatever his or her age."

*Benefield*, 214 F. Supp. 2d at 1220 (quoting *Hartman v. Bethany Coll.*, 778 F. Supp. 286, 294 (N.D.W. Va. 1991)).

### III. Plaintiffs' negligent failure-to-train claim is missing duty and causation.

To cure the absence of a legally cognizable duty to train Dr. Goode or anyone else specifically on suicide prevention, Plaintiffs attempt to manufacture a duty under the Good Samaritan rules in sections 323 and 324A of Restatement (Second) of Torts. (*See* Pls.' Br. 24 (citing *Huggins v. Aetna Ca. & Sur. Co.*, 264 S.E.2d 191, 192 (Ga. 1980)).)[10] While courts have considered the Good Samaritan doctrine in college suicide cases, they have not done so under the factual circumstances here or in a failure-to-train context. For example, in *Leary*, (Pls.' Br. 23), the court applied the doctrine because the public safety officers' actions—undertaking to help the student and then failing to ensure he obtained proper medical attention—increased the risk of harm to the student. 2009 WL 865679, at *6-8. Unlike *Leary*, this case is not one where emergency responders knew Albert was in a mental health crisis, undertook to help Albert with the crisis, or failed to follow through appropriately. Rather, this case is more akin to those cases where courts have rejected "a duty of care arising out of the 'Good Samaritan' principle[.]" *Sacchetti*, 181 F. Supp. 3d at 121 (considering that even where the university assured the decedent's parents the university was equipped to address the decedent's mental health issues, the decedent

---

[10] Plaintiffs also rely upon *Brandvain v. Ridgeview Institute, Inc.*, 372 S.E.2d 265, 271 (Ga. App. 1988), (Pls.' Br. 23), but *Brandvain* did not even involve the Good Samaritan doctrine, let alone a failure-to-train claim and instead announced a specific duty a private hospital owes to its patients.

never proactively sought mental health treatment from the university and was denied assistance so as to implicate the Good Samaritan doctrine); *see also Jain v. Iowa*, 617 N.W.2d 293, 297-300 (Iowa 2000) (rejecting legal duty under Good Samaritan doctrine because, inter alia, the student rebuffed the college's offer to help the student cope with his suicidal ideations and never "relied, to his detriment, on the services gratuitously offered by these same personnel").

Notably, the series of allegations to which Plaintiffs refer about Emory holding "itself out to its students and their parents as focused on suicide prevention" and purportedly training "anyone who had daily contact with Emory students," (Pls.' Br. 21), arise from an unverified 2014 internet article, of which Plaintiffs do not allege either Albert or his parents ever had knowledge before or during Albert's 2018-2019 enrollment at Emory, let alone relied upon to their detriment.[11] Nor do Plaintiffs claim Emory's alleged failure to train Dr. Goode specifically on suicide prevention converted a previously safe campus to a hazardous one (indeed, Dr. Goode was and is thoroughly qualified to work with students, including Albert).[12] Thus, Plaintiffs state no allegations establishing a duty (to train or otherwise) arising

---

[11] *See Smallwood v. United States*, 988 F. Supp. 1479, 1482 (S.D. Ga. 1997) ("[A]ctual knowledge . . . must exist and a general knowledge . . . would be insufficient under Georgia law [Restatement § 324A] to establish reliance.").

[12] *See Argonaut Ins. Co. v. Clark*, 154 Ga. App. 183, 185 (1980) ("Subparagraph (a) [of § 324A] applies only when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed.").

out of the Good Samaritan doctrine.

Even if they could establish a duty, it would not be enough: "causation of the alleged injuries" is also necessary to state a negligence claim. (Order 13.) And here, given their pre-dismissal discovery, Plaintiffs cannot "reasonabl[y] expect[] that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, supporting their allegation that Albert's suicide was the result of Emory's alleged failure to train Dr. Goode on suicide prevention specifically, (Pls.' Br. 22).[13] Indeed, even Plaintiffs' Amended Complaint does not allege that Albert "gave enough signs that he was about to commit suicide such that suicide prevention training would have allowed [Dr. Goode] (or any other [Emory personnel] . . .) to notice his intentions and act to stop them." *Avila v. Harlingen Indep. Consol. Sch. Dist.*, No. 1:21-CV-111, 2021 WL 5921458, at *6 (S.D. Tex. Nov. 22, 2021) ("While the Plaintiffs have pled [in a § 1983 claim] that [the student's teacher] was given no training on suicide prevention, the Court cannot say that [the sixth-grade student's] suicide was the highly predictable consequence of such failure. . . . '[S]uicide is inherently difficult

---

[13] While not determinative of Plaintiffs' failure to state a claim, Emory is compelled to point out that the testimony upon which Plaintiffs rely does not plausibly suggest that "Emory had the false impression that Goode had received suicide prevention training from a previous employer and had therefore not provided Goode with any suicide prevention training at all[.]" (Pls.' Br. 3.) Emory's 30(b)(6) deponent testified only that Dr. Goode worked under a nurse practitioner at his prior employer, Agnes Scott, and was familiarized with risk assessments. Dr. Goode testified he had no training on suicide prevention but recalled having a conversation with his Agnes Scott supervisor around identifying concerning behaviors.

for anyone to predict.'" (citation omitted)).[14] Stated differently, even if Emory had required training on suicide prevention, training college personnel to identify a student suicide risk based on Plaintiffs' "totality" approach—where that totality includes no indication a student is even in a mental health crisis, let alone considering suicide—asks them "to foresee a harm which may or may not be foreseeable, depending on the clarity of [their] crystal ball." *Wyke*, 129 F.3d at 574 (citation omitted). Holding a college effectively strictly liable whenever that crystal ball fails would counterproductively discourage colleges from ever offering suicide prevention training or implementing suicide prevention protocols.

## IV.    Conclusion

Because Plaintiffs still cannot allege facts that plausibly demonstrate Albert's suicide was foreseeable—at least not to the degree required by *Iqbal*, *Twombly*, and their progeny (and Plaintiffs' Rule 11 obligations)—Plaintiffs fail to state a claim for negligence and their Amended Complaint should be dismissed.

***

Pursuant to Local Rule 7.1(D), I hereby certify the foregoing has been

---

[14] *Cf. Estate of v. Atl. Cnty.*, No. CV 18-1953, 2020 WL 7022947, at *8 (D.N.J. Nov. 30, 2020) (rejecting § 1983 failure-to-train claim because no reasonable juror could find a known or obvious training deficiency caused the failure to prevent the prisoner's suicide); *Adams v. United States*, No. 3:19-CV-00804, 2022 WL 1538649, at *15 (D. Or. May 16, 2022) ("Plaintiff cannot prove causation here because her theory requires this court to impermissibly speculate as to whether a longer hospitalization would have prevented Adams's suicide 24 days later.").

prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C), specifically Times New Roman 14 point.

Respectfully submitted this 18th day of November, 2022.

**Allegra J. Lawrence**
Allegra J. Lawrence (Georgia Bar No. 439797)
Lisa M. Haldar (Georgia Bar No. 733508)
Rodney J. Ganske (Georgia Bar No. 283819)
Attorneys for Defendant
LAWRENCE & BUNDY LLC
1180 West Peachtree Street, NW, Suite 1650
Atlanta, Georgia 30309
Telephone: (404) 400-3350
Facsimile: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
lisa.haldar@lawrencebundy.com
rod.ganske@lawrencebundy.com